**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

MICHELE SAUNDERS and RICHARD HAYDEN, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

HEARST TELEVISION, INC.,

Defendant.

Case No. 1:23-cv-10998

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

Hon. Rya W. Zobel

Dated: August 9, 2023

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

**BURSOR & FISHER, P.A.**
Yitzchak Kopel*
Max S. Roberts*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-Mail: creilly@bursor.com

**Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

NATURE OF THE ACTION ..... 1

FACTUAL BACKGROUND ..... 2

I. HISTORY AND OVERVIEW OF THE VPPA ..... 2

II. DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ..... 3

III. DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES ..... 6

A. Testing Reveals That Defendant Illegally Shares Its Consumers' PII And Viewing Information With Third Parties, Braze And Google ..... 6

1. Overview Of The Braze API ..... 9

2. Overview Of The DoubleClick API ..... 10

3. Defendant Discloses Class Members' E-Mail Addresses To Braze ..... 11

4. Defendant Discloses Class Members' Geolocation To Braze And Google ..... 12

5. Defendant Discloses Class Members' Advertising IDs To Google ..... 14

6. Defendant Discloses Class Members' User IDs to Braze ..... 16

7. Defendant Discloses Information Identifying Which Specific Videos Were Watched By Which Specific Class Members To Braze And Google ..... 16

B. Defendant Discloses Personally Identifiable Information To Third Parties For The Purpose Of Marketing, Advertising, And Analytics ..... 23

1. Defendant Discloses Personally Identifiable Information To Braze For The Purpose Of Marketing, Advertising, And Analytics ..... 23

2. Defendant Discloses Personally Identifiable Information To Google For The Purpose Of Marketing, Advertising, And Analytics ..... 27

C. Defendant Knowingly Discloses Its Consumers' PII To Braze And Google ..... 31

IV. EXPERIENCES OF PLAINTIFFS ........ 34

A. Experience Of Plaintiff Michele Saunders ........ 34

B. Experience Of Plaintiff Richard Hayden ........ 36

PARTIES ........ 37

JURISDICTION AND VENUE ........ 37

CLASS ALLEGATIONS ........ 39

CAUSES OF ACTION ........ 41

VIOLATION OF THE VPPA, 18 U.S.C. § 2710 ........ 41

PRAYER FOR RELIEF ........ 43

JURY DEMAND ........ 43

Plaintiffs Michele Saunders and Richard Hayden ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by and through their attorneys, make the following allegations pursuant to the investigation of their counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. This is a class action suit brought against Defendant Hearst Communications, Inc. ("Hearst" or "Defendant") for violating the Video Privacy Protection Act ("VPPA").

2. The United States Congress passed the VPPA in 1988, seeking to confer onto consumers the power to "maintain control over personal information divulged and generated in exchange for receiving services from video tape service providers." S. Rep. No. 100-599, at 8. "The Act reflects the central principle of the Privacy Act of 1974: that information collected for one purpose may not be used for a different purpose without the individual's consent." *Id.*

3. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710.

4. Defendant owns and operates multiple mobile applications containing videos that provide "local news, national news, sports, traffic, politics, [and] entertainment stories."[1] At a minimum, this includes but is not limited to: KCCI 8 News and Weather, KMBC 9 News and Weather, WBAL-TV News and Weather, WCVB News Center 5, WGAL News 8 News and Weather, WISN 12 News and Weather, WLKY News and Weather, WMUR 9 News and Weather,

---

[1] GOOGLE STORE, WMUR 9 NEWS, https://play.google.com/store/apps/details?id= com.hearst.android.wmur&hl=en_US&gl=US&pli=1.

WPBF 25 News and Weather, WTAE Action News 4, WYFF News 4 and Weather, and WJCL – Savannah News, Weather (the "Apps").

5. Unbeknownst to Plaintiffs and Class Members, Defendant knowingly and intentionally discloses its users' personally identifiable information—including a record of every video viewed by the user—to unrelated third parties. By doing so, Defendant violated the VPPA.

6. Plaintiffs bring this action for damages and other legal and equitable remedies resulting from Defendant's violations of the VPPA.

## FACTUAL BACKGROUND

### I. HISTORY AND OVERVIEW OF THE VPPA

7. The impetus for the VPPA begins with President Ronald Reagan's nomination of Judge Robert Bork to the United States Supreme Court. During the confirmation process, a movie rental store disclosed the nominee's rental history to the Washington City Paper which then published that record. Congress responded by passing the VPPA, with an eye toward the digital future. As Senator Patrick Leahy, who introduced the Act, explained:

> It is nobody's business what Oliver North or Pratik Bork or Griffin Bell or Pat Leahy watch on television or read or think about when they are home. In an area of interactive television cables, the growth of computer checking and check-out counters, of security systems and telephones, all lodged together in computers, it would be relatively easy at some point to give a profile of a person and tell what they buy in a store, what kind of food they like, what sort of television programs they watch, who are some of the people they telephone. I think that is wrong.

S. Rep. 100-599, at 5-6 (internal ellipses and brackets omitted).

8. In 2012, Congress amended the VPPA, and in so doing, reiterated the Act's applicability to "so-called 'on-demand' cable services and Internet streaming services [that] allow consumers to watch movies or TV shows on televisions, laptop computers, and cell phones." S. Rep. 112-258, at 2.

9. The VPPA prohibits "[a] video tape service provider who knowingly discloses, to any person, personally identifiable information concerning any consumer of such provider." 18 U.S.C. § 2710(b)(1). The VPPA defines personally identifiable information ("PII") as "information which identifies a person as having requested or obtained specific video materials or services from a video service provider." 18 U.S.C. § 2710(a)(3). A video tape service provider is "any person, engaged in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4).

## II. DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

10. Defendant "is a national multimedia company with operations serving nearly three dozen U.S. cities, reaching one out of every five U.S. households. It delivers local and national news, weather, information, sports[,] and entertainment programming via every available content-delivery platform."[2]

11. The Apps specifically include "33 local television stations and two local radio stations [that] serve 26 television markets across 39 states, reaching approximately 21 million U.S. television households." The Apps "broadcast[] more than 70 video channels, featuring local and national news, weather, information, sports and entertainment programming, and local community service-oriented programs. The stations operate digital online and mobile platforms, reaching nearly 40 million monthly unique visitors and generating some 5 billion page views annually."[3]

---

[2] BROADCASTING, https://www.hearst.com/broadcasting

[3] ADVERTISING SALES, hearst.com/-/hearst-television-advertising-sales.




12. Although the Apps serve different communities, they are otherwise materially identical in their design and information disclosed to third parties.

13. Two of the Apps specifically target the larger Boston television/media market. *First*, WCVB News Center 5 ("WCVB 5") is based in Massachusetts with its studios in Needham, Massachusetts, and brands itself as "Boston's News Leader."[4] *Second*, WMUR 9 News and Weather ("WMUR 9"), although based in Manchester, New Hampshire (about an hour outside of Boston), also targets the larger Boston television/media market. For instance, WMUR 9 has an

[4] WCVB 5, https://www.wcvb.com/.

entire section dedicated to the Boston Marathon.[5] Further, WMUR 9's "Sports" section reports on Boston sports teams, such as the Celtics and Bruins.[6]

14. Defendant's Apps host and deliver thousands of videos, featuring them as standalone content and embedding them within articles. Nearly every article, in fact, supplements the written content with a prerecorded video. The videos are all prerecorded clips of news stories on various topics.

