IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELE SAUNDERS and RICHARD HAYDEN, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> HEARST TELEVISION, INC., <br><br> Defendant. | No. 1:23-cv-10998-RWZ |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS
THE AMENDED COMPLAINT FOR FAILURE TO STATE A CLAIM**

Matthew Greenfield (Mass. BBO No. 684596)
Jonathan R. Donnellan*
Andrea R. Butler*
Kristen L. Hauser*
*The Hearst Corporation*
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 649-2484
Fax: (212) 554-7000
matthew.greenfield@hearst.com
jdonnellan@hearst.com
abutler@hearst.com
khauser@hearst.com

*Admitted Pro Hac Vice*

*Attorneys for Defendant Hearst Television Inc.*

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

THE VIDEO PRIVACY PROTECTION ACT ........................................................ 2

RELEVANT FACTS ALLEGED ............................................................................. 4

ARGUMENT ............................................................................................................. 6

   I.   Plaintiffs' Claims Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6). ................. 6

   A. Pleading Standard. ........................................................................................ 6

   B. Defendant Hearst Television Is Not a Video Tape Service Provider. ............................... 8

   C. Plaintiffs Have Not Alleged That They Are "Consumers" Within the
      Meaning of the VPPA. ................................................................................... 9

   D. The Information Allegedly Shared with Braze and DoubleClick Is Not
      "Personally Identifiable Information" Within the Meaning of the VPPA. ..................... 11

       1.   The information disclosed does not "easily identify" any individual. .................... 13

          a)   Geolocation ................................................................................. 15

          b)   Other alphanumeric identifiers ..................................................... 17

          c)   None of the identifiers are alleged to have permitted identification of
              Plaintiffs. ................................................................................... 19

       2.   The information disclosed does not identify "specific video materials
          requested or obtained." .................................................................................. 22

   E. Plaintiffs Have Not Alleged Knowing Transmission. .................................................... 24

   F. Plaintiffs Have Not Alleged Actual Damages. ............................................................. 25

   G. The Purported Disclosures Alleged in the Amended Complaint Fall Within an
      Exception to Liability under the VPPA. ........................................................ 26

   II.  Plaintiffs' Reading of the VPPA Would Be Barred by the First Amendment. ............... 27

   A. The VPPA Is a Content-Based and Speaker-Based Restriction on Speech. .................. 27

   B. The VPPA Would Not Satisfy Any Level of Scrutiny as Applied to Hearst's
      Alleged Speech. ............................................................................................ 28

CONCLUSION ......................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ambrose v. Bos. Globe Media Partners LLC*,
No. CV 21-10810, 2022 WL 4329373 (D. Mass. Sept. 19, 2022) .....................................9, 14

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)..........................................................................................................7

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................................7

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
No. 17-CV-04570, 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017)................................ *passim*

*Berry v. FBI*,
No. 17-CV-143, 2018 WL 3468703 (D.N.H. July 17, 2018) ................................................25

*Brown v. Ent. Merchs. Ass'n*,
564 U.S. 786 (2011)..........................................................................................................28

*Brown v. Google LLC*,
525 F. Supp. 3d 1049 (N.D. Cal. 2021) ..........................................................................7, 18

*Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*,
447 U.S. 557 (1980)..........................................................................................................29

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
142 S. Ct. 1464 (2022)......................................................................................................28

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)..........................................................................................................29

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) ............................................................................................15

*Dedham Water Co. v. Cumberland Farms Dairy, Inc.*,
972 F.2d 453 (1st Cir. 1992)..............................................................................................20

*Dex Media W., Inc. v. City of Seattle*,
696 F.3d 952 (9th Cir. 2012) ............................................................................................27

*Doe v. Chao*,
540 U.S. 614 (2004)..........................................................................................................25

*Dyer v. Capital One, N.A.*,
    496 F. Supp. 3d 554 (D. Mass. 2020) ...................................................................25

*Edenfield v. Fane*,
    507 U.S. 761 (1993)............................................................................................29

*Eichenberger v. ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017) .......................................................................13, 14

*Eichenberger v. ESPN, Inc.*,
    No. C14-463, 2015 WL 7252985 (W.D. Wash. May 7, 2015)............................15

*Ellis v. Cartoon Network, Inc.*,
    803 F.3d 1251 (11th Cir. 2015) .......................................................................9, 10

*Ellis v. Cartoon Network, Inc.*,
    No. 14-CV-484, 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) ...............................15

*Exeltis USA Inc. v. First Databank, Inc.*,
    520 F. Supp. 3d 1225 (N.D. Cal. 2021) ...............................................................27

*F.A.A. v. Cooper*,
    566 U.S. 284 (2012)............................................................................................25

*Fayer v. Vaughn*,
    649 F.3d 1061 (9th Cir. 2011) ..............................................................................7

*Feldman v. Star Trib. Media Co.*,
    No. 22-CV-1731, 2023 WL 2388381 (D. Minn. Mar. 7, 2023) ............................14

*In re Fin. Oversight & Mgt. Bd. For P.R.*,
    919 F.3d 638 (1st Cir. 2019)................................................................................20

*First Fed. Sav. & Loan Ass'n of Bos. v. State Tax Comm'n*,
    437 U.S. 255 (1978)..............................................................................................8

*Gardener v. MeTV*,
    No. 22 CV 5963, 2023 WL 4365901 (N.D. Ill. July 6, 2023) ...............................11

*Giragosian v. Ryan*,
    547 F.3d 59 (1st Cir. 2008)....................................................................................7

*Golden v. NBCUniversal Media LLC.*,
    No. 22 CIV. 9858, 2023 WL 5434378 (S.D.N.Y. Aug. 23, 2023) ......................9, 10

*Goodman v. Main Springs*,
    No. 14-12585, 2014 WL 5454220 (D. Mass. Oct. 27, 2014) .................................6

*Gooley v. Mobil Oil Corp.*,
  851 F.2d 513 (1st Cir. 1988) .................................................................................7

*Greater New Orleans Broad. Ass'n v. United States*,
  527 U.S. 173 (1999) ............................................................................................29

*In re Hulu Priv. Litig.*,
  86 F. Supp. 3d 1090 (N.D. Cal. 2015) ...........................................................11, 24

*In re Hulu Priv. Litig.*,
  No. C 11-03764, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ...........................8

*Ibanez v. Fla. Dep't of Bus. & Prof'l Regul.*,
  512 U.S. 136 (1994) ............................................................................................29

*Jefferson v. Healthline Media, Inc.*,
  No. 22-CV-05059, 2023 WL 3668522 (N.D. Cal. May 24, 2023) .......................10

*Locklear v. Dow Jones & Co.*,
  101 F. Supp. 3d 1312 (N.D. Ga. 2015) ...............................................................15

*Lorillard Tobacco Co. v. Reilly*,
  533 U.S. 525 (2001) ............................................................................................29

*Martin v. Meredith Corp.*,
  No. 22-cv-4776, 2023 WL 2118074 (S.D.N.Y. Feb. 17, 2023) ...........................23

*Mayhall on behalf of D.M. v. Amazon Web Servs. Inc.*,
  No. C21-1473, 2022 WL 2718091 (W.D. Wash. May 24, 2022)..........................18

*MCI Telecomms. Corp. v. AT&T Co.*,
  512 U.S. 218 (1994) ..............................................................................................8

*Mollett v. Netflix, Inc.*,
  795 F.3d 1062 (9th Cir. 2015) .............................................................................13

*Monsarrat v. Newman*,
  28 F.4th 314 (1st Cir. 2022).................................................................................27

*Nationstar Mortg. LLC v. Nelson*,
  No. 14-CV-00507, 2015 WL 3885361 (D. Me. June 24, 2015) ...........................20

*In re Nickelodeon Consumer Priv. Litig.*,
  827 F.3d 262 (3d Cir. 2016).................................................................12, 13, 14

*In re Nickelodeon Consumer Priv. Litig.*,
  MDL No. 2443, 2014 WL 3012873 (D.N.J. July 2, 2014)...............................12, 15

*Ocasio-Hernández v. Fortuño-Burset*,
    640 F.3d 1 (1st Cir. 2011) ..........................................................................6, 7

*Peñalbert-Rosa v. Fortuño-Burset*,
    631 F.3d 592 (1st Cir. 2011) ...........................................................................7

*Perry v. Cable News Network, Inc.*,
    854 F.3d 1336. (11th Cir. 2017) ....................................................................11

*Project Veritas v. Schmidt*,
    No. 22-35271, 72 F.4th 1043 (9th Cir. 2023) .................................................28

*Reed v. Town of Gilbert, Ariz.*,
    576 U.S. 155 (2015) ....................................................................27, 28, 29, 30

*Robinson v. Disney Online*,
    152 F. Supp. 3d 176 (S.D.N.Y. 2015) ..................................................12, 13, 22

*Rubin v. Coors Brewing Co.*,
    514 U.S. 476 (1995) .......................................................................................29

*Ruiz Rivera v. Pfizer Pharm., LLC*,
    521 F.3d 76 (1st Cir. 2008) ..............................................................................7

