# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MICHELE SAUNDERS and RICHARD HAYDEN, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 1:23-cv-10998 |
| v. | Hon. Rya W. Zobel |
| HEARST TELEVISION, INC., | |
| Defendant. | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S
## <u>MOTION TO DISMISS THE FIRST AMENDED COMPLAINT</u>

Dated: October 12, 2023

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

**BURSOR & FISHER, P.A.**
Yitzchak Kopel*
Max S. Roberts*
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
        mroberts@bursor.com

**BURSOR & FISHER, P.A.**
Christopher R. Reilly*
701 Brickell Avenue, Suite 1420
Miami, FL 33131
Telephone: (305) 330-5512
Facsimile: (305) 679-9006
E-Mail: creilly@bursor.com

*Pro Hac Vice Forthcoming*
*Attorneys for Plaintiffs*

# <u>TABLE OF CONTENTS</u>

**PAGE(S)**

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

I.     THE FIRST CIRCUIT'S HOLDING IN *YERSHOV V. GANNETT SATELLITE INFORMATION NETWORK* IS BINDING ON THIS COURT ........................................ 2

II.    DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER ............................................... 3

III.   PLAINTIFFS ARE SUBSCRIBERS UNDER THE VPPA .............................................. 5

IV.   DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE INFORMATION .......................................................................................................... 6

      A.    Defendant's Briefing Uses An Incorrect Legal Standard ....................................... 6

      B.    Plaintiffs' Allegations Track And Exceed The Facts Of *Yershov* ........................... 7

             1.    An Email Address Is Reasonably And Foreseeably Likely To Identify An Individual ................................................................................... 7

             2.    Geolocation Is Reasonably And Foreseeably Likely To Identify An Individual ................................................................................................ 8

             3.    AAID And Braze User ID Are Reasonably And Foreseeably Likely To Identify An Individual ..................................................................... 11

             4.    Plaintiffs Were Identified By Braze And Google Based On The PII Defendant Disclosed ................................................................... 13

V.    DEFENDANT DISCLOSED INFORMATION THAT WAS REASONABLY AND FORESEEABLY LIKELY TO IDENTIFY THE VIDEOS REQUESTED OR OBTAINED ......................................................................................................... 15

VI.   DEFENDANT DISCLOSED PERSONALLY IDENTIFIABLE INFORMATION "KNOWINGLY" ........................................................................................................ 17

VII.  DEFENDANT'S DISCLOSURES WERE NOT MADE IN THE "ORDINARY COURSE OF BUSINESS" ...................................................................................... 19

VIII. PLAINTIFFS NEED NOT PLEAD ACTUAL DAMAGES .......................................... 20

IX.  THE VPPA COMPORTS WITH THE FIRST AMENDMENT ...................................... 22

      A.    At Most, Intermediate Scrutiny Should Apply ..................................................... 22

B.     The VPPA Satisfies Intermediate Scrutiny...........................................................23

CONCLUSION...................................................................................................................... 25

# **TABLE OF AUTHORITIES**

**PAGE(S)**

**CASES**

*ACA Connects – Am.'s Communications Ass'n v. Frey*,
   471 F. Supp. 3d 318 (D. Me. 2020) ........................................................ 22

*Adams v. America's Test Kitchen, LP*,
   2023 WL 4304675 (D. Mass. June 30, 2023) .......................................... 18

*Ambrose v. Boston Globe Media Partners LLC*,
   2022 WL 4329373 (D. Mass. Sept. 19, 2022) ........................................... 4

*Belozerov v. Gannett Co.*,
   646 F. Supp. 3d 310 (D. Mass. Dec. 20, 2022) ................................... 4, 18

*Boelter v. Hearst Communications, Inc.*,
   192 F. Supp. 3d 427 (S.D.N.Y. 2016) ....................................... 22, 24, 25

*Buechler v. Gannett Co.*,
   2023 WL 6389447 (D. Del. Oct. 2, 2023) ................................................. 3

*Cain v. Redbox Automated Retail, LLC*,
   981 F. Supp. 2d 674 (E.D. Mich. 2013) ........................................... 20, 21

*Career Schools v. Healey*,
   159 F. Supp. 3d 173 (D. Mass. 2016) ..................................................... 23

*Carey v. Brown*,
   447 U.S. 455 (1980) ............................................................................... 24

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*,
   447 U.S. 557 (1980) .................................................................... 22, 23, 24

*Dancel v. Groupon Inc.*,
   949 F.3d 999 (7th Cir. 2019) ................................................................... 8

*Daniel v. Cantrell*,
   375 F.3d 377 (6th Cir. 2004) ................................................................. 19

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
   472 U.S. 749 (1985) ............................................................................... 23

*Easlin v. The Coca-Cola Co.*,
   136 F. Supp. 3d 654 (E.D. Penn. 2015) ................................................. 17

*Eichenberger v. ESPN, Inc.*,
　876 F.3d 979 (9th Cir. 2017) ....................................................................Passim

*Ellis v. Cartoon Network, Inc.*,
　803 F.3d 1251 (11th Cir. 2015) ............................................................... 6

*Ghanaat v. Numerade Labs, Inc.*,
　2023 WL 5738391 (N.D. Cal. Aug. 28, 2023) ......................................... 4

*In re Hulu Priv. Litig.*,
　2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ......................................... 3

*In re Hulu Priv. Litig.*,
　2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ......................................... 20

*In re Hulu Priv. Litigation*,
　86 F. Supp. 3d 1090 (N.D. Cal. Mar. 31, 2015) ................................. 17, 18

*In re Hulu Priv. Litigation*,
　2013 WL 6773794 (N.D. Cal. Dec. 20, 2013) ................................... 17, 21

*In re Nickelodeon Cons. Priv. Litig.*,
　827 F.3d 262 (3rd Cir. 2016) ................................................................ 7, 9

*Jackson v. Fandom, Inc.*,
　2023 WL 4670285 (N.D. Cal. July 20, 2023) ......................................... 3

*Lamb v. Forbes Media LLC*,
　2023 WL 6318033 (S.D.N.Y. Sept. 28, 2023) ........................................ 4

*Lebakken v. WebMD, LLC*,
　640 F. Supp. 3d 1335 ....................................................................... 4, 6, 18

*Louth v. NFL Enterprises LLC*,
　2022 WL 4130866 (D.R.I. Sept. 12, 2022) .....................................Passim

*McCorhan v. Sandulli Grace, P.C.*,
　369 F. Supp. 3d 324 (D. Mass. 2019) .................................................... 19

*Robainas v. Metropolitan Life Ins. Co.*,
　2015 WL 5918200 (S.D.N.Y. Oct. 9, 2015) ........................................... 21