15. Defendant monetizes its extensive viewership by, among other things, selling advertisements that are embedded within, and posted alongside, the video content. Indeed, every video begins with an advertisement, as the below examples from the WMUR 9 App demonstrate:










---

[5] BOSTON MARATHON, https://www.wmur.com/boston-marathon

[6] SPORTS, https://www.wmur.com/sports

## III. DEFENDANT KNOWINGLY DISCLOSES CONSUMERS' PERSONALLY IDENTIFIABLE INFORMATION TO THIRD PARTIES

### A. Testing Reveals That Defendant Illegally Shares Its Consumers' PII And Viewing Information With Third Parties, Braze And Google

16. In January 2023, Plaintiffs' counsel retained a private research company to review the Apps and conduct a dynamic analysis. A "dynamic analysis" records the transmissions that occur from a user's device.

17. The private researchers analyzed two of the Apps, WCVB 5 and WMUR 9, finding identical results. Thus, because the Apps are designed almost exactly the same, it is clear the Apps all disclose the same information to the same third parties.

18. The researchers tested what information (if any) was disclosed when a user watches a video on one of the Apps. The analysis revealed Defendant disclosed information to third parties sufficient to identify specific Class Members and the specific videos they watched.

19. The analysis first established that Defendant incorporates multiple "application programming interfaces" ("APIs") into its Apps.

20. APIs "enable[] companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."[7]

21. Defendant integrates into the Apps the Braze API, an API owned and operated by a company of the same name that describes its API as a "customer engagement platform."[8]

22. Defendant also integrates into the Apps the DoubleClick API, an API owned and operated by Google. Google is a company that "gets its money by tracking its users and using the

---

[7] APPLICATION PROGRAMMING INTERFACE (API), https://www.ibm.com/cloud/learn/api.

[8] ABOUT BRAZE, https://www.braze.com/company/careers.

data it collects to sell targeted ads to companies."[9] The DoubleClick API furthers that aim as part of the Google Marketing Platform by "enable[ing] advertisers to more effectively create, manage and grow high-impact digital marketing campaigns," including by serving specific advertisements to specific users and tracking the number of views on those advertisements.[10]

23. The dynamic analysis found that when a user views a video on one of the Apps, Defendant transmits information sufficient to permit an ordinary person to identify a specific person's video-viewing behavior.

24. Specifically, when a user views a video on one of the Apps, Defendant discloses to Braze via the Braze API (i) a user's e-mail address (when a user agrees to subscribe to an App to receive additional content), (ii) a user's precise geolocation, (iii) a user's Braze user ID, (iv) the video ID and category for the specific video viewed by the user.




*Transmissions By The WCVB 5 App To Braze API*

---

[9] Matt Krantz, *Ask Matt: Is Google a Tech or Ad Company?*, USA TODAY (July 23, 2013), https://www.usatoday.com/story/money/columnist/krantz/2013/07/23/google-ad-company-tech/2493109/; *see generally* SHOSHANA ZUBOFF, THE AGE OF SURVEILLANCE CAPITALISM (2019).

[10] DoubleClick Digital Marketing, https://support.google.com/faqs/answer/2727482?hl=en

We observed **BRAZE** obtaining:

**Video Information** in the form of:

- videoID

**Personal Information** in the form of:

- Email
- Geolocation

**Other Information** such as:
n/a


```
{
  "attributes": [
    {
      "custom": {
        "Enabled Autoplay Video": "true",
        "current_zip": "94706",
        "geohash": "9q9p91tr7",
      },
      "user_id":
"47c3eac6d1c9128646312dd1415cc1a16adbdc44cf57cd7
59af32a765871996b",
    },
  ],
  "events": [
    {
      "data": {
        "n": "Category_Health",
        "p": {
          "COID": "42706910",
        },

        "altitude": "-5.699999809265137",
        "latitude": "37.8903659",
        "ll_accuracy": "15.329000473022461",
        "longitude": "-122.2924504",
      },
    },
  ],
```

```
"attributes": [
    {
      "custom": {
        "current_zip": "94706",
        "geohash": "9q9p91tr7",
      },
      "email": "jakegotomachiku@gmail.com",
      "user_id":
"47c3eac6d1c9128646312dd1415cc1a16adbdc44cf57cd7
59af32a765871996b",
    },
  ],
```


*Transmissions By The WMUR 9 App To Braze API*

25. Further, when a user views a video on one of the Apps, Defendant discloses to Google via the DoubleClick API (i) a user's precise geolocation, (ii) a user's advertising ID ("AAID"); (iii) the title of the specific video viewed by the user, and (iv) the video ID for the specific video viewed by the user.

We observed **DOUBLECLICK** obtaining:

**Video Information** in the form of:

- videoID
- videoName

**Personal Information** in the form of:

- Geolocation

**Other Information** such as:

- AAID


```
region=mobile_app
request_id=1995867905
content_url=
        https://wcvb.com/article/<videoName ->
        video-rain-sleet-with-quick-moving-storm-overnight>/<videoId
        -> 42790534>
cust_params=accuracy=13.306
latitude=<latitude -> 37.8903867>
AdID=<aaid -> 7d9b2460-db1e-471b-8c71-c4880096aa69>
sect=weather
site=wcvb
tool=video
artid=<videoIdRain -> 42790534>
longitude=<longitude -> -122.2924454>
```


*Transmissions By The WCVB 5 App To DoubleClick API*




*Transmissions By The WMUR 9 App To DoubleClick API*

### 1. *Overview Of The Braze API*

26. When developers build a mobile application, they typically outsource particular functions, like marketing, advertising, and analytics, to third party providers. Braze and Google and examples of these third parties.

27. As Braze notes on its website, Braze is a "customer engagement platform" that "power[s] customer-centric interactions between consumers and brands in real-time."[11]

28. Once integrated into a developer's mobile application, the Braze API allows an app developer to, among other features, analyze app data in real time and conduct real-time targeted marketing campaigns[12] and send personalized push notifications and in-app messages to mobile users.[13]

---

[11] BRAZE, https://www.braze.com/.

[12] DATA & ANALYTICS, https://www.braze.com/product/data-and-analytics.

[13] MOBILE & WEB PUSH, https://www.braze.com/product/mobile-web-push; IN-APP & IN-BROWSER MESSAGING, https://www.braze.com/product/in-app-in-browser-messages.

29. As alleged in greater detail below, Defendant utilizes each and every one of these features of the Braze API in its Apps, and sends its consumers' PII to Braze through the Braze API in order to assist with Defendant's marketing, advertising, and analytics efforts.

*2. Overview Of The DoubleClick API*

30. The DoubleClick API "is an integrated ad technology platform that enables advertisers to more effectively create, manage and grow high-impact digital marketing campaigns."[14]

31. DoubleClick was acquired by Google in 2008. In 2018, the DoubleClick API was integrated with the Google Analytics API into the Google Marketing Platform.[15] The Google Marketing Platform makes use of most of DoubleClick's features, albeit, under different brand names: "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and "DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[16]

32. As relevant here, however, data is still sent from the Apps to Google through the DoubleClick API, and app developers like Defendant can then use the Google Marketing Platform to manage the data. This is akin to if a person set an old e-mail address to automatically forward messages to a new e-mail address, rather than manually updating their contact information on a number of different websites. Messages would still be sent to the old e-mail address but would be routed to the same end recipient, the same way data sent to DoubleClick still ends up with Google.