*Schatz v. Republican State Leadership Comm.*,
    669 F.3d 50 (1st Cir. 2012) ...........................................................................6, 7

*Solmetex, LLC v. Apavia LLC*,
    149 F. Supp. 3d 192 (D. Mass. 2016) ...............................................................7

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ..............................................................................27, 28, 30

*Soto-Torres v. Fraticelli*,
    654 F.3d 153 (1st Cir. 2011) ............................................................................6

*St. Louis Heart Ctr. v. Nomax*,
    899 F. 3d 500 (8th Cir. 2018) .........................................................................26

*Stark v. Patreon, Inc.*,
    No. 22-CV-03131, --- F. Supp. 3d ---, 2023 WL 2090979 (N.D. Cal. Feb. 17,
    2023) ............................................................................................................28

*Sterk v. Redbox Automated Retail, LLC*,
    770 F.3d 618 (7th Cir. 2014) ..........................................................................25

*In re SuperValu, Inc.*,
    925 F.3d 955 (8th Cir. 2019) ..........................................................................25

*Tassinari v. Salvation Army Nat'l Corp.*,
    610 F. Supp. 3d 343 (D. Mass. 2022) ...................................................................27

*Tawam v. Feld Ent. Inc.*,
    No. 23-CV-357, --- F. Supp. 3d ----, 2023 WL 5599007 (S.D. Cal. July 28,
    2023) ...........................................................................................................................10

*United States v. Caronia*,
    703 F.3d 149 (2d Cir. 2012)......................................................................................29

*United States v. Vega-Rivera*,
    866 F.3d 14 (1st Cir. 2017)........................................................................................18

*Walker v. Meta Platforms, Inc.*,
    No. 22-CV-02442, 2023 WL 3607282 (N.D. Cal. Mar. 3, 2023)..............................8

*Wang v. N.H. Bd. Of Registration in Med.*,
    55 F.3d 698 (1st Cir. 1995)........................................................................................20

*Williams v. Litton Loan Servicing*,
    No. CA 10-11866, 2011 WL 3585528 (D. Mass. Aug. 15, 2011)............................25

*Wilson v. Triller, Inc.*,
    598 F. Supp. 3d 82 (S.D.N.Y. 2022)....................................................................14, 21

*Wollschlaeger v. Governor, Fla.*,
    848 F.3d 1293 (11th Cir. 2017) .................................................................................29

*Yershov v. Gannett*,
    No. 14-cv-13112 (D. Mass. Mar. 27, 2017), ECF No. 73 ......................................19

*Yershov v. Gannett Satellite Info. Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016)............................................................................. *passim*

**Statutes**

5 U.S.C. § 552a(g)(4)(A) ...................................................................................................4

18 U.S.C. § 2710......................................................................................................*passim*

**Other Authorities**

Google Authorized Buyers Help, Target mobile apps with IDFA or AAID,
    https://support.google.com/authorizedbuyers/answer/3221407?hl=en (last
    visited 7/17/23) ....................................................................................................18, 19

Google Play Console Help, Advertising ID,
   https://support.google.com/googleplay/android-
   developer/answer/6048248?hl=en#:~:text=The%20advertising%20ID%20is%
   20a,continue%20to%20monetize%20their%20apps (last visited 7/17/23) ............................18

S. Rep. No. 100–599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342–1 ...............................2, 3, 25

## INTRODUCTION

This is one of dozens (if not hundreds) of recent cases seeking to expand application of the Video Privacy Protection Act ("VPPA")—a 1988 law designed to prevent video stores and similar outlets from disclosing the video rental history of customers—well beyond Congress's intended scope and the limits of common sense.

Plaintiffs' theory is that each time someone watches a local weather report or breaking news story published by defendant Hearst Television Inc. ("HTV") on their mobile phone (or even reads a news story containing a video), he or she is entitled to a minimum of $2500 in liquidated damages under the VPPA.  Amended Complaint ("AC") ¶¶ 106, 112-13, 147. Plaintiffs claim they are entitled to this relief even though they suffered no actual damages (as required under the statute), because when they accessed news content (for free) on HTV's mobile applications ("Apps"), Plaintiffs' phones sent their approximate GPS location and a random alphanumeric identifier to HTV's third-party marketing service providers (Braze and DoubleClick).  They claim this violated their privacy under the VPPA.  Significantly, Plaintiffs are non-subscriber, non-paying, visitors to HTV's Apps and neither their names, addresses nor any other information that would easily identify them was shared with anyone.  More significantly, Plaintiffs' geolocation could be shared only if they affirmatively and voluntarily enabled "location services" on their mobile phones.  The VPPA provides no cause of action for Plaintiffs' fanciful claim.

The VPPA was enacted to address a specific and narrow issue identified by Congress and its scope is limited to achieving that end.  It was tailored to prohibit disclosures of personally identifying information connected with the titles of specific videotape cassettes, whether they were purchased, rented from a neighborhood video rental store, or obtained via a subscription

membership club or service.  It did *not* cover distribution of *all* video content, and it certainly did

not cover the distribution of broadcast news and daily weather reports, which were not even

available by videocassette or "similar" means in 1988.  Moreover, broadcast news and weather

have *never* been information of the sort for which consumption is deemed private, under any

law.  Nor does the VPPA prohibit disclosures of non-personalized mobile geolocation or other

information not associated with any specific person.

The Amended Complaint fails to meet the VPPA's specific requirements because it is

devoid of facts plausibly alleging that (i) HTV is a "video tape service provider"; (ii) Plaintiffs

are statutory "consumers"; (iii) HTV shared any "personally identifiable information" (or "PII"),

let alone "knowingly"; or (iv) that either Plaintiff suffered any "actual damages" by the alleged

disclosures.  It *does* allege facts showing, on the face of the Amended Complaint, that an

exemption to the VPPA applies.  Plaintiffs attempt to obfuscate these fundamental and fatal

pleading deficiencies by conflating alleged disclosures to two separate entities, neither of which

alone is sufficient to state a claim even under the most liberal pleading standard.

Plaintiffs' failure to allege these essential elements of a VPPA claim provides multiple

independent grounds to dismiss the Amended Complaint.  Moreover, while the Court need not

reach this issue, Plaintiffs' overbroad reading of the VPPA collides head-first with the First

Amendment if credited, rendering the VPPA unconstitutional as applied here.  For all these

reasons, the Amended Complaint should be dismissed.

## THE VIDEO PRIVACY PROTECTION ACT

During the 1987 confirmation hearings for then-Supreme Court nominee Judge Robert H.

Bork, a Washington, D.C., newspaper published a profile that included a list of 146 films the

Judge and his family had rented from a local video store.  S. Rep. No. 100–599, at 5 (1988),

*reprinted in* 1988 U.S.C.C.A.N. 4342–1 (hereinafter "S. Rep.").  This prompted Congress to

enact the VPPA, with the goal of "preserv[ing] personal privacy with respect to the rental,

purchase or delivery of video tapes or similar audio visual materials."  *Id.* at 1.  ("[S]imilar

Audio visual materials" are "laser discs, open-reel movies, or CDI technology . . . ."  *Id.* at 12.)

       The VPPA provides a civil remedy against a "video tape service provider" for

"knowingly disclos[ing], to any person, personally identifiable information concerning any

consumer of such provider."  18 U.S.C. § 2710(b)(1). The law includes precise definitions that

must be used to evaluate the adequacy of the Amended Complaint in this case:

> (1) the term "**consumer**" means any renter, purchaser, or subscriber of goods
> or services from a video tape service provider;
>
> . . . .
>
> (3) the term "**personally identifiable information**" includes information
> **which identifies *a person* as having requested or obtained specific video
> materials** or services from a video tape service provider[.]
>
> (4) the term "**video tape service provider**" means any person, engaged in the
> business, in or affecting interstate or foreign commerce, of rental, sale, or
> delivery of ***prerecorded video cassette tapes or similar*** audio visual materials[.]

*Id.* § 2710(a)(1), (3), (4) (emphases added).

       The statute expressly provides that "personally identifiable information" is "information

that identifies a *particular person* as having engaged in a specific transaction with a video tape

service provider."  S. Rep. at 12 (emphasis added).  The VPPA further provides that to be PII, it

must identify a specific individual as having "requested or obtained" specific video content.  18

U.S.C. § 2710(a)(3).  Merely revealing that an individual, much less a device, may have visited a

website containing video content does not satisfy this requirement.  *Cf.* S. Rep. at 12.  All the

required elements must be specified to fall within the law's scope—the individual's identity, the

content's identity, and that that specific content was requested or obtained by the specific

individual.

Finally, to state a claim, the VPPA requires a consumer to have suffered "actual damages", while setting a floor of $2500 for those who can make this showing.  18 U.S.C. § 2710(c)(2)(A) (providing for recovery of "actual damages but not less than liquidated damages in an amount of $2,500").  In this way, the VPPA parallels the Privacy Act of 1972.  *See* 5 U.S.C. § 552a(g)(4)(A) (providing for recovery of "actual damages sustained by the individual . . . but in no case . . . less than the sum of $1,000").