*Sellers v. Bleacher Report, Inc.*,
　2023 WL 4850180 (N.D. Cal. July 28, 2023) ......................................... 4

*Senne v. Village of Paletine, Ill.*,
  695 F. 3d 597 (7th Cir. 2012) ................................................................ 17

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ........................................................................... 23

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ....................................................................... 24, 25

*Stover v. Fingerhut Direct Marketing, Inc.*,
  709 F. Supp. 2d 473 (S.D.W. Va. 2009) ............................................. 23

*United States v. Hastie*,
  854 F.3d 1298 (11th Cir. 2017) ......................................................... 7, 8

*Wilson v. Triller*,
  598 F. Supp. 3d 82 (S.D.N.Y. 2022) ................................................... 14

*Yershov v. Gannett Satellite Information Network, Inc.*,
  820 F.3d 482 (1st Cir. 2016)......................................................... Passim

**STATUTES**

18 U.S.C. § 2710 ....................................................................... Passim

**RULES**

Fed. R. Civ. P. 9(b) ...................................................................... 19

**OTHER AUTHORITIES**

S. Rep. No. 100–599 ................................................................. Passim

Plaintiffs respectfully submit this Opposition to Defendant Hearst Television, Inc.'s ("Defendant" or "Hearst") Motion to Dismiss the First Amended Complaint.  (ECF No. 26) (the "Motion" or "MTD").

## INTRODUCTION

In 1988, Congress passed the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), in order "to preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials."  S. Rep. No. 100–599, at *1 (1988).  The VPPA was the latest in "a long line of statutes passed by the Congress to extend privacy protection to records that contain information about individuals."  *Id.* at 2.  "To effectuate this purpose, Congress in the VPPA created a civil remedy against a 'video tape service provider' for 'knowingly disclosing, to any person, personally identifiable information concerning any consumer of such provider.'"  *Yershov v. Gannett Satellite Information Network, Inc.*, 820 F.3d 482, 485 (1st Cir. 2016) (quoting 18 U.S.C. § 2710(b)(1)).  Defendant is one such "video tape service provider."

Defendant "owns and operates multiple mobile applications containing videos that provide local news, national news, sports, traffic, politics, and entertainment."  (ECF No. 22) (the "FAC") ¶ 10 (internal brackets and quotations omitted).  Defendant "incorporates multiple 'application programming interfaces' ('APIs') into its Apps."  *Id.* ¶ 19.  APIs "enable companies to open up their applications' data and functionality to external third-party developers, business partners, and internal departments within their companies."  *Id.* ¶ 20 (internal quotations and brackets omitted). Defendant "integrates into the Apps the Braze API, an API owned and operated by a company of the same name that describes its API as a 'customer engagement platform.'"  *Id.* ¶ 21.  Defendant "also integrates into the Apps the DoubleClick API, an API owned and operated by Google."  *Id.* ¶ 22.  Using both APIs, Defendant sends Braze and Google information "that would make it reasonably and foreseeably likely that [they] could identify which specific user requested or

obtained which specific video." *Id.* ¶ 72.  By doing so, Defendant violates the VPPA.

Defendant has no compelling defense.  *First*, *Yershov* is binding authority and is nearly identical to the present case.  *Second*, Defendant is a "video tape service provider" because it gains substantial revenue by delivering video clips.  *Id.* ¶¶ 10–15.  *Third*, Plaintiffs are subscribers and therefore consumers because they downloaded Defendant's mobile applications.  *Fourth*, Defendant disclosed personally identifiable information by transmitting users' email addresses, geolocation, advertising IDs, and Braze IDs.  *Fifth*, by utilizing the APIs in the first place, Defendant disclosed this personally identifiable information knowingly.  *Sixth*, Defendant did not disclose personally identifiable information in the "ordinary course of business" because Defendant discloses that information for advertising, analytics, and marketing.  *Seventh*, Plaintiffs need not allege actual damages because the VPPA contains no such requirement.  *Eighth*, the VPPA comports with the First Amendment because it is narrowly tailored to protect consumer privacy.

For the following reasons, Defendant's Motion should be denied in full.

## **ARGUMENT**

## I.   **THE FIRST CIRCUIT'S HOLDING IN *YERSHOV V. GANNETT SATELLITE INFORMATION NETWORK* IS BINDING ON THIS COURT**

As detailed herein, Plaintiffs' allegations in this case closely resemble the facts of *Yershov v. Gannett Info Network, Inc.*, 820 F.3d 482 (1st Cir. 2016).  Needless to say, this decision is binding on this Court.  Dozens of other cases cite to *Yershov*, even as recently as a month and a half ago, but none have *ever* suggested that it is not good law.

In an effort to escape from *Yershov*'s holdings, Defendant argues that "*Yershov* is not binding precedent because the case ended when plaintiff stipulated to facts indicating the court never had jurisdiction over the case from the start."  MTD at 19.  That argument is ludicrous.  If it

were true, then no case in which the plaintiff lost could ever be considered valid authority. Defendant cites no authority to support this argument, precisely because it is baseless and unsupportable.  As explained below, Plaintiff states a claim because his allegations fit within the First Circuit's directives in the *Yershov* decision.

## II.     DEFENDANT IS A VIDEO TAPE SERVICE PROVIDER

Defendant argues it cannot constitute a "video tape service provider" ("VTSP") under the VPPA because "mobile devices/Apps did not exist at [the] time" the VPPA was passed.  MTD at 8.  That is wrong.  The VPPA defines "video tape service provider" as any person or entity that sells, rents, or delivers "prerecorded video cassette tapes or similar audio visual materials."  18 U.S.C. § 2710(a)(4).  The phrase "similar audio visual materials" covers "new technologies for pre-recorded video content."  *In re Hulu Priv. Litig.*, 2012 WL 3282960, at *5 (N.D. Cal. Aug. 10, 2012).  This includes, for example, "[a] prerecorded video on a website[.]"  *See Buechler v. Gannett Co.*, 2023 WL 6389447, at *2 (D. Del. Oct. 2, 2023); *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *3 (N.D. Cal. July 20, 2023) ("Because Fandom is a website that hosts prerecorded streaming video content, Fandom qualifies as a video tape service provider under the VPPA."). The First Circuit, as well as other courts, have already held that a company may be considered a VTSP where it provides videos on a mobile application.  *See, e.g., Yershov*, 820 F.3d at 489 (holding "that the transaction described ... whereby Yershov used the mobile device application" that "gave Gannett the GPS location of Yershov's mobile device at the time he viewed a video, his device identifier, and the titles of the videos he viewed in return for access to Gannett's video content—plausibly pleads a case that the VPPA's prohibition on disclosure applies"); *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *1, 4–5 (D.R.I. Sept. 12, 2022) (denying defendant NFL Enterprises LLC's motion to dismiss plaintiff's VPPA claim "as to pre-recorded content"

that users viewed on the mobile application that "NFL Enterprises LLC owns and operates").