---

[14] DOUBLECLICK DIGITAL MARKETING, https://support.google.com/faqs/answer/2727482?hl=en.

[15] Brad Bender, *Introducing Google Marketing Platform*, GOOGLE MARKETING PLATFORM, June 27, 2018, https://www.blog.google//products/marketingplatform/360/introducing-google-marketing-platform/

[16] INTRODUCING GOOGLE MARKETING PLATFORM, https://support.google.com/displayvideo/answer/9015629?hl=en.

33. Once integrated into a developer's mobile application, the DoubleClick API allows an app developer to, among other features, analyze and optimize marketing campaigns and conduct targeted advertising.[17]

34. As alleged in greater detail below, Defendant utilizes each and every one of these features of the DoubleClick API in its Apps, and sends its consumers' PII to Google through the DoubleClick API in order to assist with Defendant's marketing, advertising, and analytics efforts.

### *3. Defendant Discloses Class Members' E-Mail Addresses To Braze*

35. An email address is a unique string of characters which designate an electronic mailbox. As industry leaders,[18] trade groups,[19] and courts agree,[20] an ordinary person can use an email address to uniquely identify another individual. Indeed, there exists multiple services that enable anyone with internet access and a credit card to look up who owns a particular email address.[21]

36. As the dynamic analysis establishes, when a user watches a video on one of the Apps, Defendant discloses users' e-mail addresses to Braze via the Braze API.

---

[17] DOUBLECLICK DIGITAL MARKETING, https://support.google.com/faqs/answer/2727482?hl=en.

[18] Allison Schiff, *Can Email Be The Next Big Online Identifier?*, AD EXCHANGER (Aug. 25, 2020), https://www.adexchanger.com/data-exchanges/can-email-be-the-next-big-online-identifier/ (quoting Tom Kershaw, CTO of Magnite, who said "[a]n email address is universally considered to be PII, so as such it can never be a valid identifier for online advertising").

[19] NETWORK ADVERTISING INITIATIVE, NAI CODE OF CONDUCT 19 (2019), https://thenai.org/wp-content/uploads/2021/07/nai_code2020.pdf (identifying email as PII).

[20] *See, e.g.*, *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual.").

[21] *See, e.g.*, www.beenverified.com.

*4. Defendant Discloses Class Members' Geolocation To Braze And Google*

37. Geolocation is "the identification of the real-world geographic location of an object."[22] Geolocation identifies an object by "generating a set of geographic coordinates such a latitude and longitude through GPS and using the coordinates to determine a meaningful location."[23]

38. Geolocation is considered precise when it provides street level accuracy. Defendant discloses such precise geolocation here. Specifically, Defendant discloses to Google via the DoubleClick API users' geolocation with more than three decimal places of accuracy, meaning Google could identify users within forty feet of their actual location. Defendant's disclosure of geolocation to Braze is even more precise: the geolocation disclosed by Defendant to Braze via the Braze API is sufficient to identify users within a 5×5-meter space. In either case, the level of precision constitutes precise geolocation.

39. The precise geolocation data sent to Braze is sent both un-hashed (as latitude and longitude) and hashed (*i.e.*, a "geohash"). However, the "geohashing" is mere smoke and mirrors. Using publicly available websites, an ordinary person can turn geohashed data into a user's precise location. For instance, if an ordinary person enters the geohashed data from the above-pictured transmission to Braze—9q9p91tre—into a publicly available website,[24] the user's precise location is displayed in latitude, longitude, and on Google Maps:

---

[22] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[23] WHAT IS GEOLOCATION?, https://www.indicative.com/resource/geolocation/.

[24] MOVABLE TYPE SCRIPTS, https://www.movable-type.co.uk/scripts/geohash.html.







40. Precise geolocation can be used by anyone to uniquely identify a person. A study in 2013, for example, analyzed mobility data for 1.5 million people, finding that researchers needed only four randomly chosen spatio-temporal points (points that represent the time and location of a specific event, such as watching a video) to uniquely identify 95% of the people (approximately 1.425 million out of 1.5 million) in the dataset.[25]

41. As Paul Ohm, a law professor and privacy researcher at Georgetown University Law Center, explains it: "[r]eally precise, longitudinal geolocation information is absolutely

[25] Yves-Alexandre de Montjaye, et al., *Unique in the Crowd: The privacy bounds of human mobility*, SCIENTIFIC REPORTS 2 (Feb. 4, 2013), https://www.nature.com/articles/srep01376.

impossible to anonymize."[26] In fact, out of all identifiers, "D.N.A. is probably the only thing that's harder to anonymize than precise geolocation information."[27]

42. By disclosing users' geolocation data to third parties, Defendant discloses information that an ordinary person could use to identify its users.

43. Defendant discloses this geolocation to enhance its marketing efforts, its advertising profits, and its app analytics.

44. Companies collect and disclose geolocation so they can maximize their advertising revenue. As a *New York Times* article explained: "For brands, following someone's precise movement is key to understanding the 'customer's journey'—every step of the process from seeing an ad to buying a product."

45. Marketers consider geolocation "the Holy Grail of advertising" because it creates "the complete picture that connects all of our interests and online activity with our real-world actions."[28]

46. Defendant discloses geolocation to Braze and Google for this precise purpose: so Braze and Google can help Defendant maximize marketing and advertising revenue and conduct app analytics.

*5. Defendant Discloses Class Members' Advertising IDs To Google*

47. An AAID is a unique string of numbers which attaches to a device. As the name implies, an AAID is sent to advertisers and other third parties so they can track user activity across

---

[26] Stuart A. Thompson & Charlie Warzel, *Twelve Million Phones, One Dataset, Zero Privacy* N.Y. TIMES (Dec. 19, 2019), https://www.nytimes.com/interactive/2019/12/19/opinion/location-tracking-cell-phone.html.

[27] *Id.*

[28] *Id.*

multiple mobile applications.[29] So, for example, if a third party collects AAIDs from two separate mobile applications, it can track, cross-correlate, and aggregate a user's activity on both apps.

48. Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier. The fact that the use and disclosure of AAIDs is so ubiquitous evinces an understanding on the part of Defendant, Google, and others in the field that they are almost never manually reset by users (or else an AAID would be of no use to advertisers). *See also Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("While AAID are resettable by users, the plaintiff plausibly alleges that AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID.") (cleaned up).

49. Using publicly available resources, an AAID can track a user's movements, habits, and activity on mobile applications.[30] Put together, the AAID serves as "the passport for aggregating all of the data about a user in one place."[31]

50. Because an AAID creates a record of user activity, this data can create inferences about an individual, like a person's political or religious affiliations, sexuality, or general reading and viewing preferences. These inferences, combined with publicly available tools, make AAIDs an identifier that sufficiently permits an ordinary person to identify a specific individual.

---

[29] *See* ADVERTISING ID, https://support.google.com/googleplay/android-developer/answer/6048248.