The VPPA also contains a number of exceptions, including disclosures with the consent of the consumer and disclosures "incident to the ordinary course of business" of the video tape service provider.  18 U.S.C. § 2710(b)(2)(B) & (E).  "[O]rdinary course of business" is defined under the statute as including "order fulfillment" and "request processing."  *Id.* § 2710(a)(2). The "ordinary course of business" exception "allows disclosure to permit video tape service providers to use mailing houses, warehouses, *computer services, and similar companies* for *marketing to their customers*."  S. Rep. at 14 (emphases added).

## RELEVANT FACTS ALLEGED[1]

Defendant Hearst Television Inc. ("HTV") is a New York-based company that, through its local news stations, broadcasts local news, weather and other programming to 39 states.  AC ¶¶ 10-11.  In certain markets, HTV also offers mobile phone applications (the "Apps" or an "App") that users can download to their phone from the Apple or Google mobile application store.  *Id.* ¶¶ 4, 106, 112.  Plaintiffs do not allege—because they cannot—that they or any users were required to share geolocation, email, or any other information to download or use the Apps or to view news and weather reports within the Apps.

---

[1] The facts set forth herein are taken, except where noted, from the allegations of Plaintiffs' Amended Complaint. They are accepted as true for purposes of this motion only; in many cases they are inaccurate.  Plaintiffs' characterizations and conclusory statements, or allegations contradicted by other factual allegations, need not be accepted as true.

To the contrary, Plaintiffs **specifically admit** that at some point, they **voluntarily** turned on their phone's "location services." *Id.* ¶¶ 106, 112, 128-30.[2] Saunders alleges she provided an email address to WCVB "[b]etween 2021 and April 2022" (*id.* ¶ 106), but does not allege she was required to do so to access video content on the app. Plaintiff Hayden does NOT allege that he ever provided an email in connection with his use of the WMUR App (*see id.* ¶¶ 112-16). Hayden does not allege that HTV shared his email with anyone.

Although Plaintiffs allege that they used the App to watch "various videos concerning local weather updates" (*id.* ¶¶ 107, 113), they do not allege they requested or received any video content (as opposed to text articles containing news content) specifically, and do not specify which updates they viewed or when. *Id.* ¶ 14. Plaintiffs affirmatively allege that any video content within the Apps only "supplements the written content", and the videos themselves are "clips of news stories on various topics." *Id.*

Plaintiffs allege that certain information is disclosed to two different service providers, Braze and DoubleClick, and include purported "captures" of that data with respect to an unidentified App user, not either Plaintiff. *Id.* ¶¶ 24, 25. With respect to alleged "transmissions" to Braze, Plaintiffs allege that Braze "obtain[s]" the following information (*id.* ¶ 24):

- A user's geolocation *if* that user chooses to enable geolocation services. *Id.* ¶¶ 24, 106, 112, 128-30.

- A user's email address *if* that user submits it. *Id.* ¶ 35.

- A "Braze user ID", which Plaintiffs allege is "string of numbers" assigned to a "user" accessing a mobile application. *Id.* ¶¶ 24, 52.

- What Plaintiff describes as "the video ID and category for the specific video viewed by the user", which plaintiffs admit is a *string of numbers* only, with no article or other title information included. *Id.* ¶ 24. (The transmission report copied into the Amended Complaint uses different terminology, identifying the numbers as a "COID".)

---

[2] As noted, Plaintiffs admit in the Amended Complaint that "location services" can be turned on and off in a phone's settings and in the App itself. *E.g.*, AC ¶¶ 106, 112.

With respect to "transmissions" to DoubleClick, Plaintiffs allege that DoubleClick "obtain[s]" the following information (*id.* ¶ 25):

- A user's geolocation *if* that user chooses to enable geolocation services.  *Id.* ¶¶ 25, 106, 112, 128-30.
- An "advertising ID" or "AAID".  AAID is a "*string of numbers* which attaches *to a device*" (*id.* ¶ 47 (emphasis added)) and can be reset at any time (*id.* ¶ 48).
- Video information in the form of "videoID" or what Plaintiffs claim is "videoName", but which appears in the purported transmission "capture" as a URL to an online article.  *Id.* ¶ 25.
- Plaintiffs do NOT allege that DoubleClick ever receives email addresses, even if provided to the App.

Plaintiffs make the conclusory allegation that they could not prevent the App "from disclosing [their] PII to third parties" (*id.* ¶¶ 109, 115), but this is contradicted by their admissions that each voluntarily chose to enable geolocation (*id.* ¶¶ 106, 112) (and, as to Plaintiff Saunders, provide email) and the absence of any allegation that geolocation (or email) was required to use the App.  Indeed, the Amended Complaint does not identify anything Plaintiffs were required to provide to HTV in order to use the free Apps, let alone to view video content.

## ARGUMENT

## I. Plaintiffs' Claims Should be Dismissed Pursuant to Fed. R. Civ. P. 12(b)(6).

### A. Pleading Standard.

Fed. R. Civ. P. 12(b)(6) requires courts to first "isolate and ignore statements in the complaint that simply offer legal labels and conclusions or merely rehash cause-of-action elements."  *Schatz v. Republican State Leadership Comm*., 669 F.3d 50, 55 (1st Cir. 2012); *see also Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 7, 11-13 (1st Cir. 2011).  This includes statements that "offer legal conclusions couched as facts . . . ."  *Goodman v. Main Springs*, No. 14-12585, 2014 WL 5454220, at *2 (D. Mass. Oct. 27, 2014) (quoting *Soto-Torres v. Fraticelli*,

654 F.3d 153, 158 (1st Cir. 2011)); *see also Brown v. Google LLC*, 525 F. Supp. 3d 1049, 1062 (N.D. Cal. 2021) (courts need not "assume the truth of legal conclusions merely because they are cast in the form of factual allegations.") (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam)). "[S]ome allegations, while not stating ultimate legal conclusions, are nevertheless so threadbare or speculative that they fail to cross 'the line between the conclusory and the factual.'" *Peñalbert-Rosa v. Fortuño-Burset*, 631 F.3d 592, 595 (1st Cir. 2011) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 n.5 (2007)).

Next, the court takes any non-conclusory, non-speculative facts as true to see if they plausibly narrate a claim for relief. *Schatz*, 669 F.3d at 55. Plausibility requires "something more than merely possible . . . ." *Id*. Although the court draws all reasonable inferences in the pleader's favor, it "need not accept every imaginable inference." *See id*. at 57 (citing *Gooley v. Mobil Oil Corp.*, 851 F.2d 513, 514, 515 (1st Cir. 1988)). Where a complaint pleads facts "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Dismissal is warranted where the non-conclusory facts alleged do not "possess enough heft to show that plaintiff is entitled to relief." *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir. 2008) (citation and alterations omitted).

"A district court may also consider 'documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice.'" *Solmetex, LLC v. Apavia LLC*, 149 F. Supp. 3d 192, 194 (D. Mass. 2016) (quoting *Giragosian v. Ryan*, 547 F.3d 59, 65 (1st Cir. 2008)) (alteration in original) (other citations omitted); *Brown*, 525 F. Supp. 3d at 1062 (a court "need not accept as true allegations contradicted by judicially noticeable

facts" and "may look beyond the . . . complaint to matters of public record" without converting the motion into one for summary judgment) (citations omitted).

**B.      Defendant Hearst Television Is Not a Video Tape Service Provider.**

HTV is a broadcaster of local news, not a distributor of prerecorded video tapes or other similar materials, and HTV's news stories, weather reports, and similar public-interest content have never been delivered by those means.  As a result, HTV is not the type of "video tape service provider" ("VTSP") covered by the VPPA.

Congress could have made the VPPA applicable to distributors of any and all video content or "audio visual materials"—including those broadcasted on TV.  They did not.  Instead, Congress expressly limited the VPPA's coverage to distributors of prerecorded videocassettes or similar media available at that time.[3]  *See* S. Rep. at 5; *cf. First Fed. Sav. & Loan Ass'n of Bos. v. State Tax Comm'n*, 437 U.S. 255, 262 (1978) ("When Congress required that federal savings and loan associations be placed in the same classification as 'similar' state institutions, it certainly did not assume that every local and mutual or cooperative thrift and home-financing institution is similar to a federal association.").  Whether one measures a VTSP by the technology or the content at issue, or both, it does not apply to HTV.  *See, e.g., In re Hulu Priv. Litig.*, No. C 11-03764, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012) (whether someone is a "service provider" under the VPPA depends on the type of video content distributed); *Walker v. Meta Platforms, Inc.*, No. 22-CV-02442, 2023 WL 3607282, at *6 (N.D. Cal. Mar. 3, 2023) (only "prerecorded video content . . . falls within the scope of 'similar audio visual materials'") (collecting cases).[4]  Here, Plaintiffs only allegedly viewed  "local weather updates" on mobile

---

[3] The "most relevant time for determining a statutory term's meaning" is the time when the law was enacted.  *MCI Telecomms. Corp. v. AT&T Co.*, 512 U.S. 218, 228 (1994).