Defendant also argues that it is not a VTSP because the videos on its apps are "[w]eather reports (or other local news)" and that type of video content has "never been distributed via 'prerecorded video cassette tapes' (let alone in 1988)."  MTD at 9.  But this argument has been repeatedly and uniformly rejected by every other court to consider it.  As a California court explained less than two months ago:

> Defendant opines that the VPPA was created with consumption of VHS tapes of feature films and television in mind and that the short, education-focused videos provided by defendant are too distinct to constitute audio-visual content under the statute.  Notably, despite the proliferation of similar cases in recent years, defendant's motion does not cite a single case finding that the length or subject matter of a video is relevant to determining coverage by the VPPA.  In contrast, plaintiffs cite multiple cases finding that a claim may be based on the sort of brief, online video content at issue here.

*Ghanaat v. Numerade Labs, Inc.*, 2023 WL 5738391, at *3 (N.D. Cal. Aug. 28, 2023).  In fact, many courts have held that video clips from news websites give rise to liability under the VPPA.  *See Belozerov v. Gannett Co.*, 646 F. Supp. 3d 310, 314 (D. Mass. Dec. 20, 2022) (holding that "video media" on "the USA Today website," was sufficient to support the allegation that Gannett was "a video tape services provider under the VPPA"); *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373, at *2 (D. Mass. Sept. 19, 2022) (holding that the Boston Globe is a video tape service provider); *Lamb v. Forbes Media LLC*, 2023 WL 6318033, at *9 (S.D.N.Y. Sept. 28, 2023) ("Forbes comes within the VPPA's definition of a video tape service provider."); *Sellers v. Bleacher Report, Inc.*, 2023 WL 4850180, at *6 (N.D. Cal. July 28, 2023) (collecting cases in which courts have held "that websites that provide video content as well as other media content— including news organizations—are video tape service providers under the VPPA"); *Lebakken v. WebMD, LLC*, 640 F. Supp. 3d 1335, 1340, n. 2 (N.D. Ga. 2022) ("The Court concludes that

Lebakken has adequately alleged that WebMD is a video tape service provider because she alleges that WebMD is engaged in the business of delivering prerecorded audio-visual materials to consumers via its e-newsletter and its website.").  Defendant's briefing cites zero cases to support its argument here that is contrary to the above wealth of authority.

## III.  PLAINTIFFS ARE SUBSCRIBERS UNDER THE VPPA

Defendant argues that Plaintiffs cannot be considered "consumers" because they "do not allege that they provided any PII in return for access to HTV's free video content."  MTD at 11. Under binding First Circuit precedent, downloading an app onto a mobile device makes someone a "subscriber" under the VPPA.

In *Yershov*, the First Circuit held that the word "subscribe" means "to receive or be allowed access electronic texts or services by subscription, with 'subscription' defined, in turn, to include an agreement to receive or be given access to electronic texts or services."  820 F.3d at 487 (internal brackets and quotations omitted).  Under this definition, the First Circuit made clear that downloading an app fits within this requirement:

> This is just what we have here: Gannett offered and Yershov accepted Gannett's proprietary mobile application as a tool for directly receiving access to Gannett's electronic text and videos without going through other distribution channels, much like how a newspaper subscriber in 1988 could, if he wished, retrieve a copy of the paper in a box at the end of his driveway without having to look for it at a store.

*Id.  Yershov* was clear that nothing further was required.  In fact, the court held that the plaintiff was a subscriber, even though he "d[id] not allege that he opted to receive push notifications."  *Id.* at 485.  Defendant tries to argue that more is required under *Yershov*.  But that is simply unsupported by a plain reading of the decision.

The allegations in this case go well beyond what is required under First Circuit law.   Both Plaintiffs allege they "downloaded" the apps and "enabled geolocation and push notifications," and Plaintiff Saunders alleges she also "provided her e-mail."   *See* FAC ¶¶ 106, 112.   Under any standard, those allegations are sufficient to establish a subscription.   *See Ellis v. Cartoon Network, Inc.*, 803 F.3d 1251, 1256 (11th Cir. 2015) ("'[S]ubscription' involves some type of commitment, relationship, or association (financial or otherwise) between a person and an entity."); *see also Lebakken*, 640 F. Supp. 3d at 1340 (finding the plaintiff created a subscription by alleging "she exchanged her email address to receive the WebMD e-newsletter").

## IV.   DEFENDANT DISCLOSED PLAINTIFFS' PERSONALLY IDENTIFIABLE INFORMATION

Defendant asserts that "Plaintiffs have not met the threshold requirement of showing that HTV disclosed information linking them to specific video material they requested."   *See* MTD at 23.   That ignores the well-established case law to the contrary.

### A.   Defendant's Briefing Uses An Incorrect Legal Standard

As an initial matter, Defendant asserts that "allegations here are insufficient to easily identify a Plaintiff or any individual."   MTD at 13 (internal quotations omitted).   Defendant's briefing uses the wrong legal standard.   As the Ninth Circuit articulated, there are two interpretations of what constitutes "personally identifiable information" ("PII").   The First Circuit—which is binding on this Court—asks whether the disclosed information is "*reasonably and foreseeably likely* to reveal which [] videos a person has obtained."   *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (emphasis in original; internal brackets removed) (citing *Yershov*, 820 F.3d at 486); *see also Louth*, 2022 WL 4130866, at *2 ("The geolocation data disclosed … is reasonably and foreseeably likely to identify a user who watches videos on the NFL

App.") (internal quotations omitted).  In other words, the standard is *not* whether the information will "easily identify" an individual as Defendant argues.  MTD at 13.

By contrast, the Third and Ninth Circuits subscribe to a test that asks whether the disclosed information "readily permits *an ordinary person* to identify a particular individual as having watched certain videos."  *Eichenberger*, 876 F.3d at 985 (citing *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262, 290 (3rd Cir. 2016)).  Under any standard, the information disclosed by Defendant to Braze and Google identifies which specific users watched which specific videos.  However, it is the "reasonably and foreseeably likely" test that guides this Court's analysis.

### B.    Plaintiffs' Allegations Track And Exceed The Facts Of *Yershov*

"PII is not limited to information that explicitly names a person."  *Yershov*, 820 F.3d at 486.  In *Yershov*, the First Circuit held the plaintiff stated a claim where he alleged that the defendant "disclosed to Adobe … Yershov's unique Android ID, and the GPS coordinates of Yershov's device at the time the video was viewed."  *Yershov*, 820 F.3d at 485.  The information disclosed in this case mirrors and exceeds the information the First Circuit found to be "reasonably and foreseeably likely" to identify a particular consumer:

| Defendant's Disclosures to Braze | Defendant's Disclosures to Google/DoubleClick | Disclosures to third parties in *Yershov* |
|---|---|---|
| Geolocation | Geolocation | Geolocation |
| Braze user ID | Android Advertising ID | Android ID |
| Email address | | |

*See* FAC ¶¶ 24–25.