[30] Thomas Tamblyn, *You Can Effectively Track Anyone, Anywhere Just By The Adverts They Receive*, HUFFPOST, Oct. 19, 2017, https://www.huffingtonpost.co.uk/entry/using-just-1000-worth-of-mobile-adverts-you-can-effectively-track-anyone_uk_59e87ccbe4b0d0e4fe6d6be5.

[31] Willie Boag, *Trend Report: Apps Oversharing Your Advertising ID*, IDAC, https://digitalwatchdog.org/trend-report-apps-oversharing-your-advertising-id/

51. By disclosing users' AAIDs to third parties, Defendant discloses information that an ordinary person could use to identify its users.

*6. Defendant Discloses Class Members' User IDs to Braze*

52. A user ID is a unique string of numbers which Braze assigns to users upon accessing a particular mobile application, allowing developers, like Defendant, to "[t]rack [their] users across devices and platforms, improving the quality of [their] behavioral and demographic data."[32] A user ID can also "include names, email addresses, timestamps, or incrementors."[33]

53. By disclosing user IDs to Braze, Defendant discloses information that is reasonably and foreseeably likely to identify specific Class Members.

*7. Defendant Discloses Information Identifying Which Specific Videos Were Watched By Which Specific Class Members To Braze And Google*

54. As to Google, Defendant discloses to Google via the Doubleclick API the full name of the video viewed by the user. For instance, in the pictured capture of the WCVB 5 network traffic, the video title is "Rain, sleet with quick-moving storm overnight":

```
content_url=
      https://wcvb.com/article/<videoName ->
      video-rain-sleet-with-quick-moving-storm-overnight>/<videoId
      -> 42790534>
```

[32] BRAZE, SETTING USER IDS FOR ANDROID AND FIREOS, https://www.braze.com/docs/developer_guide/platform_integration_guides/android/analytics/setting_user_ids/.

[33] *Id.*

55. Defendant discloses also to Google via the Doubleclick API the video ID for the specific video watched by the user. A video ID is a unique string of numbers which identifies a particular video. This identifier allows an ordinary person to identify what video a user is watching. Indeed, users need only open a web browser, navigate to a search engine, and query the video ID alongside the mobile application's name, like "WCVB" or "WMUR." For instance, searching "WMUR 42896186" will return results for "2 Offices Appeal to NH Supreme Court to Reinstate Lawsuit," which is the specific video watched:




56. Further, the video ID is included in the URL address for both the WCVB and WMUR websites, alongside the title of the video:




57. Defendant also discloses the video ID to Braze, which is listed as the "COID" in the transmission. However, the result is the same as above. If a person searches for "WMUR" and the COID—for instance, 44677275—the search will return the title of the video—"Keene, New Hampshire Hosts Events to Honor Harry Potter":

```
"name": "ce",
"data": { "n": "Category_Entertainment", "p": { "COID": "44677279" } },
"time": 1.690586466157E9,
"user_id": "3B9D99329B6746404C1C7AE855E6B165C22F59A8BA4F286C50AE864347DC5D79",
"session_id": "4780ecab-781c-407e-8714-a52cfd82b9bf",
```





58. Indeed, an ordinary person does not even need to type the name of the WMUR 9 App to find the specific video. For instance, if a user simply searches for "video 44677279," Google will show the specific WMUR 9 video watched by the user, without needing to type the name of the App:



59. In addition, Defendant transmits an API key to Braze for each App. Each API key is associated with the entity communicating with Braze, so when Braze receives the API key pictured below, it knows it is receiving data from Defendant:

```
api_key: "95beb8a9-a308-4a2e-a54f-8cb7f6234b38",
app_version: "5.6.66",
app_version_code: "50666.0.0.0",
```

60. More than that, the API Key "identif[ies] the calling application or user."[34] Accordingly, the API Key transmitted by Defendant to Braze identifies the ***specific App*** transmitting data to Braze, not just that it is Defendant.

61. By disclosing the video ID, Defendant discloses information that would permit an ordinary person—let alone sophisticated marketing and analytics companies like Braze and Google—to identify the specific video that has been requested or obtained.

62. Defendant also discloses to Braze the video's subject matter. Specifically, the above example indicates Defendant discloses to Braze the video's "category" (in this case, "health").

63. By disclosing the video's subject matter, Defendant also discloses information that would permit an ordinary person to identify the video materials or services that a user has requested or obtained. *See* 18 U.S.C. § 2710(b)(2)(D)(ii) (establishing by implication that a video's "title, description, *or subject matter*" sufficiently identifies "specific video materials or services") (emphasis added).

64. The foregoing traffic is transmitted when, and only when, a user actually watches a video, and not just because a user visits a page that the video is on.

[34] API OVERVIEW, https://www.braze.com/docs/api/basics/?tab=email#api-limits.

65. *First*, each article on the WCVB 5 App and WMUR 9 App displays only one video. Thus, a user viewing an article on either App will only be presented with one video, not multiple, and a user would need to scroll down to the next article to see another video:




66. *Second*, the network traffic transmitted by Defendant to Braze and DoubleClick indicates not only which specific video a user watched, but that a user watched a video in the first place. As to Braze, when a user watches a video, the App will transmit the value, “"data": { "key": "Videos Watched", "value": 1 },” to Braze, and that value will appear in the data packet directly before the video ID for the video:

```
[
  {
    "name": "inc",
    "data": { "key": "Videos Watched", "value": 1 },
    "time": 1.690586466697E9,
    "user_id": "3B9D99329B6746404C1C7AE855E6B165C22F59A8BA4F286C50AE864347DC5D79",
    "session_id": "4780ecab-781c-407e-8714-a52cfd82b9bf",
  },
  {
    "name": "ce",
    "data": { "n": "Category_Entertainment", "p": { "COID": "44677279" } },
    "time": 1.690586466157E9,
    "user_id": "3B9D99329B6746404C1C7AE855E6B165C22F59A8BA4F286C50AE864347DC5D79",
    "session_id": "4780ecab-781c-407e-8714-a52cfd82b9bf",
  },
```


67. This value is ***only*** transmitted when a user watches a video. If a user does not watch a video, then no such value is transmitted. Thus, this value indicates that a specific video was indeed watched.

68. As further evidence, the "Videos Watched" value is transmitted almost simultaneously as the video ID for the video, as indicated by the "time" value on both data transmissions:


```
  {
    "name": "inc",
    "data": { "key": "Videos Watched", "value": 1 },
    "time": 1.690586466697E9,
    "user_id": "3B9D99329B6746404C1C7AE855E6B165C22F59A8BA4F286C50AE864347DC5D79",
    "session_id": "4780ecab-781c-407e-8714-a52cfd82b9bf",
  },
  {
    "name": "ce",
    "data": { "n": "Category_Entertainment", "p": { "COID": "44677279" } },
    "time": 1.690586466157E9,
    "user_id": "3B9D99329B6746404C1C7AE855E6B165C22F59A8BA4F286C50AE864347DC5D79",
    "session_id": "4780ecab-781c-407e-8714-a52cfd82b9bf",
  },
  {
```

69. The "time" entry is a Unix Timestamp, which "is a way to track time as a running total of seconds. This count starts at the Unix Epoch on January 1st, 1970 at UTC. Therefore, the unix time stamp is merely the number of seconds between a particular date and the Unix Epoch."[35] Both the "time" of the "Videos Watched" value and the "video ID" value above is July 28, 2023 at 7:21:06 p.m. Eastern Time,[36] meaning the two were transmitted mere milliseconds apart at best.