[4] The few district court decisions permitting a claim to proceed past a motion to dismiss based on pure news content are not binding on this Court and not persuasive, as they provide scant analysis of what constitutes "similar audio

devices.  AC ¶¶ 107, 113.  Weather reports (or other local news) have never been distributed via "prerecorded video cassette tapes" (let alone in 1988), and mobile devices/Apps did not exist at that time.  The fact that weather may now be watched between scheduled broadcasts (which are clearly not within the VPPA's scope), on one's phone, while in transit, does not change the fact that HTV's content—which has always been publicly available over airwaves—is not the sort targeted by the VPPA and does not make HTV a "video tape service provider" under the law.  A mere time delay in when the news is watched should not transform HTV into a VTSP under the statute.  The Amended Complaint should be dismissed for this reason alone.

### C.      Plaintiffs Have Not Alleged That They Are "Consumers" Within the Meaning of the VPPA.

Under the VPPA, a "consumer" is a "renter, purchaser, or subscriber of goods or services from a video tape service provider."  18 U.S.C. § 2710(a)(1).  Plaintiffs do not allege they "rented or purchased" anything from HTV.  Nor do they allege they are "subscribers", or facts that plausibly could support such an allegation.  The only allegation addressing their consumer status is the conclusory Class-wide claim that "Plaintiffs . . . are 'consumers' as defined by the VPPA because they downloaded, installed, and watched videos using the Apps."  AC ¶ 141.

Merely downloading a mobile app (or even watching videos on it) is not sufficient to render an App user a "subscriber."  Every appellate court to consider the issue—including the First Circuit—has required more.  *See, e.g.*, *Yershov*, 820 F.3d at 486; *Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1252 (11th Cir. 2015) ("[A] person who downloads and uses a free mobile

---

visual materials".  *See, e.g.*, *Ambrose v. Bos. Globe Media Partners LLC*, No. CV 21-10810, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022); *Golden v. NBCUniversal Media LLC.*, No. 22 CIV. 9858, 2023 WL 5434378, at *4 (S.D.N.Y. Aug. 23, 2023).  No court to HTV's knowledge has ever applied the VPPA to local news or weather reports, and *Yershov*, which addressed a Gannett news app, did not consider the VTSP requirement at all, noting that the defendant had not "challenge[d] the sufficiency of [the] pleading as to this element of the claim."  *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 485 n.2 (1st Cir. 2016).

application on his smartphone to view freely available content, without more, is not a 'subscriber' . . . under the VPPA."). The court in *Ellis* reasoned that subscriber status requires "some type of commitment, relationship, or association (financial or otherwise) between a person and an entity," and that such commitment might be established by "payment, registration, commitment, delivery, . . . and/or access to restricted content." *Id*. at 1256 (alteration in original) (citation omitted); *see also Golden*, 2023 WL 5434378, at *9 (dismissing complaint where newsletter "subscription" did not provide "any video viewing benefits beyond those accessible to any member of the public who . . . accessed the . . . app") (collecting cases); *Tawam v. Feld Ent. Inc*., No. 23-CV-357, --- F. Supp. 3d ----, 2023 WL 5599007, at *5 (S.D. Cal. July 28, 2023) ("While Plaintiffs allegedly signed up for Defendant's email mailing list, not everything that can conceivably be labeled a 'subscription' automatically triggers the protections of the VPPA."); *Jefferson v. Healthline Media, Inc*., No. 22-CV-05059, 2023 WL 3668522, at *3 (N.D. Cal. May 24, 2023).

The First Circuit, which took an arguably "broader" view of who might qualify as a "subscriber" under the VPPA, required specific allegations beyond mere installation and use of an app, or the provision of additional information, such as an email address or enabling of geolocation. Installing a mobile app was deemed sufficient to create a subscriber relationship *only when* plaintiff alleged that installation *required* the user to provide personal information *in exchange for access* to the app's content. *Yershov*, 820 F.3d at 486, 489. Thus, in *Yershov*, the First Circuit found that plaintiff had satisfied this requirement only because he alleged that "[to] use the App", he was *required* to provide it with personal information, such as "his mobile device's GPS location", something the Court explained was "materially different from" a case in

-10-

which a plaintiff might access a website (or App) without requiring PII.  *Id.*[5]; *see also Gardener v. MeTV*, No. 22 CV 5963, 2023 WL 4365901, at *4 (N.D. Ill. July 6, 2023) (dismissing complaint for failure to allege "subscriber") (citing *Yershov*, 820 F.3d at 489).  There are no such allegations here.

As the Eleventh Circuit subsequently noted, finding "subscriber" status in the absence of specific allegations that provision of PII was required in order to use the app "would require the conclusion that every app user is a subscriber" under the VPPA.  *Perry v. Cable News Network, Inc.*, 854 F.3d 1336, 1343 & n.6. (11th Cir. 2017) (distinguishing *Yershov* and affirming dismissal where provision of GPS location data was not required "to use the app").  Doing so would render the statute's "subscriber" requirement meaningless.  Because Plaintiffs do not allege that they provided any PII to HTV *in return for access to HTV's free video content* there is no plausible allegation that they are "consumers" under the VPPA.

**D.     The Information Allegedly Shared with Braze and DoubleClick Is Not "Personally Identifiable Information" Within the Meaning of the VPPA.**

A third independent basis for dismissal is the absence of any factual allegations giving rise to a plausible inference that the information disclosed meets the VPPA's very specific definition of "PII": "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider."  18 U.S.C. § 2710(a)(3).  This requires fact allegations that the information disclosed would permit the recipient to identify at least three things: "1) a consumer's identity; 2) the identity of 'specific video materials'; and 3) the fact that the identified person 'requested or obtained' that material."  *In re Hulu Priv.*

---

[5] This aspect of the *Yershov* decision was dependent on the court's separate finding that GPS location information was sufficient to identify a specific individual, and therefore constituted, *when combined with other information*, "PII" under the VPPA.  As discussed *infra*, this aspect of *Yershov* should not apply to a mobile news and weather app (which by its nature is used at multiple locations and insufficient by itself to identify a specific individual),and is of questionable precedent and conflicts with every other appellate court to have considered the issue.

*Litig.*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015); *see also Yershov*, 820 F.3d at 485-86;

*Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015).  Plaintiffs have not

alleged any of these elements.

Courts, including the First Circuit, have recognized "there must be limitations to what

constitutes PII under the VPPA."  *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-

04570, 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017), *report and recommendation*

*adopted*, 2017 WL 3726050 (S.D.N.Y. Aug. 28, 2017); *see also Yershov*, 820 F.3d at 486; *In re*

*Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) (Congress did not intend

the VPPA "to cover factual circumstances far removed from those that motivated its passage");

*Robinson*, 152 F. Supp. 3d at 181 ("If nearly any piece of information can, with enough effort on

behalf of the recipient, be combined with other information so as to identify a person, then the

scope of PII would be limitless."); *accord In re Nickelodeon Consumer Priv. Litig.*, MDL No.

2443, 2014 WL 3012873, at *11 (D.N.J. July 2, 2014) ("Certainly, this type of information might

one day serve as the basis of personal identification after some effort on the part of the recipient,

but the same could be said for nearly any type of personal information.").

First, PII must identify a purported "customer"—not just a device.  Under *Yershov*, the

information allegedly disclosed must do so "easily."  820 F.3d at 486.  Short of a specific name,

a person may be easily identified by revealing a social security number to the government

(because the government would be able to easily identify the person the number corresponded to)

or "when a football referee announces a violation by 'No. 12 on the offense,' [because] everyone

with a game program knows the name of the player who was flagged."  *Id*.  The information

allegedly disclosed here does not come close to easily "identifying a person" in this way.

Second, the information shared must also be "reasonably and foreseeably likely to reveal which . . . video[] [the consumer] has obtained." *Id*.  This means that the information would "readily permit *an ordinary person* to identify a [particular individual]", *In re Nickelodeon*, 827 F.3d at 290 (emphasis added), without the need for additional steps to connect the information to a specific individual.[6]  Here, Plaintiffs' allegations do not suggest that it would be possible for anyone, including Braze and DoubleClick, to do so without taking additional, unspecified steps.  Nor do the disclosures alleged—including GPS location, *see, e.g.*, AC ¶¶ 24-25—demonstrate that even taking additional steps would permit identification of particular individuals (let alone Plaintiffs), and Plaintiffs do not allege otherwise.