#### 1.    An Email Address Is Reasonably And Foreseeably Likely To Identify An Individual

"As industry leaders, trade groups, and courts agree, an ordinary person can use an email address to uniquely identify another individual."  FAC ¶ 35; *see also United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) ("Email addresses fall within the ordinary meaning of

information that identifies an individual."); *Eichenberger*, 876 F.3d at 986 ("[A] Facebook link or *an email address* may very well readily enable an 'ordinary person' to identify an individual") (emphasis added).

Defendant's arguments on this topic are without merit.  *First*, Defendant argues "Plaintiffs allege that the App *can* share email with Braze—but only if a user chooses to provide their email address to HTV."  MTD at 15 n.7 (emphasis in original).  This has no bearing on the analysis.  A user choosing to provide their e-mail address to Defendant for news updates does not give Defendant permission to disclose that e-mail address to third parties in association with video-viewing data.

*Second*, Defendant chides Plaintiff Sauders for not alleging what her specific e-mail address is.  *Id*.  Defendant's argument defies logic.  This is a privacy class action.  Plaintiff Sauders alleges her e-mail address should not have been disclosed to any third party.  Why would she broadcast her e-mail address to the world on a public docket?

*Third*, Defendant cites to *Dancel v. Groupon Inc*., 949 F.3d 999 (7th Cir. 2019).  However, the Seventh Circuit recognized in *Dancel* that an e-mail address "can qualify as 'personal information.'"  *Id. at* 1008 (citing *Hastie*, 854 F.3d at 1301).  Nothing in *Dancel* holds that an e-mail address is not reasonably and foreseeably likely to identify a particular person.

## 2. Geolocation Is Reasonably And Foreseeably Likely To Identify An Individual

As in *Yershov*, the precise geolocation disclosed here was reasonably and foreseeably likely to identify Plaintiffs.  Specifically, Plaintiffs allege "Defendant discloses to Google via the DoubleClick API users' geolocation with more than three decimal places of accuracy, meaning Google could identify users within forty feet of their actual location."  FAC ¶ 38.  And Plaintiffs allege "the geolocation disclosed by Defendant to Braze via the Braze API is sufficient to identify

users within a 5×5-meter space." *Id.*; *see also id.* ¶ 39 (showing precise level of geolocation disclosed by Defendant); *id.* ¶ 41 ("[R]eally precise, longitudinal geolocation information is absolutely impossible to anonymize.").  This is sufficient under *Yershov* and other First Circuit precedent to constitute PII.  *Yershov*, 820 F.3d at 486 ("Given how easy it is to locate a GPS coordinate on a street map, this disclosure would enable most people to identify what are likely the home and work addresses of the viewer."); *see also Louth*, 2022 WL 4130866, at *2 (PII alleged where "[t]he NFL App discloses a user's geolocation with more than three decimal places of accuracy (i.e., within less than forty feet of the user)") (cleaned up).  Indeed, both the Third and Ninth Circuit have similarly suggested that geolocation data would even satisfy the "ordinary person" standard.  *Eichenberger*, 876 F.3d at 986 ("It is not difficult to imagine other examples that may count [as PII under the VPPA] – for example … the GPS coordinates of a particular device"); *In re Nickelodeon*, 827 F.3d at 290 ("Some disclosures predicated on new technology, such as the dissemination of precise GPS coordinates or customer ID numbers, may suffice.").

Against this weight of authority, Defendant's arguments fall apart.  *First*, Defendant argues the "GPS signals to Braze and/or DoubleClick may have been located in or around 1306 to 1314 Solano Avenue in Albany, California … . There is nothing in the data, much less the Amended Complaint, to suggest who in particular might live at the corresponding California addresses, or that whoever was using the App at that time even lives at one of those addresses and was not just walking or driving by or visiting temporarily."  MTD at 16.  Aside from making factual arguments and construing inferences against Plaintiffs, Defendant's argument is simply not true.  As the screenshot in the FAC makes clear, the disclosed geolocation not only points to one address, but *one specific room* in that address:



FAC ¶ 39.  As the screenshot shows, the specific *portion* of the office where the testing occurred is readily determined.  Further, and ironically, Plaintiffs did not say what the specific address of the geolocation was.   And by using publicly available tools and the surrounding businesses, Defendant determined where the geolocation was coming from all on its own.  As *Yershov* held, "[g]iven how easy it is to locate a GPS coordinate on a street map," two sets of geolocation data "would enable most people to identify what are likely the home and work addresses of the viewer." *Yershov*, 820 F.3d at 486.  Defendant already has one geolocation point from the FAC –the tester's workplace, and would easily receive another if the user went home and watched a video.  Indeed, Defendant acknowledges that "[m]obile apps are by nature designed to be used on the go and in a variety of locations."  MTD at 17.  This multitude of coordinates would give any ordinary person plenty of data with which to narrow down the precise identity of the videos' viewer.   FAC ¶ 40 ("A study in 2013, for example, analyzed mobility data for 1.5 million people, finding that researchers needed only four randomly chosen spatio-temporal points (points that represent the

time and location of a specific event, such as watching a video) to uniquely identify 95% of the people"). This is especially true where, as here, a user's e-mail address and AAID are also disclosed, giving no doubt that several geolocation points correspond to the same individual.

*Second*, to that point, Defendant argues "*Yershov* relied on the express—and extreme— hypothetical assumption that '146' GPS disclosures over time that all identified the same residential and workplace address could be a reliable static indicator of the person who lived and worked at those addresses." MTD at 17. Defendant plays fast and loose with the holding in *Yershov*. What the First Circuit actually did was pose a hypothetical of "Gannett [] disclos[ing] that a person viewed 146 *videos* on a single device at *2 sets* of specified GPS coordinates." *Yershov*, 820 F.3d at 486.[1] In other words, while the user in this hypothetical may have watched 146 *videos*, only two sets of geolocation points—not 146—would be disclosed in this hypothetical. That is no different from here. Plaintiffs allege they used the Apps to watch videos over the course of months, if not years. FAC ¶¶ 106–107, 112–113. Construing the allegations in Plaintiffs' favor, it is plausible Plaintiffs watched numerous of videos over this period of time, and had at least two pieces of geolocation data (if not more) disclosed. Regardless, the actual facts before the First Circuit did not involve 146 sets of geolocation being disclosed, only "the GPS coordinates of the device at the time the video was viewed." *Yershov*, 820 F.3d at 484.