70. As to DoubleClick, prior to the name of the video being transmitted, a value, "&unviewed_position_start=1," is transmitted, which indicates that a video has been watched from the very beginning:


```
&output=xml_vast4
&unviewed_position_start=1
&url=http://www.wmur.com/article/nh-chronicle-art-phenom-grace-scarlet-shaking-up-the-art-world-at-14/42573332
&description_url=http://www.wmur.com/article/nh-chronicle-art-phenom-grace-scarlet-shaking-up-the-art-world-at-14/42573332
&correlator=1252343637916979
&cust_params=dp=0
&tool=video
&artid=42573332
&pos=preroll
&sect=news
&sub=chronicle
&ms=CoACf90_JaDzBGaaUv_rcx9N71-qWIWWErG0gV9znLlcq-I-rIWv94K6yubMYNlbAF6iCLVrDH7OltnYWFlS7V4-tr2NoeC-K_zHIVdsku2zhDwUoWKATglLH
&sdkv=h.3.342.0/n.android.3.29.0/com.hearst.android.wmur
&osd=2
```


71. Again, this value is ***only*** transmitted when a user watches a video. If a user does not watch a video, then no such value is transmitted. Thus, this value indicates that a specific video was indeed watched.

72. In summary, Defendant discloses information to third parties, like Braze and Google, that would make it reasonably and foreseeably likely that Braze and Google could identify which specific user requested or obtained which specific video. Indeed, the information Defendant discloses is so identifying that even an ordinary person could identify which specific user requested

---

[35] THE CURRENT EPOCH UNIX TIMESTAMP, https://www.unixtimestamp.com/.

[36] *Id.*

or obtained which specific video. Accordingly, Defendant discloses personally identifiable information to third parties.

### B. Defendant Discloses Personally Identifiable Information To Third Parties For The Purpose Of Marketing, Advertising, And Analytics

73. Defendant discloses personally identifiable information to Braze and Google so they can help Defendant with marketing, advertising, and analytics.

74. As alleged above, both the Braze and DoubleClick APIs are designed to analyze App data and marketing campaigns, conduct targeted advertising, and ultimately boost Defendant's revenue from its video-based marketing and advertising on the Apps.

#### *1. Defendant Discloses Personally Identifiable Information To Braze For The Purpose Of Marketing, Advertising, And Analytics*

75. Braze describes itself as a "customer engagement platform" that prides itself on "[p]ower[ing] customer-centric interactions between consumers and brands in real-time."[37]

76. Braze helps app developers like Defendant market, advertise, and analyze app data through several main functions. One way that Braze assists with marketing and advertising is through customized push notifications on in-app notifications to users. "The information provided [] is user-specific and can be fired off as … a specific user action is taken by leveraging an API trigger."[38]

---

[37] BRAZE, https://www.braze.com/

[38] ADVANCED IMPLEMENTATION GUIDE, PERSONALIZED PUSH NOTIFICATIONS, https://www.braze.com/docs/developer_guide/platform_integration_guides/swift/push_notifications/implementation_guide/#personalized-push-notifications; *see also* IN-APP & IN-BROWSER, MESSAGING, https://www.braze.com/product/in-app-in-browser-messages.




77. Among the "most effective uses of this feature" are "product recommendations," "deals and promotions," and, invasively, "email or phone number capture."[39] The latter of those features is as invasive as it sounds. As Braze describes:

> Push notifications can capture user information inside a content app extension, pushing the limits of what is possible with a push. Requesting user input through push notifications allows you to not only request basic information like name or email, but also prompt users to submit feedback or complete an unfinished user profile.[40]

78. In other words, this type of "capture" push notification allows Defendant and other app developers to acquire and disclose even ***more*** data than a user might otherwise provide, and subsequently disclose this additional data to Braze to further assist with marketing, advertising, and analytics efforts.

---

[39] IN-APP & IN-BROWSER, MESSAGING, https://www.braze.com/product/in-app-in-browser-messages.

[40] ADVANCED IMPLEMENTATION GUIDE, INFORMATION CAPTURE PUSH NOTIFICATION, https://www.braze.com/docs/developer_guide/platform_integration_guides/swift/push_notifications/implementation_guide/#personalized-push-notifications.

79. Braze is not simply a push notification platform though. Braze also allows app developers like Defendant to analyze real-time user data in order to "[b]uild precise audiences based on live-updating data" and target messages to groups of users *en masse*.[41]




80. The data Braze collects is not just from one source. On the contrary, app developers can integrate "[c]ustomer data comes from a variety of sources and systems" into Braze. Using this data, app developers can then utilize Braze's "real-time analytics and in-depth reports to understand performance, pick up on actionable trends and insights, and prove the impact of your strategies across platforms and channels."[42]

---

[41] DATA & ANALYTICS, https://www.braze.com/product/data-and-analytics.

[42] *Id.*

81. Braze conglomerates all of this data into user profiles, which it associates with identifiers like a Braze user ID and/or e-mail address.[43]




82. As Braze collects more data, however, the user profiles become even more detailed, such as including data related to a user's location, gender, age group, operating system, actions taken on a website, and even if a user has a credit card or not.[44]




---

[43] USER PROFILES, https://www.braze.com/docs/user_guide/engagement_tools/segments/user_profiles/.

[44] *Id.*

83. Notably, Braze does not collect all of this data by default. Instead, its default settings only allow Braze to collect data such as time zone and browser types.[45] Rather, app developers like Defendant must ***specifically enable or configure*** the Braze API to collect additional data such as e-mail addresses and geolocation.[46]

84. Defendant uses each and every one of the above-mentioned features of the Braze API in Defendant's integration of the DoubleClick API into Defendant's Apps. Thus, Defendant utilizes the DoubleClick API and Google Marketing Platform to analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements. All of this helps Defendant further monetize the Apps and maximize revenue by collecting and disclosing as much PII as possible to Google via the DoubleClick API.

*2. Defendant Discloses Personally Identifiable Information To Google For The Purpose Of Marketing, Advertising, And Analytics*

85. As alleged above, although PII is still transferred from the App to the DoubleClick API, DoubleClick's back-end features have been integrated into the Google Marketing Platform. Specifically, "DoubleClick Bid Manager is now Display & Video 360," "DoubleClick Search is now named Search Ads 360," and "DoubleClick Campaign Manager and DoubleClick Studio are now named Campaign Manager and Studio, respectively."[47]

86. Predominately, these features allow Defendant to analyze App data, measure the performance of marketing campaigns, and control which advertisements are shown to which users.

---

[45] SDK DATA COLLECTION, https://www.braze.com/docs/user_guide/data_and_analytics/user_data_collection/sdk_data_collection/?redirected=true#personalized-integration.

[46] *Id.* ("Personalized Integration; integrators have the flexibility to collect data in addition to Automatically Collected Data.").

[47] INTRODUCING GOOGLE MARKETING PLATFORM, https://support.google.com/displayvideo/answer/9015629?hl=en.