      **1.  The information disclosed does not "easily identify" any individual.**

The differences between the factual allegations of this case and those at issue in *Yershov* and other cases attempting to establish VPPA claims (such as those involving the Facebook Pixel) make clear the allegations here are insufficient to "easily identify" a Plaintiff or any individual.  In *Yershov* and the Pixel cases, for example, central to the court decisions denying motions to dismiss were factual allegations that the recipient of the information at issue (in *Yershov*, Adobe, and in the Pixel cases, Facebook) itself possessed preexisting personalized information (including names), that the *recipient* could *actually* (and not just hypothetically) use *at the time of receipt* to identify a specific, named, individual.  *See, e.g.*, *Yershov*, 820 F.3d at

---

[6] A majority of courts use the "*ordinary person*" test.  *In re Nickelodeon*, 827 F.3d at 290 (emphasis added); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017).  As the Ninth Circuit has observed, "[t]he 'ordinary person' test better informs video service providers of their obligations under the VPPA."  876 F.3d at 985.  This is because "the statute views disclosure from the perspective of the disclosing party.  It looks to what information a video service provider discloses, not to what the recipient of that information decides to do with it.  As a result, 'personally identifiable information' must have the same meaning without regard to its recipient's capabilities.  Holding otherwise would make '[t]he lawfulness of [a] disclosure . . . depend on circumstances outside of [a video service provider's] control.'"  *Id.* (quoting *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015)); *see also Robinson*, 152 F. Supp. 3d at 182 (interpretations of the VPPA that look to whether "information disclosed by a provider, plus other pieces of information collected elsewhere by non-defendant third parties" identify a particular person are at odds with the language of the statute).

484-85 (describing allegations); *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 91 (S.D.N.Y. 2022) (noting that *Yershov* "explicitly relied on the allegation that the defendant knew Adobe would be able to use this information to identify the plaintiff with particularity because of vast information the company collects about individuals for the purpose of creating 'digital dossiers'") (citing *Yershov*, 820 F.3d at 485-86)); *Feldman v. Star Trib. Media Co.*, No. 22-CV-1731, 2023 WL 2388381, at *9 (D. Minn. Mar. 7, 2023) (denying motion to dismiss where complaint alleged that "connecting a Facebook ID to a specific person, a URL to a particular video, and the specific person to the particular video is a reasonably straightforward exercise" for Facebook); *Ambrose*, 2022 WL 4329373, at *2 (noting specific allegations that Facebook would be able to connect the material disclosed by Pixel to existing, personalized profiles that would permit it to specifically determine what information identifiable registered users had viewed); *see also* AC ¶ 80.  There are no such allegations here.

        While Plaintiffs try to leave the impression that such connections are being made by Braze and DoubleClick, their factual allegations indicate precisely the opposite—that *none* of the information allegedly disclosed actually permitted Braze or DoubleClick, let alone an "ordinary person", to identify either Plaintiff or any other individual as having requested or obtained a specific video.  *See, e.g.*, *Eichenberger*, 876 F.3d at 986 (information disclosed "*cannot* identify an individual unless it is combined with other data in Adobe's possession—data that ESPN never disclosed and apparently never even possessed"); *In re Nickelodeon*, 827 F.3d at 283 (questioning whether the definition of PII includes information that "[t]o an average person . . . would likely be of little help in trying to identify an actual person").

        In nonetheless trying to meet *Yershov*'s "easily identify" test, Plaintiffs rely heavily on two pieces of information that they allege were disclosed to either Braze or DoubleClick:

geolocation data, and a third alphanumeric identifier (a "Braze ID" or an "AAID").  Neither

meets *Yershov*'s test and is PII within the meaning of the VPPA.

### a)  Geolocation

Plaintiffs allege that the purported disclosure of their voluntarily enabled device

geolocation information (in the form of a hashed identifier or longitude/latitude) to both Braze

and DoubleClick "combined with publicly available tools" transform those disclosures into PII

under the VPPA.[7]  *See, e.g.*, AC ¶¶ 50, 53, 72, 110, 111.  Although the *Yershov* court suggested

that GPS data *can* be identifying under certain circumstances, it is not necessarily the case, and

Plaintiffs' very specific allegations illustrate why it is not the case here.[8]  In fact, Plaintiffs'

---

[7] Plaintiffs have not alleged that an email address is sufficient personal information to sustain a VPPA claim for the purported Braze transmissions.  Plaintiffs allege that the App *can* share email with Braze—but only if a user *chooses* to provide their email address to HTV.   There also is no allegation that Saunders' email address (which is not alleged) would easily identify her, or that any email addresses that are alleged to have been transmitted to Braze (*see* AC ¶ 24) identify any specific person, whether on their own or combined with other information allegedly disclosed. Plaintiffs instead allege that an email address is merely "a unique string of characters which designate an electronic mailbox" (*id.* ¶ 35), *not* a specific individual.  *See, e.g.*, *Dancel v. Groupon, Inc.*, 949 F.3d 999, 1008-09 (7th Cir. 2019) (finding that an email or username is not *inherently* identifying and finding, in the context of a right of publicity statute, "[t]he [statute] . . . requires more . . . . It demands that an attribute, even a name, serve to identify an individual. . . . whose identity is being appropriated" because the fact that usernames are unique "does nothing to answer the question whether any given username identifies that specific individual who is behind that username and its associated account").  This would doom Plaintiffs' claim if they were relying on alleged email disclosures. Notably, the class that Plaintiffs purport to represent is defined to include all persons who used the apps "with location services enabled", regardless of whether they submitted an email address.  AC ¶¶ 128-30.

[8] To the extent *Yershov* is misread to stand for the proposition that device identifiers and GPS signals, in all cases and without more, are capable of identifying a particular person, it would be both counterfactual (*see infra* pp. 16-17, 19-22) and contrary to the weight of case law.  *See also In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873, at *10 ("PII is information which must, without more, itself link an actual person to actual video materials."); *Ellis v. Cartoon Network, Inc.*, No. 14-CV-484, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (PII not disclosed where the third party to whom an Android ID and viewing history were provided had to "collect information from other sources" to identify the plaintiff), *aff'd on other grounds*, 803 F.3d 1251; *Locklear v. Dow Jones & Co.*, 101 F. Supp. 3d 1312, 1318 (N.D. Ga. 2015) ("[A] Roku serial number, without more, is not akin to identifying a particular person and, therefore, is not PII." (citation and quotation marks omitted)), *abrogated on other grounds*, *Ellis*, 803 F.3d 1251; *Eichenberger v. ESPN, Inc.*, No. C14-463, 2015 WL 7252985, at *6 (W.D. Wash. May 7, 2015) (allegation that Adobe "used information gathered from other sources to link plaintiff's Roku device serial number and the record of what videos were watched to plaintiff's identity" failed to state a claim for disclosure of PII under the VPPA).  Even *Yershov* cautioned against reading its holding too broadly.  820 F.3d at 489.

allegations provide no factual basis to conclude that their geolocation data enabled anyone to identify them, or anyone else.  They support the opposite conclusion.

The precise geolocation information provided in ¶¶ 24-25—which purports to include actual data transmitted to Braze and DoubleClick as part of a "dynamic analysis" and includes three different longitude/latitudes—indicates the device(s) that sent GPS signals to Braze and/or DoubleClick may have been located in or around 1306 to 1314 Solano Avenue in Albany, California (*see* AC ¶¶ 24-25, and 39, p. 13) at some point in time.  This information does not make any individual "easily identifiable" to an "ordinary person," either on its face or with "publicly available tools."[9]  There is nothing in the data, much less the Amended Complaint, to suggest who in particular might live at the corresponding California addresses, or that whoever was using the App at that time even lives at one of those addresses and was not just walking or driving by or visiting temporarily.  It does not "easily identify" the Plaintiffs, who allege they reside across the country in Massachusetts and New Hampshire (AC ¶¶ 118-19), or anyone else.[10]  The addresses appear to encompass, among other things, a number of commercial properties, including a chiropractor's office and apartment buildings.[11]  Plaintiffs do not even allege—and could not—that the GPS coordinates included in ¶¶ 24-25 reflect the actual home or

---

[9] Notably, the articles Plaintiffs cite to support their theory do NOT state that a single GPS coordinate at a single point in time is sufficient to identify an individual; rather, they are clear that such identification is only possible with following multiple data points over a long period of time—approaching a year or more.  AC ¶¶ 40 n.25, 41.  This is the very nature of a "longitudinal" study such as those referenced in n.25 and ¶ 41 of the Amended Complaint.

[10] Although Plaintiffs broadly allege that in theory, "[p]recise geolocation *can* be used by anyone to uniquely identify a person" *id.* ¶ 40 (emphasis added), they do NOT allege that it is possible to do so from the specific geohashes alleged in the Amended Complaint.  Nor do they allege *how* "anyone" would be able to identify the individuals who viewed news content on the HTV Apps from the geohashes provided.

[11] All of this information is readily ascertainable from the information incorporated by reference into the Amended Complaint by going to the very Google map embedded there and searching for the business names listed there and zooming in or out and examining "street view" as needed.  Alternatively, the longitude and latitude included in ¶¶ 24-25 can be placed into publicly available online calculators.  In either case, any addresses found do not lead to specifically identifying any individual alleged to have been using either of the Apps, let alone a Plaintiff.

business address of any specific unidentified users who conducted the "dynamic analysis" at the time they purportedly accessed news reports on the Apps, much less that the geolocation could determinatively identify that unique individual and not any number of others. *See id.* ¶¶ 24-25.