### 3. AAID And Braze User ID Are Reasonably And Foreseeably Likely To Identify An Individual

In *Yershov*, the First Circuit found an "Android ID" was reasonably and foreseeably likely to identify a particular user. *Yershov*, 820 F.3d at 484–85. Defendant tries to distinguish Android

---

1 The First Circuit picked the "146" number as a reference to Judge Bork, whose video-viewing information was disclosed in 1988. *Yershov*, 820 F.3d at 484 ("The profile contained a list of 146 films that Judge Bork and his family had rented from a video store."). This incident served as the impetus for the VPPA's enactment. *Id*.

IDs from the AAIDs disclosed here, arguing "an AAID attaches to a device, not a user, and is resettable, not persistent." MTD at 18 (cleaned up). This is a distinction without a difference. As the *Louth* court held, it is plausible an AAID "is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets their AAID." *Louth*, 2022 WL 4130866, at *3 (cleaned up). Accordingly, it was plausible "that AAID is PII because it is unique both to a specific device and user." *Id.* (cleaned up).

Plaintiffs' allegations here are identical. *See*, *e.g.*, FAC ¶ 48 ("Although technically resettable, an AAID is a persistent identifier because virtually no one knows about AAIDs and, correspondingly, virtually no one resets that identifier."); *id.* ¶ 47 ("[A]n AAID is sent to advertisers and other third parties so they can track *user activity* across multiple mobile applications.") (emphasis added). Indeed, as Plaintiffs allege, an AAID would serve no purpose if it could not reliably track user activity, "or else an AAID would be of no use to advertisers." *Id.* ¶ 48.

As to the Braze ID, Defendant argues "[n]o *ordinary person* would be able to identify anyone, let alone a Plaintiff, from the [Braze ID]." MTD at 19 (emphasis added). Again, this is not the standard in the First Circuit. Instead, it was reasonably and foreseeably likely that Braze could use the Braze IDs to identify a particular individual. As Plaintiffs allege, the Braze ID allows users to be tracked "across devices and platforms," is linked to "names [and] email addresses," and is associated with the user profiles of the consumers whose information Braze collects. FAC ¶¶ 52, 81–82. Such allegations make it plausible that if Braze has a Braze ID, it can reasonably and foreseeably identify the associated user.

### 4. Plaintiffs Were Identified By Braze And Google Based On The PII Defendant Disclosed

As a last-ditch effort, Defendant argues that even if the disclosed information is PII, "Plaintiffs do not allege that either Braze or DoubleClick actually combined information from HTV with their own on-hand information" so as to actually identify Plaintiffs.  MTD at 22.  *First*, as the above arguments make clear, Braze and DoubleClick did not need any additional information to identify Plaintiffs.  The disclosed information is sufficient in and of itself to make it reasonably and foreseeably likely that Plaintiffs would be identified.  *See* Argument §§ IV.B.1–3, *supra*; *see also* FAC ¶¶ 35–53.

*Second*, Plaintiffs do allege that the information disclosed to Braze and DoubleClick was used to identify Plaintiffs, "attribute [Plaintiffs'] video viewing records to an individualized profile of Plaintiff[s] [] in [Braze and DoubeClick's] databases," and bolster Defendant's marketing, advertising, and analytics efforts.  FAC ¶¶ 110–111, 116–117.

*Finally*, the standard is not whether the Braze and DoubeClick actually identified Plaintiffs, but whether they had the capability to do so.  As the Ninth Circuit noted in *Eichenberger*, "Congress used the word 'identifi*able*'" in the VPPA.  *Eichenberger*, 876 F.3d at 984 (emphasis in original).  "[T]he suffix 'able' means 'capable of.' ... It follows, then, that the term 'personally identifiable information' covers some information that is '*capable of*' identifying a person."  *Id.* (emphasis added); *see also id.* ("Under the VPPA, what information did Congress intend to cover as 'capable of' identifying an individual?").  Thus, so long as Braze and DoubleClick were *able* or *capable of* identifying Plaintiffs using the information Defendant disclosed (notwithstanding that Plaintiffs allege Braze and DoubleClick did identify Plaintiffs using the information Defendant disclosed), Plaintiffs allegations are sufficient.

13

Defendant cites to *Wilson v. Triller*, 598 F. Supp. 3d 82 (S.D.N.Y. 2022), but that case offers Defendant no reprieve.  As an initial matter, the information disclosed in *Wilson* was a far cry from the information disclosed here.  *Compare* FAC ¶¶ 35–53 (Defendant disclosed e-mail addresses, precise geolocation, AAID, and Braze ID); *with Wilson*, 598 F. Supp. 3d at 92 ("Triller disclosed to the third parties Wilson's UID, her country, time zone … other profile[s] she viewed, as well as certain other information about her device.").

Further, unlike here, the plaintiff in *Wilson* did not allege "this information alone that allows Facebook and Appsflyer" to identify a particular individual.  *Wilson*, 598 F. Supp. 3d at 92. Instead, "in order to make this association, the third party must 'pair' the UID with information from a user's Triller profile page, which may or may not contain various personal information about the user."  *Id*.  Thus, the third parties in *Wilson* could not identify a particular user unless specific information was present on a user's profile page, and the plaintiff did not allege "what information was actually included on [her] profile nor how that information could be used by a third party to identify [her]."  *Id*.

By contrast, Plaintiffs here allege that the disclosed information, standing alone, was reasonably and foreseeably likely to identify them.  Further, Plaintiffs plead what information they provided to Defendant, what information Defendant disclosed to Braze and DoubleClick, and that Braze and DoubleClick used this information to identify Plaintiffs.  *See, e.g.*, FAC ¶¶ 106–107, 110–113, 116–117.  Plaintiffs also allege how Braze and Google use that information to identify them.  *See, e.g.*, *id.* ¶¶ 82 (alleging how Braze assembles data in to "user profiles," which it "associates with identifiers like a Braze user ID and/or e-mail address"); *id.* ¶ 95 (alleging Google helps Defendant "target specific users or specific groups of users for advertisements"); *id.* ¶¶ 111,

116 (alleging Google and Brazed used Plaintiffs' personally identifiable information "to create a user profile that included [their] activity").  Accordingly, *Wilson* is distinguishable.

## V.   DEFENDANT DISCLOSED INFORMATION THAT WAS REASONABLY AND FORESEEABLY LIKELY TO IDENTIFY THE VIDEOS REQUESTED OR OBTAINED

Defendant asserts that "Plaintiffs have not met the threshold requirement of showing that HTV disclosed information linking them to specific video material they requested."  *See* MTD at 23.  That argument ignores Plaintiffs' allegations.