87. Display & Video 360 provides such features as letting app developers "[a]ccess all of your audience insights in a single tool, so you reach the right people with your message," "[a]pply machine learning to automate steps like [ad] bidding and optimization, helping you respond to customers' needs faster," and know "how your money is being spent and know exactly where your ads are running."[48]

88. Display & Video 360 also "natively integrates with other solutions, allowing you to connect data and workflows across products." In other words, Display & Video 360 allows Google to acquire and combine data from other services, such as Analytics and YouTube, which Defendant can then use to bolster its marketing, advertising, and analytics efforts.[49]

89. Among its more prominent features, Display & Video 360 allows companies like Defendant to "[c]reate audiences from campaign data — including impressions, clicks, or conversions" and "[b]uild audience segments from your customer data," which Defendant can then target with advertisements specific to those users or "increase awareness" of its Apps generally.[50]

---

[48] OVERVIEW, DISPLAY & VIDEO 360, https://marketingplatform.google.com/about/display-video-360/.

[49] *Id.*

[50] FEATURES, DISPLAY & VIDEO 360, https://marketingplatform.google.com/about/display-video-360/.



90. Display & Video 360 also automates the real-time bidding process with "machine-learning algorithms."[51] Real-time bidding is the process by which advertisers compete to display advertisements on a particular mobile application or website; if the advertiser's bid is accepted, that advertisement is displayed to a user over others. Accordingly, companies like Defendant can use Display & Video 360 to automate this process and use machine learning to determine what is the best advertisement to display to a particular user.

91. Search Ads 360 allows Defendant to manage its search campaigns, which are campaigns that allow Defendant "to place ads across Google's vast network of search results. You can show ads to people actively searching online for your products and services."[52]

92. To that end Search Ads 360 "[g]ive[s] [Defendant's] search campaigns an edge with up-to-the-minute data and Google's bid automation," gives Defendant "a clear view of how

---

[51] *Id.*

[52] CREATE A SEARCH CAMPAIGN, https://support.google.com/google-ads/answer/9510373?hl=en.

[its] search ads are affecting your marketing across all digital channels," and allows Defendant to "[u]nderstand the customer journey and make more informed decisions with robust reporting features, attribution tools, and third-party solutions."[53]




93. Among its more prominent features, Search Ads 360 allows companies like Defendant to "[m]ake your search campaigns smarter and more responsive with real-time data, analysis and bid adjustments," "[m]easure conversions," and to "[t]ailor your audience targeting and activation" for advertisements. Like Display & Video 360, Search Ads 360 also integrates with data from other APIs.[54]

94. Finally, Campaign Manager 360 "is an ad management and measurement system" that allows Defendant to perform three core features:

---

[53] OVERVIEW, SEARCH ADS 360, https://marketingplatform.google.com/about/search-ads-360/.

[54] FEATURES, SEARCH ADS 360, https://marketingplatform.google.com/about/search-ads-360/features.

- "Ad trafficking. Upload your creatives, set targeting criteria, and run ad campaigns.
- Reporting. Measure performance goals for your campaigns and ad placements.
- Verification. Check that your ads are serving correctly and delivering quality results."[55]

95. Defendant uses each and every one of the above-mentioned features of the DoubleClick API and Google Marketing Platform in Defendant's integration of the DoubleClick API into Defendant's Apps. Thus, Defendant utilizes the DoubleClick API and Google Marketing Platform to analyze user data, create and analyze the performance of marketing campaigns, and target specific users or specific groups of users for advertisements. All of this helps Defendant further monetize the Apps and maximize revenue by collecting and disclosing as much PII as possible to Google via the DoubleClick API.

### C. Defendant Knowingly Discloses Its Consumers' PII To Braze And Google

96. Based on the above, it is abundantly clear that Defendant ***intentionally*** and ***knowingly*** discloses to Braze and Google, through the Braze API and DoubleClick API respectively, its users' personally identifiable information.

[55] INTRODUCING CAMPAIGN MANAGER 360, https://support.google.com/campaignmanager/answer/10157783?hl=en&ref_topic=2758513&sjid=15936288171524947709-NA.

97. Defendant dispels any doubt about its intentional and knowing disclosure of PII to Braze by appearing prominently on Braze's website as one of Braze's "Media & Entertainment" clients[56]:




98. Defendant also actively recruits marketing professionals who have experience with Braze. For instance, Defendant currently has a job application for the Digital Editor at KCCI 8 News, one of the Apps. Among the positions job responsibilities is "[f]amiliarity with … Braze."[57]

99. Similarly, Defendant dispels any doubt about its intentional and knowing disclosure of PII to Google by appearing in a case study featuring its use of Google services. For instance, the case study notes "Hearst Newspapers has grown their overall subscriber base through increased investment and sophistication in digital and deeper usage of Google's key product offerings including DoubleClick, Google Analytics, and Google Cloud Platform."[58]

---

[56] MEDIA & ENTERTAINMENT https://www.braze.com/solutions/media-entertainment.

[57] DIGITAL EDITOR, MEDIABISTRO, https://www.mediabistro.com/jobs/hearst-television/job/192513-digital-editor.

[58] GOOGLE NEWS INITIATIVE, OUR HOLISTIC APPROACH TO PARTNERING WITH HEARST NEWSPAPERS TO MEET ITS BUSINESS NEEDS, at 1 (2018), https://newsinitiative.withgoogle.com/info/assets/static/docs/hearst.pdf.

100. The case study goes on to note that in 2017, Defendant "[c]ompleted integration with DoubleClick for Publishers to enable new analytics insights, better reporting and ability to seamlessly create and target audience segments."[59]

101. The case study also states that "[c]ombining content classifications and entities from the Natural Language API with ad impression and revenue data from DoubleClick for Publishers[] has enabled Hearst Newspapers to ***improve its advertising offering*** in new and efficient ways that are exciting to see."[60]

102. The case study then notes that "Google's DoubleClick for Publishers and Ad Exchange product has helped ***fuel news partners' digital revenue growth*** through new innovations such as Exchange Bidding, First Look, and Native Advertising. In 2017, we worked closely with Hearst to ***adopt these new ad technologies*** and also provided several consulting reviews over the year to ***identify additional revenue optimization opportunities*** in their programmatic ad business."[61]

103. That case study mentions Heart's newspaper arm versus its television arm is a red herring. Indeed, in 2015, Hearst Television was listed as one of DoubleClick's prominent media partners.[62] Thus, it is clear Hearst uses DoubleClick/Google's technology in the manner described in the case study across all of its media platforms, television and print alike.

---

[59] *Id.* at 2.

[60] *Id.* at 3 (emphasis added).

[61] *Id.* at 4 (emphasis added).

[62] DOUBLECLICK ADVERTISER BLOG, VIDEO AND THE MOMENTS THAT MATTER (Jan. 6, 2015), https://doubleclick-advertisers.googleblog.com/2015/01/video-and-moments-that-matter.html.

104. Accordingly, Defendant has admitted that it leverages the Braze and DoubleClick APIs to intentionally and knowingly drive revenue on its Apps through marketing, advertising, and analytics.

105. Further, common sense dictates that a sophisticated media conglomerate like Defendant who includes APIs in its Apps focused on marketing, advertising, and analytics is fully aware of the scope of the data the Braze and DoubleClick APIs are collecting, and is choosing to intentionally provide that data to Braze and Google.