The First Circuit's decision in *Yershov* is of no help to Plaintiffs.  It provides no basis to conclude that any individual GPS disclosure can easily or reliably identify a specific individual at the time they request specific video content.  Rather, *Yershov* relied on the express—and extreme—hypothetical assumption that "146" GPS disclosures over time that all identified the same residential and workplace address could be a reliable static indicator of the person who lived and worked at those addresses.  820 F.3d at 486.  That assumption has no place in this case, where the allegations do not support it, and in fact contradict it.  Mobile apps are by nature designed to be used on the go and in a variety of locations, including public locations and places frequented by other people.  GPS location only indicates where a device is at a given moment in time, which can change throughout a day (or week, or month).  Given these realities, geolocation necessarily is not sufficient to "easily identify" *an individual person* checking a weather report or reading a news update on an HTV mobile App at any given time.  Plaintiffs admit as much when they provide two different GPS locations that they allege to correspond with a single individual (reflected on pp. 8-9 of the Amended Complaint), yet provide no basis to "easily identify" that individual.  This is far from the extreme example cited by the *Yershov* court.  On the facts alleged here, the geolocation enabled by Plaintiffs on their phone and purportedly shared with Braze and DoubleClick are not PII within the meaning of the VPPA.

### b)   *Other alphanumeric identifiers*

Plaintiffs' attempt to equate alleged disclosures of certain alphanumeric identifiers (a "Braze ID" to Braze, and an "Advertising ID" or "AAID" to DoubleClick) by the HTV Apps

with the types of "easily identifying" disclosures relied upon by the *Yershov* court similarly fails. In *Yershov*, the court's decision was based on very different—and patently incorrect—facts. [12] There, the plaintiff alleged (albeit incorrectly) that the Android ID/AAID "remains constant" and that the AAID was tied to a specific *user*, not just a device.  820 F.3d at 484 n.1 (noting that the plaintiff specifically alleged that "Android IDs . . . are unique both to a specific device and user, such that where a device has multiple users, each user appears as a separate device.").  Here, in sharp contrast, Plaintiffs correctly acknowledge that neither is true:  rather, an AAID attaches "to a device", not a user, and is "resettable", not persistent.  AC ¶¶ 47-48; *see also* Google Play Console Help, Advertising ID, https://support.google.com/googleplay/android-developer/answer/6048248?hl=en#:~:text=The%20advertising%20ID%20is%20a,continue%20to%20monetize%20their%20apps (last visited 7/17/23) ("The advertising ID is a unique, user-resettable ID. . . . It enables users to reset their identifier or opt-out of personalized ads . . . within Google Play apps.").  Plaintiffs (or any device user) can also opt out of sharing AAID entirely. *See, e.g.*, *id.*; Google Authorized Buyers Help, Target mobile apps with IDFA or AAID, https://support.google.com/authorizedbuyers/answer/3221407?hl=en (last visited 7/17/23).[13]

Plaintiffs' allegations with respect to disclosures to Braze are similarly deficient.  Despite their conclusory allegation that Braze IDs "*can*" include "names, email addresses" and other

---

[12] Many of the allegations relied upon by the *Yershov* court were later disclaimed as never supported, and the complaint was voluntarily dismissed.  *See infra* pp. 19-20.

[13]  It is well-established that the court can take notice of publicly available documents.  *See, e.g.*, *Brown*, 525 F. Supp. 3d at 1061 (documents that appear on Google's websites are "proper subjects for judicial notice") (collecting cases); *see also United States v. Vega-Rivera*, 866 F.3d 14, 20 (1st Cir. 2017) (taking notice of Google map); *Mayhall on behalf of D.M. v. Amazon Web Servs. Inc.*, No. C21-1473, 2022 WL 2718091, at *4 (W.D. Wash. May 24, 2022) (taking notice of documents where they "appear on publicly available websites and the facts included are not subject to reasonable dispute"), *report and recommendation adopted*, No. 21-CV-01473, 2023 WL 2728292 (W.D. Wash. Mar. 31, 2023). Such documents are also incorporated by reference in the Amended Complaint, which describes Plaintiffs as downloading the HTV Apps onto their Android devices and purports to describe certain features of DoubleClick and App use on those devices.

information (AC ¶ 52 (emphasis added)), Plaintiffs do not allege any facts to support this claim, and the specific facts alleged with respect to purported dynamic captures of transmissions from the HTV Apps show that as allegedly transmitted, these IDs are no more than seemingly random numbers and letters.  *Id.* ¶ 24.  No ordinary person would be able to identify anyone, let alone a Plaintiff, from the number, and Plaintiffs do not allege that Braze was able to (let alone did) identify them.  As a result, neither the Braze ID nor the AAID are PII under the VPPA.

> ### c)  *None of the identifiers are alleged to have permitted identification of Plaintiffs.*

Plaintiffs undoubtedly have attempted to tailor their allegations to fit their reading of the First Circuit's decision in *Yershov*.  But the facts alleged do not fit *Yershov*, a decision explicitly tied to the very specific allegations made there.  820 F.3d at 489.

As an initial matter, *Yershov* is not binding precedent because the case ended when plaintiff stipulated to facts indicating the court never had jurisdiction over the case from the start. Following the First Circuit's opinion and reinstatement of plaintiff's claims in that case, the parties engaged in discovery.  Throughout the process, there were questions as to plaintiff's ability to support his allegations.  *See, e.g.*, Mem. Of Law in Opp'n to Mot. For Ext. of Time, *Yershov v. Gannett*, No. 14-cv-13112 (D. Mass. Mar. 27, 2017) ("*Yershov* docket"), ECF No. 73. Ultimately, the plaintiff stipulated that he ***did not have*** evidence to support the most basic allegations of his complaint (upon which the First Circuit relied):  that defendant "disclos[ed] his PII—in the form of the title of the videos he watched [on the USA Today App], his unique Android ID, and his GPS coordinates—to third party analytics company [Adobe Systems Inc.]" that permitted Adobe to "identif[y] Yershov and attribute[] his video viewing records to an individualized profile of Plaintiff Yershov in its databases."  ECF No. 83, *Yershhov* docket (stipulation of dismissal with prejudice) (citing *Yershov* Compl. ¶ 42).  The very facts the

*Yershov* plaintiff disclaimed in his stipulation of dismissal were the very same facts relied upon by the First Circuit in ruling on the motion to dismiss before it. *See supra* at 15-18. In other words, the *Yershov* plaintiff *never had* Article III standing at all to bring his claims (let alone a cause of action under the VPPA), the facts alleged were *always* hypothetical, the claim was not properly before the court. And there was never a justiciable controversy to begin with, rendering the First Circuit's decision advisory at best.[14] *See, e.g.*, *In re Fin. Oversight & Mgt. Bd. For P.R.*, 919 F.3d 638, 646 (1st Cir. 2019) ("In the absence of an actual controversy, federal courts cannot issue advisory opinions."); *Wang v. N.H. Bd. Of Registration in Med.*, 55 F.3d 698, 702 (1st Cir. 1995) ("We decline the invitation to provide an advisory opinion on a claim for which there is no evidentiary support in the appellate record.").[15]

Moreover, as noted *supra* pp. 9-13 and notes 6 and 8, if *Yershov* were read as broadly as to encompass the allegations here, it would be out of step with every other appellate court (and most district courts) to have considered claims like Plaintiffs'. *Yershov*'s assumption that particular GPS disclosures and AAIDs are static indicators that can "easily identify" individuals is also contrary to the way GPS and AAIDs work in practice (and common sense in the context of a mobile application, not to mention the very articles relied upon by Plaintiffs in their Amended Complaint). *See supra* at 15-19. Moreover, that assumption was based on the extreme example of 146 geolocation data points that all pointed to the same person's home and work and

---

[14] The stipulation of dismissal in *Yershov* demonstrates that it was not a case of subsequent facts rendering the case moot, but rather that the facts alleged to give rise to a purported claim *never existed in the first place*.

[15] *Cf. Nationstar Mortg. LLC v. Nelson*, No. 14-CV-00507, 2015 WL 3885361, at *2 (D. Me. June 24, 2015) ("If Nationstar did, in fact, lack standing to bring a foreclosure complaint, then a judgment on that claim would not have preclusive effect."); *Dedham Water Co. v. Cumberland Farms Dairy, Inc.*, 972 F.2d 453, 459 (1st Cir. 1992) (statements not essential to determination of legal question before the court are dicta: "[d]ictum constitutes neither the law of the case nor the stuff of binding precedent")."

no place else.  But the VPPA requires assessing PII at a given point in time—that of a particular disclosure.

Finally, *Yershov* is distinguishable on its facts.  The extreme hypothetical facts upon which *Yershov*'s dictum was based are absent here, as are *any* actual facts that indicate an individual could be "easily identified."  *See* discussion, *supra*.  Moreover, despite attempting to allege that geolocation, email, and a Braze or AAID *could* be shared (if affirmatively enabled in the case of geolocation and email) and the inclusion of many pages of allegations speculating about what Braze and DoubleClick "*may*" be able to do with such information, Plaintiffs do not allege that either Braze or DoubleClick actually used the information purportedly shared by HTV to identify specific individuals who viewed specific video content on the Apps—let alone that they did so and could identify Plaintiffs.  *See* AC ¶¶ 73-95.  This is in sharp contrast to the allegations in *Yershov*, where the plaintiff alleged that "Adobe *was* able to identify *Yershov* and link the videos he had viewed to his individualized profile maintained *by Adobe*."  820 F.3d at 484-85 (emphases added).  There are no such allegations here.