To constitute personally identifiable information, the disclosures must not only be "reasonably and foreseeably likely" to reveal a consumer's identity, but they must also be "reasonably and foreseeably likely" to identify the specific video materials that the consumer requested or obtained.  *See Yershov*, 820 F.3d at 482.  The VPPA prohibits disclosures from foreseeably revealing, for example, a video's "title, description, or subject matter."  *See* 18 U.S.C. § 2710(b)(D)(ii); *see also* S. Rep. 100–599, at *13–14 (stating that the VPPA regulates disclosures that identify "the subject matter of the video").

Defendant discloses information that identifies the video materials a consumer has requested.  Defendant discloses to Google "the full name of the video viewed by the user."  FAC ¶ 54.  Defendant discloses to Braze "a video's subject matter."  *Id.* ¶ 62.  And for both third parties, Defendant discloses a "video ID," which is "a unique string of numbers that identifies a particular video."[2]  *Id.* ¶ 55.  Each of these identifiers is sufficient to reveal what videos a user has watched.

---

[2] This allegation is intended to establish that Defendant provides Braze and Google with back-end tools that link Video IDs to their corresponding titles.  In any event, Plaintiffs allege that an ordinary person can use the video ID to identify a video.  *See* FAC ¶ 55 ("[U]sers need only open a web browser, navigate to a search engine, and query the video ID alongside the mobile application's name, like 'WCVB' or 'WMUR.'")  To the extent more is needed, Plaintiffs respectfully request leave to amend.

*Yershov*, 820 F.3d at 490 (holding that "the titles of the videos" sufficiently reveals the specific video materials that consumer requested);.

Defendant argues that these identifiers correspond to URLs rather than actual videos. That has no basis in the pleadings. As explained in the FAC, "Defendant discloses to Google via the DoubleClick API the full name of the vide viewed by the user." FAC ¶ 16. Thus, when a video titled "Rain, sleet with quick-moving storm overnight" was watched, the traffic showed the following code: "<videoname-> video-rain-sleet-with-quick-moving-storm-overnight …." FAC ¶ 54. Defendant's argument that the "videoname" parameter does not identify the video, despite the fact that it matched the exact title of the video watched, is senseless and contrary to the pleadings.

The traffic also shows video IDs for the videos watched. "A video ID is a unique string of numbers which identifies a particular video." FAC ¶ 55. Defendant argues that Plaintiffs are incorrect, and that the "video ID" identifier in its apps' traffic refers to URLs rather than videos. MTD at 23. This argument also contradicts common sense and the pleadings and is therefore inappropriate for resolution on a motion to dismiss. Notably, another court within this circuit has explicitly held that disclosure of a similar video ID was sufficient to state a claim under the VPPA. *See Louth*, 2022 WL 4130866, at *3 (holding that the defendant disclosed information revealing video materials by disclosing a "video ID which identifies the video that is being watched").

Finally, as alleged in the FAC, "Defendant also discloses to Braze the video's subject matter." FAC ¶ 57. The VPPA contemplates that the disclosure of the "subject matter" of a video alone is sufficient for a violation. As the VPPA's legislative history indicates: "Disclosure of subject matter may be made only in instances where communications are sent directly to the consumer. Some video tape service providers sell limited types of videos. For example, a golf

shop may rent or sell golf videos … The disclosure of the customer lists of those providers indirectly would disclose the subject matter of the video." *See* S. Rep. 100–599, at *13–14.  Here, the subject matter was disclosed to a third party rather than "directly to the consumer." Defendant's disclosure of the video's subject matter was therefore also sufficient to give rise to liability under the VPPA.

## VI. DEFENDANT DISCLOSED PERSONALLY IDENTIFIABLE INFORMATION "KNOWINGLY"

Defendant contends that Plaintiffs fails to allege it disclosed personally identifiable information "knowingly." *See* MTD at 24–25.  That assertion ignores the 147 paragraphs in the FAC that unmistakably demonstrate that Defendant knew it was disclosing Plaintiffs' personally identifiable information to third parties.

A defendant discloses PII knowingly when it possesses "consciousness of transmitting the private information." *In re Hulu Privacy Litigation*, 86 F. Supp. 3d 1090, 1095 (N.D. Cal. 2015). This approach is "consistent with cases that have explained the knowledge requirement under the Electronic Communications Privacy Act of 1986, on which the VPPA was modeled." *Id.*  It does not matter whether the defendant possesses "knowledge of illegality or potential consequences," *see Senne v. Village of Paletine, Ill.*, 695 F. 3d 597, 603 (7th Cir. 2012), nor does it matter whether "third parties actually see the disclosed information to constitute a violation." *Easlin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 671 (E.D. Penn. 2015); *see also In re Hulu Privacy Litigation*, 2013 WL 6773794, at *7 (N.D. Cal. Dec. 20, 2013) ("Again, the DPPA's plain language is so similar to the VPPA as to be practically indistinguishable.").  Instead, a video tape service provider violates the VPPA by consciously transmitting: "1) a user's identity; 2) the identity of the video material; and 3) the connection between the two—*i.e.*, that the given user had 'requested or obtained' the given video material." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d at 1097.

Plaintiffs plausibly plead that Defendant disclosed their personally identifiable information knowingly.  *See, e.g.*, FAC ¶¶ 75–84 (describing the various services that Braze provides to Defendant); *id.* ¶¶ 85–95 (describing the various services that Google provides to Defendant); *id.* (¶ 97 ("Defendant dispels any doubt about its intentional and knowing disclosure of PII by appearing prominently on Braze's website."); *id.* ¶ 99 ("Defendant dispels any doubt about its intention and knowing disclosure of PII to Google by appearing in a case study featuring its use of Google services."); *id.* ¶ 105 ("[C]ommon sense dictates that a sophisticated media conglomerate like Defendant who includes APIs in its Apps focused on marketing, advertising, and analytics is fully aware of the scope of the data th[at] Braze and DoubleClick APIs are collecting, and is choosing to intentionally provide that data to Braze and Google.").

As courts have uniformly held, these allegations are sufficient to establish a "knowing" disclosure.  *See Louth*, 2022 WL 4130866, at *4 ("[I]t can reasonably be inferred that NFL Enterprises knowingly transmitted PII for the purpose of targeted advertising."); *see also Belozerov*, 646 F. Supp. 3d at 315 ("[T]he Court finds that plaintiff has plausibly pled that Gannett's disclosure of users' PII was made knowingly."); *Adams v. America's Test Kitchen, LP*, 2023 WL 4304675, at *7 (D. Mass. June 30, 2023) (finding plaintiff adequately alleged the defendants "knowingly disclosed" personally identifiable information); *Lebakken*, 640 F. Supp. 3d at 1343 ("The Court finds that Lebakken does plausibly allege WebMD's conscious transmission of its consumers' private information, and thus, WebMD is not entitled to dismissal of the First Amended Complaint on that ground.").