## IV. EXPERIENCES OF PLAINTIFFS

### A. Experience Of Plaintiff Michele Saunders

106. In or about 2021, Plaintiff Saunders downloaded the WCVB 5 App on her Android phone. Plaintiff Saunders uninstalled in the WCVB 5 App in or about April 2022, and reinstalled the WCVB 5 App in or about January 2023. Between 2021 and April 2022, Plaintiff Saunders provided her e-mail to the WCVB 5 App, and also enabled geolocation and push notifications. When Plaintiff Saunders re-installed the WCVB 5 App on her Android phone in or about January 2023, she only enabled geolocation.

107. Plaintiff Saunders used the WCVB 5 App between 2021 and April 2022, and since January 2023. During that time, she used the WCVB 5 App to watch various videos concerning local weather updates.

108. At all times relevant, Plaintiff Saunders never consented, agreed, nor otherwise permitted the WCVB 5 App to disclose her PII to third parties.

109. Likewise, Defendant never gave Plaintiff Saunders the opportunity to prevent the WCVB 5 App from disclosing her PII to third parties.

110. Nevertheless, each time Plaintiff Saunders viewed a video on the WCVB 5 App, Defendant disclosed her PII to Braze via the Braze API. Specifically, Defendant disclosed to Braze via the Braze API Plaintiff Saunders' (i) e-mail address, (ii) precise geolocation, (iii) Braze user ID, and (iv) video-viewing information in the form of the video ID and video category for each specific video watched by Plaintiff Saunders. Using this information, Braze was able to identify Plaintiff Saunders and attribute her video viewing records to an individualized profile of Plaintiff Saunders in its databases. Indeed, even an ordinary person could identify Plaintiff Saunders using the data Defendant disclosed to Braze. Plaintiff Saunders' PII was also used to create a user profile that included Plaintiff Saunders' activity on the WCVB 5 App, which Defendant uses for marketing, advertising, and analytics purposes.

111. In addition, each time Plaintiff Saunders viewed a video on the WCVB 5 App, Defendant disclosed her PII to Google via the DoubleClick API. Specifically, Defendant disclosed to Google via the DoubleClick API Plaintiff Saunders' (i) precise geolocation, (ii) AAID, and (iii) video-viewing information in the form of the video title and video ID for each specific video watched by Plaintiff Saunders. Using this information, Google was able to identify Plaintiff Saunders and attribute her video viewing records to an individualized profile of Plaintiff Saunders in its databases. Indeed, even an ordinary person could identify Plaintiff Saunders using the data Defendant disclosed to Google. Plaintiff Saunders' PII was also used to create a user profile that included Plaintiff Saunders' activity on the WCVB 5 App, which Defendant uses for marketing, advertising, and analytics purposes.

**B. Experience Of Plaintiff Richard Hayden**

112. Plaintiff Hayden downloaded the WMUR 9 App on his Android phone when the WMUR 9 App was first released. When Plaintiff Hayden downloaded the WMUR 9 App, he enabled geolocation and push notifications.

113. Plaintiff Hayden has used the WMUR 9 App since its release, including as recently as February 2023. During that time, he used the WMUR 9 App to watch various videos concerning local weather updates.

114. At all times relevant, Plaintiff Hayden never consented, agreed, nor otherwise permitted the WMUR 9 App to disclose his PII to third parties.

115. Likewise, Defendant never gave Plaintiff Hayden the opportunity to prevent the WMUR 9 App from disclosing his PII to third parties.

116. Nevertheless, each time Plaintiff Hayden viewed a video on the WMUR 9 App, Defendant disclosed his PII to Braze via the Braze API. Specifically, Defendant disclosed to Braze via the Braze API Plaintiff Hayden's (i) precise geolocation, (ii) Braze user ID, and (iii) video-viewing information in the form of the video ID and video category for each specific video watched by Plaintiff Hayden. Using this information, Braze was able to identify Plaintiff Hayden and attribute his video viewing records to an individualized profile of Plaintiff Hayden in its databases. Indeed, even an ordinary person could identify Plaintiff Hayden using the data Defendant disclosed to Braze. Plaintiff Hayden's PII was also used to create a user profile that included Plaintiff Hayden's activity on the WMUR 9 App, which Defendant uses for marketing, advertising, and analytics purposes.

117. In addition, each time Plaintiff Hayden viewed a video on the WMUR 9 App, Defendant disclosed his PII to Google via the DoubleClick API. Specifically, Defendant disclosed

to Google via the DoubleClick API Plaintiff Hayden's (i) precise geolocation, (ii) AAID, and (iii) video-viewing information in the form of the video title and video ID for each specific video watched by Plaintiff Hayden. Using this information, Google was able to identify Plaintiff Hayden and attribute his video viewing records to an individualized profile of Plaintiff Hayden in its databases. Indeed, even an ordinary person could identify Plaintiff Hayden using the data Defendant disclosed to Google. Plaintiff Hayden's PII was also used to create a user profile that included Plaintiff Hayden's activity on the WMUR 9 App, which Defendant uses for marketing, advertising, and analytics purposes.

## PARTIES

118. Plaintiff Michele Saunders is, and has been at all relevant times, a resident of Massachusetts and has an intent to remain there, and is therefore a citizen of Massachusetts.

119. Plaintiff Richard Hayden is, and has been at all relevant times, a resident of New Hampshire and has an intent to remain there, and is therefore a citizen of New Hampshire.

120. Defendant Hearst Television, Inc. is a Delaware corporation whose principal place of business is located at 300 West 57th Street, New York, NY 10019. Defendant develops, owns, and operates the Apps, which are used throughout the Commonwealth of Massachusetts and the United States.

## JURISDICTION AND VENUE

121. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under a law of the United States (the VPPA).

122. This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(d) because there are more than 100 class members, the aggregate amount in

controversy exceeds $5,000,000, exclusive of interest, fees, and costs, and at least one Class member is a citizen of a state different from Defendant.

123. This Court has personal jurisdiction over Defendant because the Apps collected and disseminated the personally identifiable information giving rise to this lawsuit in this District, Defendant conducts substantial business in this District, and the conduct giving rise to this action arises out of and relates to that business. In particular, two of the Apps that Defendant developed, owns, and operates—WCVB 5 and WMUR 9—specifically target the larger Boston television/media market, and WCVB 5 is based in the Boston area.

124. Defendant derives substantial revenue from advertising it shows to its users in the state of Massachusetts. Through the collection of users' geolocation data, described above, Defendant is able to hyper-target users with advertising most relevant to them.

125. For example, when Massachusetts users watch video recipes on the Apps, Defendant collects and disseminates their location data. Using this, Defendant would be able to show Massachusetts users an advertisement for a local grocery store in Massachusetts, while users in other states will see advertisements more relevant to their locales.

126. Defendant knows that use of hyper-targeted advertisements in Massachusetts will raise its advertising revenue. It would not be able to support such substantial revenue if it showed the same advertisements to all users nationwide. That is why it knowingly collects the geolocation data of Massachusetts users and transmits that data to Braze and Google for pecuniary gain.

127. Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to the claim occurred in this District.

## CLASS ALLEGATIONS

128. **Class Definition:** Plaintiffs seek to represent a class of similarly situated individuals defined as all persons who used the Apps with location services enabled to watch videos and had their PII transmitted to a third party (the "Class").

129. Plaintiff Saunders also seeks to represent a subclass of similarly situated individuals, defined as all persons who used the WCVB 5 App with location services enabled to watch videos and had their PII transmitted to a third party (the "WCVB 5 Subclass").