*Wilson v. Triller* is instructive in its analysis of allegations similar to those in Plaintiffs' Amended Complaint.  In *Wilson*, the district court examined the allegations of the complaint before it through the lens of *Yershov* and found they came up short:

> While the complaint alleges what sort of information *could* be included on a user's profile and then ultimately disclosed to the third parties, it contains no allegation as to what information *was actually included* on Wilson's profile nor how that information could be used by a third party to identify Wilson. Indeed, the complaint lacks any allegation that would allow the Court to infer a "firm and readily foreseeable" connection between the information disclosed and Wilson's identify, thus failing to state a claim under the VPPA even assuming the broader approach set out in *Yershov*.

598 F. Supp. 3d at 92 (emphases added) (citations omitted).  Here, Plaintiffs' allegations require the Court to make greater inferential leaps:  the linkages required between the data allegedly

disclosed to Braze and to DoubleClick (each of which disclosures must be assessed separately

from one another) and the ability to identify either Plaintiff, are simply "too uncertain, or too

dependent on too much yet-to-be-done, or unforeseeable detective work . . . ." *Yershov*, 820

F.3d at 486.[16]  Plaintiffs do not allege that either Braze or DoubleClick actually combined

information from HTV with their own on-hand information.  As noted *supra*, neither the Court

nor anyone else would be able to take the information provided by Plaintiffs on pages 7-9 of the

Amended Complaint and identify with any confidence a specific individual who allegedly

viewed the referenced content.  In short, Plaintiffs' allegations make plain that here "[a]n

unrelated third party equipped with the information purportedly disclosed by [Defendant], and

nothing more, could not identify [Plaintiff]." *Robinson*, 152 F. Supp. 3d at 184.  As a result,

Plaintiffs have failed to meet their burden under Rule 12(b)(6) of alleging facts giving rise to any

plausible inference that it was reasonably and foreseeably likely that the disclosures at issue

would "easily" identify a Plaintiff.

## 2.   The information disclosed does not identify "specific video materials requested or obtained."

In addition to easily identifying a specific "consumer", the information disclosed must

*connect* the consumer to *specific video material* the consumer *requested or obtained*.  18 U.S.C.

§ 2710(a)(3); *Yershov*, 820 F.3d at 486.  By its plain language, the VPPA is concerned with

revealing an individual's specific interest, as reflected by a request for or receipt of "specific

video materials."  If the information purportedly disclosed reveals, *e.g.*, only that someone

---

[16] As one district court noted, "[w]hatever the impact of modern digital technologies on the manner in which personal information is shared, stored, and understood by third parties . . . the Court cannot ascribe such an expansive intent to Congress in enacting the VPPA.  It would render meaningless the requirement that the information identify a specific person as having rented or watched specific videos, as all information would, with some work, be identifying, and would transmute a statute focused on disclosure of specific information to one principally concerned with what third parties might conceivably be able to do with far more limited disclosures." *Robinson*, 152 F. Supp. 3d at 181.

visited a particular website, and does not reveal whether they were interested in specific video content on that website, the VPPA is not implicated.  *See Martin v. Meredith Corp.*, No. 22-cv-4776, 2023 WL 2118074, at *3 (S.D.N.Y. Feb. 17, 2023); *see also* S. Rep. at 12 (VPPA not violated by disclosing "whether a [ ] person patronized a [video store] . . . on a particular date").

Plaintiffs have not met the threshold requirement of showing that HTV disclosed information linking them to specific video material they requested.  Instead, Plaintiffs point to what they describe as "captures" of transmissions in AC ¶ 24 (Braze) and ¶ 25 (DoubleClick).  In the case of DoubleClick, this includes a website URL, characterized by Plaintiffs as a "VideoName", and a string of numbers characterized as a "VideoID."  For Braze, this includes only a string of numbers identified in the capture as "COID"  (which Plaintiffs again describe as "VideoID" but that does not appear as such in the purported transmission "captures" in ¶¶ 24 and 56).  Neither indicates the specific video content a specific consumer requested or obtained. First, a URL linking to a news story—which may or may not include accompanying video content—at most indicates a request for or receipt of the news story, and not a "*request* for *specific video* material."  *Id.* ¶ 14 (alleging that the videos on the Apps only "supplement[] the written content"), ¶¶ 24-25; *Martin*, 2023 WL 2118074, at *3-4 (dismissing complaint despite general allegations that video title was shared where specific allegations revealed "only webpage titles [shared]": "merely disclosing the name of the webpage does not indicate that a website visitor requested or obtained specific video materials on that webpage").  It is a far cry from disclosing that a judge rented a copy of "Citizen Kane" on video tape.  Indeed, Plaintiffs' very attempt in paragraph 58 of the Amended Complaint to allege that the content requested or viewed was specifically "video" content illustrates just the opposite:  the article identification number (or "videoID" as Plaintiffs deem it) is not, in fact, merely video.  Notably, as suggested

by corresponding paragraphs in Plaintiffs' original complaint (ECF No. 1), entering just the article number without the word "video" yields the same result—a hyperlink to a news article.

Nor does the inclusion of a number that, according to Plaintiffs, indicates whether a video was watched (AC ¶ 66) transform the transmissions at issue into ones sufficient to satisfy the VPPA's requirement of revealing the "specific video material" requested or obtained by a consumer.  This is especially apparent here, where if the link included in Amended Complaint ¶ 58 is followed (whether or not the word "video" is included in the search), https://www.wmur.com/article/keene-new-hampshire-wizarding-week-harry-potter/44677279, the result is not only clearly a news article, but it is on a page that includes, contrary to Plaintiffs' allegation in paragraph 65, *multiple* videos and *multiple* news stories on multiple topics—not "specific video content".  Even under Rule 12(b)(6)'s liberal pleading standard, these allegations are simply too tenuous and require too many inferential steps to meet Plaintiffs' burden of demonstrating that the article ID or URL allegedly transmitted to Braze or DoubleClick reflects "specific video content" as required by the VPPA.

### E.      Plaintiffs Have Not Alleged Knowing Transmission.

Any disclosure of PII is actionable only if it was made "knowingly" by defendant.  This requires allegations that a defendant *knew* that a third party would actually link information it already possessed with other information conveyed and become aware that a particular person had in fact purchased a particular video.  *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1096 (granting summary judgment where the connection would be established, if at all, by an act of the recipient); *see also Bernardino*, 2017 WL 3727230, at *9.  "[T]he knowledge element of the VPPA violation is intertwined with the definition of PII.  If Barnes & Noble did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information."  *Bernardino*, 2017 WL 3727230, at *9.

Here, Plaintiffs do no more than conclude that "it is abundantly clear that [HTV] intentionally and knowingly discloses to Braze and Google, . . . its users' personally identifiable information." AC ¶ 96 (emphasis omitted).  Plaintiffs plead no facts to support that bare conclusion, let alone that HTV thought it was conveying PII.  And the facts that are alleged demonstrate that any connection between the information allegedly disclosed and any individual's identity would be done, if at all, only by Braze or DoubleClick.  *See, e.g.*, AC ¶¶ 72. This is not sufficient under the VPPA.

## F.    Plaintiffs Have Not Alleged Actual Damages.

Finally, the VPPA provides a cause of action only where an individual is able to allege (and ultimately prove) "actual damages."  18 U.S.C. § 2710(c)(2); *see also Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 n.1 (7th Cir. 2014) (distinguishing "actual damages" requirement from harm required for Article III standing); *Bernardino*, 2017 WL 3727230, at *7 (noting, in denying preliminary injunction, possibility that "a jury values *the harm from providing the DVD purchase information to Facebook's database* at a higher amount" (emphasis added)); *Doe v. Chao*, 540 U.S. 614 (2004) (requiring actual damages under Privacy Act);[17] *cf. In re SuperValu, Inc.*, 925 F.3d 955, 964 (8th Cir. 2019) (analyzing similar language under 815 Ill. Comp. Stat. 505/10a(a) and finding "[t]he actual damage element of a private ICFA action requires that the plaintiff suffer 'actual pecuniary loss.'" (citations omitted)); *Dyer v. Capital One, N.A.*, 496 F. Supp. 3d 554, 562 (D. Mass. 2020) (dismissing RESPA claim for failing to allege actual damages); *Williams v. Litton Loan Servicing*, No. CA 10-11866, 2011 WL

---

[17] The VPPA was modeled on the Privacy Act.  *See* S. Rep. at 8.  Under the Privacy Act, "actual damages" require allegations of "special damages for proven pecuniary loss."  *F.A.A. v. Cooper*, 566 U.S. 284, 298 (2012); *Berry v. FBI*, No. 17-CV-143, 2018 WL 3468703, at *3 (D.N.H. July 17, 2018) ("[C]ourts routinely dismiss claims for damages under the Privacy Act that fail to allege any discernible pecuniary injury") (collecting cases), *aff'd*, No. 18-1926, 2020 WL 13065178 (1st Cir. Feb. 27, 2020).