Notwithstanding this, should a semblance of skepticism remain, courts relax the pleading requirements "where information is in a defendant's sole possession."  *McCorhan v. Sandulli Grace, P.C.*, 369 F. Supp. 324, 335 (D. Mass. 2019) (internal quotations omitted).  This is

particularly true with regard to allegations concerning "knowledge," which "may be alleged generally." Fed. R. Civ. P. 9(b).  At a minimum, therefore, Plaintiffs' allegations are sufficient to move beyond the pleading stage and into discovery.

## VII.   DEFENDANT'S DISCLOSURES WERE NOT MADE IN THE "ORDINARY COURSE OF BUSINESS"

Defendant contends that "the VPPA's 'ordinary course of business' exception applies on the face of the Amended Complaint and provides an independent basis for dismissal." *See* MTD at 27.  That argument runs headlong into well-established case law, the plain text of the VPPA, and the VPPA's legislative history.

The VPPA contains an exception for disclosures "incident to the ordinary course of business."  18 U.S.C. § 2710(b)(2)(E).  The statute defines "ordinary course of business" as meaning "only debt collection activities, order fulfillment, request processing, and the transfer of ownership."  18 U.S.C. § 2710(a)(2).  The terms "order fulfillment" and "request processing," in turn, are "defined in the legislative history as the use, by VTSPs, of 'mailing houses, warehouses, computer services, and similar companies for marketing to their customers.'"  *Daniel v. Cantrell*, 375 F.3d 377, 382 (6th Cir. 2004) (quoting S. Rep. No. 100–599, at *14 (1988)).

But that is not what Defendant did here.  As alleged in the FAC, Defendant disclosed personally identifiable information to third parties "in order to assist with Defendant's marketing, advertising, and analytics."  FAC ¶ 34.  As numerous courts have found, these activities fall outside the ordinary course of business.  *See Louth*, 2022 WL 4130866, at *4 (holding that "analytics" and "advertising" are purposes that "do not fall within the narrow categories statutorily defined as the 'ordinary course of business'"); *Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 685 (E.D. Mich. 2013) (finding the disclosure of personally identifiable information "for the purpose of … promotions[] and analytics … do[es] not appear to fall within the narrow categories of 'debt

collection activities, order fulfillment, request processing, and transfer of ownership'"); *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *7 (N.D. Cal. Apr. 28, 2014) (observing that the defendant used a third-party's identifier "to track Hulu users' activities," and that "was not part of orders processing").

Defendant concedes that the VPPA regulates disclosures for advertising and analytics, instead focusing on whether the statute regulates disclosures for "marketing" and "customer engagement." *See* MTD at 26.  Defendant references the legislative history, specifically the portion explaining that Congress intended the exception to cover "mailing houses," "warehouses," and "similar companies for marketing to their customers."  *See* S. Rep. No. 100–599, at *14. Defendant emphasizes the word "marketing," *see* MTD at 26, but the VPPA explicitly regulates disclosures made for "marketing goods and services directly to the consumer."  18 U.S.C. 2710(b)(2)(D)(ii).  That makes sense because the entities listed in the legislative history— "mailing houses," "warehouses," and "similar companies"—are passive repositories of information; they may receive customer records so they know where to send marketing materials, but they are not involved with analyzing those records or targeting those materials.  The opposite is true here.  *See* FAC ¶ 28 (alleging the Braze API helps Defendant to, among other things, "analyze app data and conduct real-time targeted marketing campaigns and send personalized push notifications and in-app messages to mobile users"); *see generally id.* ¶¶ 73–95.  And even if the arguments submitted by Defendant had force, the "ordinary course of business" exception "is a question that is best answered during discovery, not upon a motion to dismiss."  *Cain*, 981 F. Supp. 2d at 685.

## VIII.  PLAINTIFFS NEED NOT PLEAD ACTUAL DAMAGES

Defendant argues that Plaintiffs fail to allege "that they have suffered actual damages resulting from the alleged disclosures."  MTD at 26.  That misreads the law.

The VPPA provides that "[a]ny person aggrieved by any act of a person in violation of this section may bring a civil action in a United States district court."  18 U.S.C. § 2710(c).  In general, "an aggrieved party is one that experiences some sort of wrong or harm."  *See Robainas v. Metropolitan Life Ins. Co.*, 2015 WL 5918200, at \*7 (S.D.N.Y. Oct. 9, 2015).  Applying that to the VPPA, "[t]he consumer … is 'aggrieved' based solely on the disclosure of personally identifiable information to third parties."  *See In re Hulu Priv. Litig.*, 2013 WL 6773794, at \*5.

Plaintiffs are aggrieved because they allege that Defendant disclosed their personally identifiable information.  *See, e.g.*, FAC ¶ 3 ("Defendant knowingly and intentionally discloses its users' personally identifiably information—including a record of every video viewed by the user— to unrelated third parties."); *id.* ¶ 146 ("Plaintiffs and members of the Classes did not provide Defendant with any form of consent—written or otherwise—to disclose their PII to third parties.").

Defendant's contrary interpretation lacks force.  Defendant points to sub-section (c)(2), asserting that the language requires Plaintiffs to show "pecuniary loss."  MTD at 26.  But that provision only outlines what "the court may award," *see* 18 U.S.C. § 2710(c)(2), not what elements are necessary to bring a cause of action.  *See id.* (stating aggrieved persons are entitled to "actual damages but not less than … \$2,500," "punitive damages," "attorneys' fees," and "equitable relief as the court determines to be appropriate").  Thus, "[n]othing in subsection (c) (or any other part of the statute) requires an injury beyond a violation of subsection (b)."  *See In re Hulu Priv. Litig.*, 2013 WL 6773794, at \*5.

Finally, Defendant argues that "by alleging they chose to enable location services … Plaintiffs admit that any purported damages were caused by their own actions."  MTD at 26.  That form of victim-blaming makes no sense.  Plaintiffs enabled geolocation so that weather reports would be accurate.  They did not enable it so it could be transmitted to third parties.

## IX.  THE VPPA COMPORTS WITH THE FIRST AMENDMENT

Defendant contends that the First Amendment protects its ability to disclose what videos Michelle Saunders and Richard Hayden watched.  *See* MTD at 27–30.  That is wrong.

### A.  At Most, Intermediate Scrutiny Should Apply

Defendant begins by arguing that, as applied, "the VPPA is subject to strict scrutiny." MTD at 28.  At most, intermediate scrutiny is appropriate because Defendant's speech is commercial and only concerns a private matter.