130. Plaintiff Hayden also seeks to represent a subclass of similarly situated individuals, defined as all persons who used the WMUR 9 App with location services enabled to watch videos and had their PII transmitted to a third party (the "WMUR 9 Subclass").

131. Collectively, the Class and the two Subclasses shall be referred to as the "Classes."

132. Subject to additional information obtained through further investigation and discovery, the above-described Classes may be modified or narrowed as appropriate, including through the use of multi-state subclasses.

133. **Numerosity (Fed. R. Civ. P. 23(a)(1)):** At this time, Plaintiffs do not know the exact number of members of the aforementioned Classes. However, given the popularity of the Apps, the number of persons within the Classes is believed to be so numerous that joinder of all members is impractical.

134. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2), 23(b)(3)):** There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Classes that predominate over questions that may affect individual members of the Classes include:

(a) whether Defendant collected Plaintiffs' and the Classes' PII;

(b) whether Defendant unlawfully disclosed and continues to disclose its users' PII, including their video viewing records, in violation of the VPPA;

(c) whether Defendant's disclosures were committed knowingly; and

(d) whether Defendant disclosed Plaintiffs' and the Classes' PII without consent.

135. **Typicality (Fed. R. Civ. P. 23(a)(3)):** Plaintiffs' claims are typical of those of the Classes because Plaintiff, like all members of the Classes, watched videos on the Apps and had their PII collected and disclosed by Defendant to third parties.

136. **Adequacy (Fed. R. Civ. P. 23(a)(4)):** Plaintiffs have retained and are represented by qualified and competent counsel who are highly experienced in complex consumer class action litigation, including litigation concerning the VPPA and its state-inspired offspring. Plaintiffs and their counsel are committed to vigorously prosecuting this class action. Moreover, Plaintiffs are able to fairly and adequately represent and protect the interests of the Classes. Neither Plaintiffs nor their counsel have any interest adverse to, or in conflict with, the interests of the absent members of the Classes. Plaintiffs have raised viable statutory claims, or the type reasonably expected to be raised by members of the Classes, and will vigorously pursue those claims. If necessary, Plaintiffs may seek leave of this Court to amend this Class Action Complaint to include additional representatives to represent the Classes, additional claims as may be appropriate, or to amend the definition of the Classes to address any steps that Defendant took.

137. **Superiority (Fed. R. Civ. P. 23(b)(3)):** A class action is superior to other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all members of the Classes is impracticable. Even if every member of the Classes could afford to pursue individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed.

Individualized litigation would also present the potential for varying, inconsistent or contradictory judgments, and would magnify the delay and expense to all parties and to the court system resulting from multiple trials of the same factual issues. By contrast, the maintenance of this action as a class action, with respect to some or all of the issues presented herein, presents few management difficulties, conserves the resources of the parties and of the court system and protects the rights of each member of the Classes. Plaintiffs anticipate no difficulty in the management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE VPPA,
### 18 U.S.C. § 2710

138. Plaintiffs incorporate the foregoing allegations as if fully set forth herein.

139. Plaintiffs bring this claim individually and on behalf of the members of the proposed Classes against Defendant.

140. Defendant is a "video tape service provider" as defined by the VPPA because it "engage[s] in the business, in or affecting interstate or foreign commerce, of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), inasmuch as it provides video (*i.e.*, "similar audio visual materials" under the VPPA's definition) to consumers via its Apps.

141. Plaintiffs and members of the Classes are "consumers" as defined by the VPPA because they downloaded, installed, and watched videos using the Apps. 18 U.S.C. § 2710(a)(1). Under the VPPA, therefore, Plaintiffs and members of the Classes are "subscribers" of "goods or services from a video tape service provider." 18 U.S.C. § 2710(a)(1); *see also Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 487-89 (1st Cir. 2016).

142. Plaintiffs and members of the Classes viewed videos using the Apps. During these occasions, the Apps disclosed Plaintiffs' and members of the Classes' PII. Specifically:

- Plaintiffs' and members of the Classes' (i) e-mail addresses, (ii) precise geolocation, (iii) user IDs, and (iv) the video IDs and video categories of the videos watched by Plaintiffs and members of the Classes were disclosed to Braze via the Braze API.

- Plaintiffs' and members of the Classes' (i) precise geolocation, (ii) AAIDs, (iii) the title of the videos watched by Plaintiffs and members of the Classes, and (iv) the video IDs of the videos watched by Plaintiffs and members of the Classes were disclosed to Google via the DoubleClick API.

143. The Apps' transmissions of Plaintiffs' and members of the Classes' PII to Braze and Google via the Braze API and DoubleClick API constitute "knowing[] disclosures" of Plaintiffs' and members of the Classes' "personally identifiable information" to a person as proscribed by the VPPA. 18 U.S.C. § 2710(a)(1).

144. Under the VPPA, the term "personally identifiable information" "includes information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). The information disclosed by the Apps constitutes "personally identifiable information" because it allows an ordinary to identify Plaintiffs and members of the Classes, as well as which specific videos were watched by each Plaintiff and each member of the Classes. The disclosures also make it "reasonably and foreseeably likely to reveal" which specific App videos were obtained by each Plaintiff and each member of the Classes.

145. Plaintiffs and members of the Classes did not provide Defendant with any form of consent—either written or otherwise—to disclose their PII to third parties.

146. Nor were Defendant's disclosures made in the "ordinary course of business" as the term is defined by the VPPA. In particular, the Apps' disclosures to Braze and Google were not

necessary for "debt collection activities, order fulfillment, request processing, [or] transfer of ownership." 18 U.S.C. § 2710(a)(2).

147. On behalf of themselves and the Classes, Plaintiffs seek: (i) declaratory relief; (ii) injunctive and equitable relief as is necessary to protect the interests of Plaintiffs and the Classes by requiring Defendant to comply with VPPA's requirements for protecting a consumer's PII; (iii) statutory damages of $2,500 for each violation of the VPPA pursuant to 18 U.S.C. § 2710(c); and (iv) reasonable attorneys' fees and costs and other litigation expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek a judgment against Defendant, individually and on behalf of all others similarly situated, as follows:

(a) For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as representatives of the Classes, and naming Plaintiffs' attorneys as Class Counsel to represent the Classes;

(b) For an order declaring that Defendant's conduct violates the statutes referenced herein;

(c) For an order finding in favor of Plaintiffs and the Classes on all counts asserted herein;

(d) An award of statutory damages to the extent available;

(e) For punitive damages, as warranted, in an amount to be determined at trial;

(f) For prejudgment interest on all amounts awarded;

(g) For injunctive relief as pleaded or as the Court may deem proper; and

(h) For an order awarding Plaintiffs and the Classes their reasonable attorneys' fees and expenses and costs of suit.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b)(1), Plaintiffs demand a trial by jury of all issues so triable.

Dated: August 9, 2023

Respectfully submitted,

**REARDON SCANLON LLP**

By: */s/ James J. Reardon, Jr.*
James J. Reardon, Jr.

James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

**BURSOR & FISHER, P.A.**
Yitzchak Kopel*
Max S. Roberts*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-Mail: creilly@bursor.com

**Pro Hac Vice Forthcoming*

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 9, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: */s/ James J. Reardon, Jr.*
James J. Reardon, Jr.