3585528, at *4 (D. Mass. Aug. 15, 2011) (same); *St. Louis Heart Ctr. v. Nomax*, 899 F. 3d 500, 503-05 (8th Cir. 2018). The need to prove actual damages is reflected in the legislative history as well. It notes that "[t]he civil remedies section puts teeth into the [VPPA], ensuring that the law will be enforced by individuals *who suffer as the result of* unauthorized disclosures. It provides that an individual *harmed* by a violation of the Act may seek compensation in the form of actual and punitive damages, equitable and declaratory relief and attorneys' fees and costs." S. Rep. at 8 (emphasis added).

Plaintiffs do not even attempt to allege that they have suffered actual damages resulting from the alleged disclosures. *See, e.g.*, AC ¶¶ 138-47 (Count 1). There is no allegation that either Plaintiff suffered any pecuniary loss. Moreover, by alleging they chose to enable location services even though it was not required for them to use the App (and view videos on the App), Plaintiffs admit that any purported damages were caused by their own actions.

**G.    The Purported Disclosures Alleged in the Amended Complaint Fall Within an Exception to Liability under the VPPA.**

The VPPA provides several exemptions to liability even when "personally identifying information" about specific video materials is disclosed. Disclosures "incident to the ordinary course of business of the video tape service provider" are permitted. 18 U.S.C. § 2710(b)(2)(D)-(E); S. Rep. at 14; *see Bernardino*, 2017 WL 3727230, at *8. These include, *inter alia*, "order fulfillment" and "request processing", which the legislative history makes clear includes disclosures to "computer services" and others "for marketing to [the video tape service provider's] customers." S. Rep. at 14. Here, the *only* disclosures alleged in the Amended Complaint are *admitted* to be in connection with "marketing" or "customer engagement" and the third parties to which information was allegedly disclosed are described as "third parties" engaged "to assist with Defendant's marketing . . . efforts", including to conduct "real-time

targeted marketing campaigns . . . ."  AC ¶¶ 22, 26-30, 32-34 (alleging ways Braze and

DoubleClick are used to market to App users).  As a result, the VPPA's "ordinary course of

business" exception applies on the face of the Amended Complaint and provides an independent

basis for dismissal.  *See, e.g.*, *Monsarrat v. Newman*, 28 F.4th 314, 318 (1st Cir. 2022) (dismissal

based on affirmative defense proper where "facts establishing the defense are clear from the face

of the complaint as supplemented by 'matters fairly incorporated within it and matters

susceptible to judicial notice.'"); *Tassinari v. Salvation Army Nat'l Corp.*, 610 F. Supp. 3d 343,

360 (D. Mass. 2022) (dismissing claim based on statutory exemption applicable on face of

complaint).

## II.     Plaintiffs' Reading of the VPPA Would Be Barred by the First Amendment.

As discussed above, the VPPA is narrowly tailored to protect a very specific privacy

interest and Plaintiffs have failed to allege any violation.  There is thus no need to consider the

constitutional implications of Plaintiffs' claims.  However, if Plaintiffs' overbroad reading of the

VPPA were credited, it would not only do violence to the statute, it would run headlong into the

First Amendment and could not survive constitutional scrutiny as applied.

### A.     The VPPA Is a Content-Based and Speaker-Based Restriction on Speech.

Hearst's challenged communication of data is fully protected by the First Amendment.

*See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558-60 (2011); *Dex Media W., Inc. v. City of

Seattle*, 696 F.3d 952, 965 (9th Cir. 2012) (compilations of information are non-commercial

speech "entitled to full First Amendment protection"); *Exeltis USA Inc. v. First Databank, Inc.*,

520 F. Supp. 3d 1225, 1230 (N.D. Cal. 2021) ("collection of . . . consumer information" is non-

commercial speech).

The VPPA is a content-based restriction on speech.  *Reed v. Town of Gilbert, Ariz.*, 576

U.S. 155, 163 (2015) ("Government regulation of speech is content based if a law applies to

particular speech because of the topic discussed or the idea or message expressed."); *see also Sorrell*, 564 U.S. at 558-60 (law governing commercial and other uses of "records containing prescriber-identifiable information" is content-based); *Stark v. Patreon, Inc.*, No. 22-CV-03131, --- F. Supp. 3d ---, 2023 WL 2090979, at *9 (N.D. Cal. Feb. 17, 2023) (VPPA is a content- and speaker-based regulation of speech).  The VPPA restricts disclosure of specific information and applies only to certain speakers, both defined by statute.

As a content- and speaker-based regulation, the VPPA is subject to strict scrutiny.  *Reed*, 576 U.S. at 164; *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 142 S. Ct. 1464, 1472 (2022); *Project Veritas v. Schmidt*, No. 22-35271, 72 F.4th 1043, 1058-59 (9th Cir. 2023). "Content-based laws . . . are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests."  *Reed*, 576 U.S. at 163.  Any curtailment of speech must be "actually necessary" to the restriction imposed.  *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011).  "It is rare that a regulation restricting speech because of its content will ever be permissible."  *Id*. (citation omitted).  But even if intermediate scrutiny applied, the VPPA would not survive review if applied here.

**B.      The VPPA Would Not Satisfy Any Level of Scrutiny as Applied to Hearst's Alleged Speech.**

Whatever the merit of Congress's stated interest in protecting privacy when enacting the VPPA (S. Rep. at 5-6), broadening the law's scope to reach HTV's communication of data to Doubleclick or Braze is about as far from "narrow[] tailor[ing]" to protect that interest as one can imagine.  Plaintiffs' overbroad reading would transform the VPPA's targeted aim into a blunderbuss attack on any communications by publishers to facilitate advertising.  There is no compelling state interest in prohibiting such communications.  *Cf.*, *Stark*, 2023 WL 2090979, at *14.  Nor would suppressing the communication of data points that do not clearly identify any

individual directly advance any privacy interest, much less to a material degree, and in a narrowly tailored way.  This is particularly true where, as here, the challenged disclosures are non-public, depersonalized data and numbers, and involve no human review or judgment.  *See, e.g.*, *Bernardino*, 2017 WL 3727230, at *10 ("Given that no human being ever learned the name of the DVD Bernardino purchased through any disclosure made by Barnes & Noble and that Bernardino herself did not even know her . . . information was shared with Facebook until she was so advised by an expert, this Court agrees that this action concerns an effort to shape policy more than Bernardino's effort to remedy a breach of her privacy.").

Even if HTV's speech were deemed "commercial speech" and the Court chose to apply intermediate scrutiny under *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), the VPPA as applied here would not survive review. Plaintiffs' broad rendering of the VPPA is the antithesis of a statute "narrowly drawn" to advance in a "direct and material" way Congress's stated interest in protecting privacy.  *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012) (citing *Central Hudson*, 447 U.S. at 566); *Edenfield v. Fane*, 507 U.S. 761, 767 (1993); *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (more than "mere speculation or conjecture" is required) (quoting *Greater New Orleans Broad. Ass'n v. United States*, 527 U.S. 173, 188 (1999)); *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 486-87 (1995) (same); *Ibanez v. Fla. Dep't of Bus. & Prof'l Regul.*, 512 U.S. 136, 143-44 (1994) (same); *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 416-18 (1993) (same); *accord Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1312 (11th Cir. 2017).  This is underscored by the VPPA's exceptions, which permit disclosure of the very same information for some purposes (such as marketing directly to individuals) but not others.  *See, e.g.*, 18 U.S.C. § 2710(b)(2); *Reed*, 576 U.S. at 160 (laws that treat some speech "less favorably" than others

cannot withstand First Amendment scrutiny); *Sorrell*, 564 U.S. at 572-73 (prohibiting use of identifying information for marketing while allowing others to use same information undercut state's professed privacy aim).  The VPPA is not "narrowly tailored" to any substantial governmental interest to the extent it can be read to sweep up Hearst's communications unrelated to Congress's aim in enacting the VPPA.  *Reed*, 576 U.S. at 163.

Because the VPPA cannot be applied as Plaintiffs urge without violating the First Amendment, the Court should decline Plaintiffs' invitation to give the VPPA an overbroad reading and preserve its proper scope.  Otherwise, it must decline to apply the statute at all.

## CONCLUSION

For the reasons set forth herein, and because Plaintiffs have already had a chance to amend their original complaint, Plaintiffs' Amended Complaint should be dismissed with prejudice.

Dated: September 12, 2023             Respectfully submitted,

By:  /s/ Matthew Greenfield
Matthew Greenfield (Mass. BBO No. 684596)
Jonathan R. Donnellan*
Andrea R. Butler*
Kristen Hauser*
*The Hearst Corporation*
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 649-2484
Fax: (212) 554-7000
matthew.greenfield@hearst.com
jdonnellan@hearst.com
abutler@hearst.com
khauser@hearst.com

*Admitted Pro Hac Vice*

*Attorneys for Defendant Hearst Television Inc.*

-30-

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on September 12, 2023.

<u>/s/ Matthew Greenfield</u>