Defendant's disclosures constitute commercial speech.  Commercial speech is "expression related solely to the economic interests of the speaker and its audience." *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 661 (1980).  Plaintiffs plead precisely that, alleging Defendant discloses personally identifiable information so companies like Google and Braze "can help Defendant with marketing, advertising, and analytics."  FAC ¶ 73. Because these activities relate solely to Defendant's economic interest, "Defendant's speech is commercial in nature."  *See Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427, 445 (S.D.N.Y. 2016) (applying intermediate scrutiny in a case against Defendant involving a state analog to the VPPA and a nearly identical set of facts); *see also ACA Connects – Am.'s Communications Ass'n v. Frey*, 471 F. Supp. 3d 318 (D. Me. 2020) (applying intermediate scrutiny to a state law restricting the ability "to use, disclose, sell, and provide access to customers' personal information").

For commercial speech, "the default test" is the "intermediate-scrutiny approach." *See Mass. Ass'n of Priv. Career Schools v. Healey*, 159 F. Supp. 3d 173, 189 (D. Mass. 2016).  The degree of scrutiny can change, however, depending on "the nature both of the expression and of the governmental interests served by its regulation."  *See Central Hudson Gas & Elec. Corp.*, 447 U.S. at 563.  Here, Defendant's speech only concerns a private matter—the videos that Plaintiffs

watched on their mobile devices—so the rational-basis test should apply.  *See Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 759 (1985) ("[S]peech on matters of purely private concern is of less First Amendment concern."); *see also Snyder v. Phelps*, 562 U.S. 443, 452 (2011) ("[W]here matters of purely private significance are at issue, First Amendment protections are often less rigorous."); *Stover v. Fingerhut Direct Marketing, Inc.*, 709 F. Supp. 2d 473, 479 (S.D.W. Va. 2009) (finding under analogous circumstances that the defendant's speech was "entitled to only a modicum of First Amendment protection").  But even under intermediate scrutiny, the VPPA satisfies that test with ease.

### B.     The VPPA Satisfies Intermediate Scrutiny

For intermediate scrutiny, the Supreme Court has enunciated "a four-part analysis."  *See Central Hudson Gas & Elec. Corp.*, 447 U.S. at 566.  Addressing each in turn, the first prong asks whether "the expression is protected by the First Amendment."  *Id.*  Although speech on private concerns is "of less First Amendment concern," the first prong has been met because the Supreme Court has made clear that "such speech is not totally unprotected by the First Amendment."  *See Dun & Bradstreet, Inc.*, 472 U.S. at 759–60.

The second prong examines "whether the asserted interest is substantial."  *See Central Hudson Gas & Elec. Corp.*, 447 U.S. at 566.  Defendant concedes this point, arguing instead that there is no "compelling" state interest.  *See* MTD at 28.  That makes sense because Congress passed the VPPA to "preserve personal privacy," *see* S. Rep. 100–599, at *1, and that interest is undoubtedly substantial.  *See Carey v. Brown*, 447 U.S. 455, 471 (1980) ("The State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society."); *Boelter*, 192 F. Supp. 3d at 447 (holding "the protection of consumer privacy" is "a substantial state interest").

The next prong is "whether the regulation directly advanced the governmental interest asserted." *See Central Hudson Gas & Elec. Corp.*, 447 U.S. at 566.  According to Defendant, the VPPA fails to advance consumer privacy because "the challenged disclosures are non-public, depersonalized data and numbers, and involve no human judgment or review."  *See* MTD at 29.  Each of these characterizations is flawed.  Defendant's disclosures may indeed be "non-public," but that is exactly what Congress intended to regulate, seeking to curb the "[p]rivate commercial interests" that "want personal information to better advertise their products."  S. Rep. 100–599, at *7.  And far from concerning only "depersonalized data and numbers," Plaintiffs allege that "Defendant discloses information that an ordinary person could use to identify its users."  FAC ¶ 51.  Finally, Defendant may represent that the disclosures "involve no human judgment or review," but nothing in the pleadings supports that inference, so at this stage, it should be ignored.

The last prong requires courts to consider whether the regulation "is not more extensive than necessary" to serve the governmental interest.  *See Central Hudson Gas & Elec. Corp.*, 447 U.S. at 566.  Defendant argues that the VPPA is insufficiently tailored because the VPPA's exceptions "permit disclosure of the very same information for some purposes … but not for others."  *See* MTD at 29.  But the ordinary business exception is "narrow," *see Louth*, 2022 WL 4130866, at *4, and as the Supreme Court has acknowledged, such exceptions are permissible. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 573 (2011) ("[T]he State might have advanced its asserted privacy interest by allowing the information's sale or disclosure in only a few narrow and well-justified circumstances."); *id.* ("If Vermont's statute provided that prescriber-identifying information could not be sold or disclosed except in narrow circumstances then the State might have a stronger position."); *see also Boelter*, 192 F. Supp. 3d at 449 ("The Court finds that the VRPA is sufficiently tailored to advance the state of Michigan's interests.").

24

## CONCLUSION

For the foregoing reasons, Defendant's Motion should be denied in full.  To the extent that

any portion of Defendant's Motion is granted, Plaintiffs request leave to amend.


Dated: October 12, 2023                              Respectfully submitted,

                                                     **REARDON SCANLON LLP**

                                                     By: _/s/ James J. Reardon, Jr._
                                                             James J. Reardon, Jr. BBO# 566161

                                                     James J. Reardon, Jr.
                                                     45 South Main Street, 3rd Floor
                                                     West Hartford, CT 06107
                                                     Telephone: (860) 955-9455
                                                     Facsimile:  (860) 920-5242
                                                     E-Mail: james.reardon@reardonscanlon.com

                                                     **BURSOR & FISHER, P.A.**
                                                     Yitzchak Kopel*
                                                     Max S. Roberts*
                                                     1330 Avenue of the Americas, 32nd Floor
                                                     New York, NY 10019
                                                     Telephone: (646) 837-7150
                                                     Facsimile:  (212) 989-9163
                                                     E-Mail: ykopel@bursor.com
                                                             mroberts@bursor.com

                                                     **BURSOR & FISHER, P.A.**
                                                     Christopher R. Reilly*
                                                     701 Brickell Avenue, Suite 1420
                                                     Miami, FL 33131
                                                     Telephone: (305) 330-5512
                                                     Facsimile:  (305) 679-9006
                                                     E-Mail: creilly@bursor.com

                                                     *Pro Hac Vice Forthcoming*

                                                     *Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on  October 12, 2023, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By: <u>*/s/ James J. Reardon, Jr.*</u>
    James J. Reardon, Jr.