**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHARLES THERRIEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEARST TELEVISION, INC.,<br><br>Defendant. | Case No. 1:23-cv-10998<br><br>Hon. Richard G. Stearns |

# PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Dated: September 6, 2024

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Pro Hac Vice*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

## TABLE OF CONTENTS

**PAGE**


INTRODUCTION ........................................................................................................1

EVIDENCE COMMON TO ALL CLASS MEMBERS ..............................................................1

I. OVERVIEW OF THE CLASS APPS ........................................................................ 1

II. DEFENDANT TRANSMITS CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO BRAZE FOR MARKETING AND ANALYTICS PURPOSES ........................................................................ 2

III. DEFENDANT TRANSMITS CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO GOOGLE FOR PURPOSES OF REVENUE GENERATION ........................................................................ 5

IV. DEFENDANT KNOWINGLY DISCLOSED PERSONAL INFORMATION TO BRAZE AND GOOGLE ........................................ 7

V. IT IS REASONABLY AND FORESEEABLY LIKELY THAT BRAZE AND GOOGLE COULD IDENTIFY CLASS MEMBERS BASED ON THE INFORMATION DEFENDANT DISCLOSED TO BRAZE AND GOOGLE ........................................................................ 11

ARGUMENT ..........................................................................................................17

I. THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(A) ........................................................................ 17

A. Numerosity Is Satisfied ........................................................ 17

B. Commonality Is Satisfied ........................................................ 17

C. Plaintiff's Claims Are Typical ........................................................ 18

D. Plaintiff And His Counsel Will Adequately Represent The Classes ........................................................ 19

1. Plaintiff's Interests Do Not Conflict With The Interests Of The Class ........................................ 19

2. Plaintiff's Counsel Are Qualified ........................................ 20

E. The Classes May Be Objectively Ascertained ........................................ 20

II. THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(B) ........................................................................ 23

A. Common Questions Of Law Or Fact Predominate .................................. 23

B. Class Litigation Is Superior To Other Methods Of Adjudication.......................................................................................... 24

CONCLUSION.......................................................................................................................25

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*Amchem Prod., Inc. v. Windsor*,
521 U.S. 591 (1997) .......... 23

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
568 U.S. 455 (2013) .......... 23

*Andrews v. Bechtel Power Corp.*,
780 F.2d 124 (1st Cir. 1985) .......... 19

*Baker v. Equity Residential Management, L.L.C.*,
390 F. Supp. 3d 246 (D. Mass. 2019) .......... 23

*DaSilva v. Border Transfer of MA, Inc.*,
296 F. Supp. 3d 389 (D. Mass. 2017) .......... 18

*Donovan v. Philip Morris USA, Inc.*,
268 F.R.D. 1 (D. Mass. 2010) .......... 25

*Ebin v. Kangadis Food Inc.*,
297 F.R.D. 561 (S.D.N.Y. 2014) .......... 20

*Gintis v. Bouchard Transp. Co., Inc.*,
596 F.3d 64 (1st Cir. 2010) .......... 24

*Hawkins v. S2Verify*,
2016 WL 3999458 (N.D. Cal. July 26, 2016) .......... 24

*In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Pracs. Litig.*,
2015 WL 7282543 (D.N.H. Nov. 16, 2015) .......... 20

*In re Dial Complete Marketing and Sales Pracs. Litig.*,
312 F.R.D. 36 (D.N.H. 2015) .......... 22

*In re Nexium Antitrust Litig.*,
777 F.3d 9 (1st Cir. 2015) .......... 20, 23, 24

*In re Pharmaceutical Industry Average Wholesale Price Litig.*,
230 F.R.D. 61 (D. Mass. 2005) .......... 17

*Martins v. 3PD, Inc.*,
2013 WL 1320454 (D. Mass. Mar. 28, 2013) .......... 17

*Matamoros v. Starbucks Corp.*,
699 F.3d 129 (1st Cir. 2012)........................................................................................ 19

*McAdams v. Massachusetts Mut. Life Ins. Co.*,
2002 WL 1067449 (D. Mass. May 15, 2002)................................................................ 17

*Muniz v. XPO Last Mile, Inc.*,
342 F.R.D. 189 (D. Mass. 2022) .................................................................................. 25

*Salam v. Lifewatch, Inc.*,
2016 WL 8905321 (N.D. Ill. Sept. 6, 2016)................................................................. 23

*Schuchardt v. Law Off. of Rory W. Clark*,
2016 WL 232435 (N.D. Cal. Jan. 20, 2016)................................................................. 24

*Smillow v. Sw. Bell Mobile Sys., Inc.*,
323 F.3d 32 (1st Cir. 2003)........................................................................................... 22

*Tardiff v. Knox Cnty.*,
365 F.3d 1 (1st Cir. 2004)............................................................................................. 24

*Thrower v. Citizens Disability, LLC*,
2022 WL 3754737 (D. Mass. Aug. 30, 2022) .............................................................. 22

*Vargas v. Spirit Delivery & Distribution Servs., Inc.*,
245 F. Supp. 3d 268 (D. Mass. 2017)........................................................................... 24

*Wal-Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011) ............................................................................................... 17, 18

*Zaklit v. Nationstar Mortg. LLC*,
2017 WL 3174901 (C.D. Cal. 2017) ............................................................................ 25

**STATUTES**

18 U.S.C. § 2710 ....................................................................................................... 1, 24

**RULES**

Fed. R. Civ. P. 23 .................................................................................................... Passim

## INTRODUCTION

Plaintiff has brought a proposed class action against Defendant Hearst Television, Inc. ("Defendant"), alleging that Defendant violated the Video Privacy Protection Act ("VPPA"), 18 U.S.C. § 2710. Plaintiff now moves, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), to certify the following Class:

> **All persons in the United States that (i) downloaded one of the Class Apps onto their mobile phone, (ii) enabled location permissions for the Class App for at least 250 sessions, and (iii) watched at least ten (10) videos between May 5, 2021 and April 16, 2024 (the "Class Period").**

The "Class Apps" refer to the 28 mobile applications for Android and iOS owned and operated by Defendant.[1] Plaintiff also seeks certification of the following two subclasses. The Email Subclass is defined as follows:

> **All Class Members that provided their email addresses to the Class Apps at the time of onboarding.**

Finally, the AAID Subclass is defined as follows:

> **All Class Members that (i) downloaded one of the Class Apps onto their Android mobile devices and (ii) did not limit ad tracking during the time they used the Class Apps during the Class Period.**

As detailed herein, the Class and Subclasses readily meet the requirements of Fed. R. Civ. P. 23.

## EVIDENCE COMMON TO ALL CLASS MEMBERS

### I. OVERVIEW OF THE CLASS APPS

"Hearst Television is a national multimedia company with operations serving nearly three

[1] The "Class Apps" are KETV NewsWatch 7, KMBC 9 News, KCCI 8, WISN 12, WLKY, WLWT News 5, WXII 12, WTAE Pittsburgh's Action News 4, WGAL News 8, MyNBC 5, WMUR News 9, WMTW News 8, WCVB NewsCenter 5, WBAL-TV 11, WYFF News 4, WJCL, WESH 2, WPBF 25, NBC2, WVTM 13 Birmingham News, WDSU 6, 16 WAPT, 40/29 News and Weather, KOCO 5, KOAT Action 7, KSBW Action News 8, KCRA 3, and ABC 7 News.

dozen U.S. cities, reaching 24 million U.S. television households. It delivers local and national news, weather, information, sports and entertainment programming via every available content-delivery platform."[2] This litigation involves Defendant's twenty-eight "TV Station Digital Brands" which [redacted] Deposition Transcript of Michael Rosellini ("Rosellini Dep.") at 9:17-10:12.[3] These brands [redacted] *Id.* at 9:9-14. The brands, including the Class Apps, derive revenue by [redacted] *Id.* at 18:24-19:8.

Although the Class Apps cover various news and weather markets, [redacted] *Id.* at 62:12-13. In other words, [redacted] *Id.* at 62:14-18. To put it another way, the Class Apps are all identical save for the station-specific imagery, similar to how two shirts of the same style but different colors will otherwise be identical to each other. When users install the Class Apps, [redacted] *Id.* at 110:12-20. [redacted] *Id.* at 118:16-119:14.

## II. DEFENDANT TRANSMITS CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO BRAZE FOR MARKETING AND ANALYTICS PURPOSES

Defendant [redacted] Rosellini Dep. at 141:14-20. Michael Rosellini, Defendant's Senior Vice President for Digital Services,

---

[2] TELEVISION, https://www.hearst.com/television.

[3] The Rosellini Deposition transcript is attached to the Declaration of Yitzchak Kopel ("Kopel Decl.") as **Exhibit 4**.

described Braze as [redacted] *Id.* at 30:7-9. But he also explained that Braze provides a [redacted] *Id.* at 31:11-20. In fact, the Statement of Work in Braze's contract with Defendant included descriptions of Braze's [redacted] Kopel Decl. Ex. 13 (Braze/Appboy contract); *see also id.* Ex. 14 [redacted]

[redacted][4] [redacted] Rosellini Dep. at 112:2-10. At that time, [redacted] *Id.* at 112:16-19. For users that enter their email addresses at the time they first use the mobile application, [redacted] *Id.* at 110:24-111:2. [redacted] *Id.* at 115:20-22.

For users that enabled location services while using the Class Apps (or for those that allowed the Class Apps to receive location even when the Class Apps were in the "background"), [redacted]

[4] SDKs are "set[s] of tools for developers that offers building blocks for the creation of an application instead of developers starting from scratch … For example, Google Analytics provides an SDK that gives insight into user behavior, engagement, and cross-network attribution." API VS. SDK: THE DIFFERENCE EXPLAINED (WITH EXAMPLES), https://getstream.io/glossary/api-vs-sdk/.

[redacted][5] *Id.* at 120:11-19 [redacted]; *see also* *id.* at 119:10-24. [redacted] *Id.* at 160:10-20. The geolocation data is then associated with the user's Braze profile, including the Braze ID, and where supplied, the user's email address.

Defendant also configured the Class Apps to transmit to Braze (and record to the user's Braze profile) updates each time the user watches a video. [redacted] *Id.* at 135:23-25. When the user opens an article, [redacted] *Id.* at 133:7-9 [redacted]; *id.* at 71:23-72:9 [redacted] Then, when the user plays a video on that article, Defendant sends an additional value to Braze indicating that a video was played, and an updated "video counter" showing the total number of videos watched in the user's profile is updated. *Id.* at 136:9-13 [redacted] This tells Braze the video from the referenced "content ID" was requested, obtained, and played.

In this manner, Defendant transmits Class Members' (i) geolocation; (ii) email addresses;

---

[5] The term "foreground" refers to when the app is open and "in focus or actively being displayed on a [phone's] screen." WHAT IS FOREGROUND?, https://www.lenovo.com/in/en/glossary/what-is-foreground/. By contrast, "[w]hen a process is moved to the background, it continues to run, but it no longer has direct user interaction or visibility." *Id.*

and (iii) videos watched to Braze for the purposes of marketing and analytics. Braze then maintains a "profile" for each Class Member associating all of this information with a unique Braze ID, allowing it to identify Class Members and the videos they watch. This conduct affected all Class Members throughout the entirety of the class period for all of the Class Apps:

[redacted]

*Id.* at 132:7-21; *see also id.* at 125:12-126:13 [redacted]; *id.* at 115:23-116:6 [redacted]; *id.* at 133:14-25 [redacted].

During discovery, Defendant produced [redacted] for each of the Class Apps (28 in total) showing every user whose geolocation and/or e-mail address were disclosed to Braze, the corresponding Braze ID for each user, the number of "sessions" for each user (*i.e.*, the number of times the user "foregrounded" the Class App), and the total number of videos watched by the user on the Class App. *See* Kopel Decl. Exs. 16-43 (Bates Nos. HTV-0000612-40) (the "Class List"); *see also* Rosellini Dep. at 152:22-153:3.

## III. DEFENDANT TRANSMITS CLASS MEMBERS' PERSONALLY IDENTIFIABLE INFORMATION TO GOOGLE FOR PURPOSES OF REVENUE GENERATION

Google Ad Manager ("GAM") displays advertisements to drive revenue for Defendant. Rosellini Dep. at 21:13-16 [redacted]

[redacted]; *see also id.* at 58:22-59:3 [redacted]; *id.* at 54:17 [redacted][6] As described below, Defendant configured GAM to receive Class Members' (i) geolocations; (ii) Android Advertising IDs ("AAIDs"); and (iii) videos watched.

There are two types of advertisements on the Class Apps: (i) "display ads" that appear on the Class Apps generally; and (ii) "video ads" that appear on videos that are played. *Id.* at 41:19-20 [redacted] Defendant configured the Class Apps [redacted] *Id.* at 68:11-19 [redacted] Because display ads appear throughout the Class Apps, it is a virtual certainty that Class Members had their geolocation passed at least once, and more likely several times, every time they used the Class Apps. *Id.* at 51:17-23 [redacted] *Id.* at 76:10-14 [redacted] Defendant [redacted] *Id.* at 79:24-80:5 [redacted]

[6] Although Plaintiff's allegations refer to "DoubleClick," [redacted] Rosellini Dep. At 41:4-11.

[redacted]

Finally, Defendant passed information to Google sufficient to show a Class Member was watching a video and identified the video being watched in the form of a pre-roll ad call. A "pre-roll advertisement" is a type of ad that [redacted] *Id.* at 82:6-11 [redacted] *Id.* at 83:6-8. [redacted] *Id.* at 135:23-24. [redacted] *Id.* at 86:23-24. [redacted] *Id.* at 90:23-24. Google is also provided with [redacted] *Id.* at 91:4-5; *see also* Kopel Decl. Exs. 53-54 [redacted] In this manner, Google was notified when Class Members requested, obtained, and played videos and what those specific videos were.

The aforementioned information was disclosed to Google [redacted] *See*, *e.g.*, Rosellini Dep. at 53:22-54:3, 68:11-69:12 [redacted]; *id.* at 79:10-23 [redacted]; *id.* at 86:12-24 [redacted]

## IV. DEFENDANT KNOWINGLY DISCLOSED PERSONAL INFORMATION TO BRAZE AND GOOGLE

Mr. Rosellini testified he is [redacted] Rosellini Dep. at 33:7-11. However, [redacted] *Id.* at 33:12-15. Mr. Rosellini explained [redacted]

[redacted] *Id.* at 37:4-13. Nor does he [redacted] *Id.* at 37:14-15. This is surprising in light of Defendant's multi-year litigation involving violations of Michigan's Video Rental Privacy Act—that state's analog to the VPPA—which ultimately ended in a large class action settlement.[7] Based on this, it is clear that Defendant at least *should have* been aware of the VPPA and taken precautions against violating it.

Regardless, Defendant did not sleepwalk into violating Class Members' privacy rights. To the contrary, Defendant knowingly and intentionally made the aforementioned disclosures. For instance, as Defendant's documents explain, [redacted] Kopel Decl. Ex. 14. Mr. Rosellini explained Defendant purposely configured the Class Apps to pass this information to Braze and that he was aware of it:

[redacted]

[7] Jonathan Stempel, *Hearst Reaches $50 Million Magazine Subscriber Data Privacy Settlement*, REUTERS (July 12, 2018), https://www.reuters.com/article/business/hearst-reaches-50-million-magazine-subscriber-data-privacy-settlement-idUSKBN1K234M/; *see generally Boelter v. Hearst Communications, Inc.*, Case No. 1:15-cv-3934 (S.D.N.Y.).

[redacted]

*Id.* at 106:9-107:22. Mr. Rosellini also explained Defendant [redacted] *Id.* at 115:23-116:2 [redacted] Mr. Rosellini also explained [redacted] *Id.* at 168:25-8.

Although Mr. Rosellini maintained Braze's purpose was limited to [redacted] (*id.* at 30:7-9), he also conceded [redacted]

[redacted]

*Id.* at 126:20-127:13.

Perhaps most importantly, [redacted] The Master Services Agreement between Defendant and Braze, which was [redacted] (*id.* at 141:4-7), expressly stated:

[redacted]

Kopel Decl. Ex. 15 at HTV-000234. Mr. Rosellini acknowledged he read this and understood it to mean [redacted] Rosellini Dep. at 145:3-6. But, despite this clear admonition from Braze, Defendant failed to take any action to ensure it complied with the VPPA:

[redacted]

*Id.* at 145:7-146:19.

Defendant also knowingly and intentionally transmitted Class Members' PII to Google. For instance, documents show Defendant, [redacted] Kopel Decl. Exs. 53-54. The Article ID thus allowed [redacted] Rosellini Dep. at 250:16-23 [redacted] Mr. Rosellini also confirmed that [redacted]

[redacted]

*Id.* at 244:22-245:6; *see also* Kopel Decl. Ex. 52 at HTV-000332 [redacted] Thus, Defendant knowingly disclosed Class Members' personal information to Braze and Google.

## V. IT IS REASONABLY AND FORESEEABLY LIKELY THAT BRAZE AND GOOGLE COULD IDENTIFY CLASS MEMBERS BASED ON THE INFORMATION DEFENDANT DISCLOSED TO BRAZE AND GOOGLE

Plaintiff relies on the Declaration of Dr. Narseo Vallina-Rodriguez ("Vallina-Rodriguez Decl.") to show just how easy it is to identify class members based on (i) geolocation; (ii) e-mail address; and (iii) AAID. This concept is supported by dozens of peer-reviewed articles and Dr. Vallina-Rodriguez's examination of the available data in this case. But common sense and the factual record in this case already displays this concept to a remarkable degree.

As Dr. Vallina-Rodriguez explains, [redacted] Vallina-Rodriguez Decl. ¶ 46. Based on this, Dr. Vallina Rodriguez opined that [redacted]

[redacted][8] [redacted] *Id.* ¶ 85.

To be clear, Dr. Vallina-Rodriguez's opinion is hyper-conservative. *Id.* ¶ 84. Consider that the records produced by Defendant in this case were extremely limited in that they only included each Class Members' most recently recorded geolocation coordinate (*i.e.*, only one point per Class Member). Rosellini Dep. at 159:19-22 [redacted] By contrast, the Class consists of people for whom Braze retains the historical geolocation (*i.e.*, the hundreds of points of geolocation that were disclosed by Defendant to Braze). *See* Kopel Decl. Ex. 3.

Even with these limitations, Class Counsel identified from the Class List produced by Defendant that *Mr. Rosellini himself* used two of the Class Apps: WCVB and WJCL. In both instances, the geolocation coordinates from the Class List matched Mr. Rosellini's home address perfectly: [redacted]

[redacted]

[8] Dr. Vallina-Rodriguez defines [redacted] Vallina-Rodriguez Decl. ¶ 44.

[redacted]

Kopel Decl. Exs. 46, 48. In addition, a simple Google search of this address along with the word "beenverified"[9] turned up Mr. Rosellini's name as the first result:

[redacted]

[9] Mr. Rosellini testified [redacted] Rosellini Dep. at 183:19-184:4.

Kopel Decl. Ex. 47. Mr. Rosellini recognized [redacted]

[redacted]

*Id.* at 186:17-187:7. Mr. Rosellini insisted it was a coincidence that the records reflected his home address both times, and speculated it could be different for other people:

[redacted]

*Id.* at 190:6-14. Mr. Rosellini's "speculation" is rebutted by [redacted] Vallina-Rodriguez Decl. ¶ 55 (emphasis added). For instance, Braze produced 78 historical geolocation coordinates tracking Michele Saunders, the original plaintiff in the case, correlating to her use of Defendant's mobile website. Kopel Decl. Ex. 3. That production further confirms this concept: 75 out of the 78 location points reflected her former home address. *Id.*; *see also* ECF No. 77 ¶¶ 4-5. Plaintiff also affirms that he uses a Class App from his home multiple times per week. *See* Declaration of Charles Therrien ("Therrien Decl.") ¶ 3.

Unsurprisingly, Mr. Rosellini was *also* readily identifiable in the Class List because he logged into the Class Apps using his personal e-mail address. As Dr. Vallina-Rodriguez explains, [redacted] Vallina-Rodriguez Decl. ¶ 104.

Here, Mr. Rosellini's e-mail address, [redacted] appeared alongside both entries in the Class List with the geo-coordinates for Mr. Rosellini's home. And again, a simple Google search connected Mr. Rosellini's e-mail address with his name:

[redacted]

Kopel Decl. Ex. 44. This is to be expected. Plaintiff's name also comes right up as the second result when one searches his e-mail address on Google:

[redacted]

Kopel Decl. Ex. 5. Similarly, former Plaintiff Michele Saunders' e-mail address is

[redacted] which clearly identifies her name. Mr. Rosellini tried to stage an unconvincing argument here too:

[redacted]

*Id.* at 207:4-12. But ultimately, even Mr. Rosellini had to concede that his email address and home address were more distinctive and descriptive of himself than even his name, which, as is evident from a search for the name on LinkedIn, is shared by many others:

[redacted]

[redacted]

*Id.* at 192:6-194:10.

## ARGUMENT

### I. THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(A)

#### A. Numerosity Is Satisfied

To satisfy the numerosity requirement, Plaintiff must show that joinder of all members of the putative class would be "impracticable." Fed. R. Civ. P. 23(a)(1). "[G]enerally, courts have approved of classes which include more than 40 individuals." *McAdams v. Massachusetts Mut. Life Ins. Co.*, 2002 WL 1067449, at *3 (D. Mass. May 15, 2002), *aff'd*, 391 F. 3d 287 (1st Cir. 2004) (finding the numerosity requirement met when the proposed class contained 117 members). Here, based on his review of the Class List, Dr. Vallina-Rodriguez concluded there were [redacted] unique Braze IDs with associated geolocation data. Vallina-Rodriguez Decl. ¶ 108. Therefore, there are well over forty class members and numerosity is satisfied.

#### B. Commonality Is Satisfied

To satisfy commonality, Plaintiff must demonstrate "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). A common question is one whose "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Martins v. 3PD, Inc.*, 2013 WL 1320454, at *6 (D. Mass. Mar. 28, 2013) (cleaned up). Further, "[c]ommonality requires the plaintiff to demonstrate that the class members have suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011) (cleaned up). Commonality "does not require that all putative class members share identical claims." *In re Pharmaceutical Industry Average Wholesale Price Litig.*, 230 F.R.D. 61, 78 (D. Mass. 2005) (cleaned up). On the contrary, "even a single question of law or fact common to the members of

the class will satisfy the commonality requirement." *Dukes*, 564 U.S. at 369 (Ginsburg, J. concurring in part) (cleaned up).

Here, common questions of law and fact abound, including but not limited to: (i) whether the information disclosed by Defendant to Braze and Google is reasonably and foreseeably likely to identify consumers and the videos they requested or obtained; (ii) whether Defendant disclosed this information knowingly; (iii) whether Defendant's disclosures were made in the ordinary course of business; (iv) whether Defendant is a video tape service provider; and (v) whether Plaintiff and Class Members are "consumers" of Defendant. Just one of these inquiries would suffice for commonality. Thus, this element is met.

### C. Plaintiff's Claims Are Typical

Fed. R. Civ. P. 23(a)(3) requires Plaintiff's claims to be "typical" of the class. Fed. R. Civ. P. 23(a)(3). To prove typicality's "permissive standards," "a class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *DaSilva v. Border Transfer of MA, Inc.*, 296 F. Supp. 3d 389, 404 (D. Mass. 2017). Accordingly, the named plaintiff's claim must "arise from the same event or practice or course of conduct that gives rise to the claims of other class members, and … are based on the same legal theory." *Id*. "Even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories or where the claim arises from the same practice or course of conduct." *Id.* at 405.

Here, Plaintiff's claim arises from the same course of conduct by Defendant as every other Class Member: Plaintiff watched videos on one of the Class Apps and Defendant disclosed his video-viewing behavior and PII (his geolocation, e-mail address, and AAID) to Braze and Google. SAC ¶¶ 106-110. Defendant's data confirms this, as Plaintiff is included on the Class List. *See*

Kopel Decl. Ex. 36 (WMUR Class List) at Row 10862 [redacted] Plaintiff's claims will stand and fall with every other Class Members' based on the same evidence. Typicality is therefore met.

**D. Plaintiff And His Counsel Will Adequately Represent The Classes**

Adequacy requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This is a two-prong test, requiring first that "the interests of the representative party will not conflict with the interests of any of the class members," and second, that "class counsel be qualified, experienced and able to vigorously conduct the proposed litigation." *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 130 (1st Cir. 1985).

*1. Plaintiff's Interests Do Not Conflict With The Interests Of The Class*

The First Circuit has held that "perfect symmetry of interest is not required and not every discrepancy among the interests of class members renders a putative class action untenable." *Matamoros v. Starbucks Corp.*, 699 F.3d 129, 138 (1st Cir. 2012). "Only conflicts that are fundamental to the suit and that go to the heart of the litigation prevent a plaintiff from meeting the Rule 23(a)(4) adequacy requirement." *Id.* (cleaned up). "Put another way, to forestall class certification the intra-class conflict must be so substantial as to overbalance the common interests of the class members as a whole." *Id.*

Here, Plaintiff has demonstrated he is an adequate class representative. Plaintiff has retained competent counsel, assisted with his counsel's investigation of his claims, reviewed and authorized the filing of legal documents, is prepared to respond to discovery and provide his personal phone for imaging, and has kept in regular contact with his counsel to discuss the case. Therrien Decl. ¶¶ 4-5. Plaintiff is prepared to sit for a deposition and testify at trial. *Id.* ¶ 6; *see also In re Colgate-Palmolive Softsoap Antibacterial Hand Soap Mktg. & Sales Pracs. Litig.*, 2015

WL 7282543, at *7 (D.N.H. Nov. 16, 2015) (adequacy met where "[t]he class representatives were active participants in the litigation and settlement process, from initial fact gathering, to responding to discovery requests and appearing for depositions, to examining the scope and nature of the relief."). Plaintiff also has no interests antagonistic to the interests of the absent class members and there are no conflicts between them. Therrien Decl. ¶ 7.

*2. Plaintiff's Counsel Are Qualified*

Plaintiff's counsel—Yitzchak Kopel and Max S. Roberts of Bursor & Fisher, P.A.—are class action lawyers who have extensive experience litigating consumer claims, including claims involving false or misleading advertising. *See* Kopel Decl. Ex. 1. "The firm has been appointed class counsel in dozens of cases in both federal and state courts, and has won multi-million dollar verdicts or recoveries in five [now six] class action jury trials since 2008." *Ebin v. Kangadis Food Inc.*, 297 F.R.D. 561, 566 (S.D.N.Y. 2014); *Ambrose v. Boston Globe Media Partners, LLC*, 1:22-cv-10195, ECF No. 70 ¶ 8 (D. Mass. Sept. 8, 2023) (Stearns, J.) (in VPPA case, finding Bursor & Fisher "adequately represented the Settlement Class for the purposes of litigating this matter and entering into and implementing the Settlement Agreement").

**E. The Classes May Be Objectively Ascertained**

The First Circuit has held that "the definition of the class must be 'definite,' that is, the standards must allow the class members to be ascertainable … with reference to objective criteria." *In re Nexium Antitrust Litig.*, 777 F.3d 9, 20 (1st Cir. 2015) ("*In re Nexium*") (cleaned up).

Here, every element of the Class Definition is based on objective criteria, given that class membership requires that during the Class Period, Class Members (i) downloaded one of the Class Apps onto their mobile phone; (ii) enabled location permissions for the Class App for at least 250 sessions, and (iii) watched at least ten videos. The Subclasses are similarly based on (i) whether

ad tracking was enabled, or (ii) whether email addresses were provided. Each of these elements are objective, and common evidence will show that Defendant disclosed the PII for all such Class Members to third parties in violation of the VPPA. *See* Argument § II.A, *infra*.

In addition, Defendant has produced a Class List that shows every account whose geolocation and/or e-mail address was disclosed to Braze (and, by the same token, Google). Kopel Decl. Exs. 16-43. The Class List also shows how many "sessions" of the Class App were initiated by each account, as well as how many videos were watched by each account. *See id.* at Columns I and V. Thus, the activity for every single Class Member is reflected directly in the Class List.

Only two variables are needed to determine whether persons are excluded from the Class and/or Subclasses that are not directly reflected in the Class List: whether persons kept their (i) geolocation and (ii) AAID (for Subclass Members) permissions enabled on the Class App during the Class Period. *See id.* Columns J and K (reflecting first and last use of the Class Apps during the Class Period). Defendant's counsel advised that Defendant lacks any records "of dates that geolocations permissions were enabled and disabled by" class members. Kopel Decl. Ex. 2. Mr. Rosellini's testimony similarly suggested [redacted] *See* Rosellini Dep. at 137:25-138:8 [redacted]

This is unproblematic because Braze and Google likely have this information for every Class Member. For instance, Braze's production of the historical geolocation data of the original Plaintiff, Michele Saunders, indicates that Braze knows the exact number of geolocation datapoints it collected for each Class Member. *See* Kopel Decl. Ex. 3 (showing 78 historical geolocation datapoints collected from Ms. Saunders' device). Moreover, Google likely has this information

given the above-cited evidence shows Google collected AAIDs every time it filled an ad call. *See* Evidence Common To All Claims § III, *supra*. Of course, it would not have been appropriate for Plaintiff to seek such sweeping and voluminous productions from third parties prior to class certification.

Given that this data came from Defendant, it would certainly be able to request it back from its vendors. Therefore, to the extent it is available, Defendant could simply retrieve the data and pass it on to Plaintiff so that it is not prejudiced by inclusion of class members who do not fit the class definition. Anyone that does not fit the class definition can simply be culled from the list prior to trial. This is the height of administrative feasibility, as there are no questions for the factfinder to determine. Rather, to the extent the data shows that anyone does not fit the class definition, it is determinative, and culling them will require nothing beyond a simple Microsoft Excel formula. This approach has been expressly permitted by the First Circuit. *See Smillow v. Sw. Bell Mobile Sys., Inc.*, 323 F.3d 32, 40 (1st Cir. 2003) ("Common issues predominate where individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria – thus rendering unnecessary an evidentiary hearing on each claim."); *see also Thrower v. Citizens Disability, LLC*, 2022 WL 3754737, at *4 (D. Mass. Aug. 30, 2022) ("Individualized factual determinations do not create inefficiency or unfairness [at class certification] if they can be made pursuant to rote, mechanical processes.").

If Braze and Google lack this information, Class Members can provide affidavits attesting membership. *In re Dial Complete Mktg. and Sales Pracs. Litig.*, 312 F.R.D. 36, 50 (D.N.H. 2015) ("[T]he court of appeals for this circuit has plainly supported the view that testimonial affidavits and declarations are an acceptable methodology for establishing class membership at the liability stage of a case."); *see also In re Nexium*, 777 F.3d at 20 (holding "testimony in the form of an

affidavit or declaration would be sufficient in a class action."). Notably, such affidavits would be unrebutted to the extent that Defendant lacks data to the contrary. Moreover, the fact that Defendant apparently lacks this data cannot prevent certification. On the contrary, "denying class certification because the defendant is unable to provide a list of potential class members would encourage the defendant not to keep records, shielding themselves from liability." *Salam v. Lifewatch, Inc.*, 2016 WL 8905321, at *2 (N.D. Ill. Sept. 6, 2016) (cleaned up).

## II. THE PROPOSED CLASSES SATISFY THE REQUIREMENTS OF RULE 23(B)

Fed. R. Civ. P. 23(b)(3) authorizes class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members," and "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Both requirements are met here.

### A. Common Questions Of Law Or Fact Predominate

The predominance inquiry "tests whether proposed class actions are sufficiently cohesive to warrant adjudication by representation." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623-24 (1997). "In evaluating predominance, a court must ask whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues." *Baker v. Equity Residential Management, L.L.C.*, 390 F. Supp. 3d 246, 259 (D. Mass. 2019) (cleaned up). Notably, Fed. R. Civ. P. 23(b)(3) calls only for "a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 459 (2013) (cleaned up). Further, as the Supreme Court and First Circuit have made clear, "the need for some individualized determinations at the liability and damages stage does not defeat class certification." *In re Nexium*, 777 F.3d at 21. In other words, "Rule 23(b)(3) does not require a

plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Id.* (cleaned up).

Here, this case will turn entirely on the common questions set forth above (Argument § I.B, *supra*), and each is answerable as to every Class Member using the same evidence. Defendant is either a video tape service provider or it is not. The information Defendant disclosed is either PII or it is not. Defendant either knowingly disclosed this information or it did not. And all Class Members are either all consumers for purposes of the VPPA or none are. *Schuchardt v. Law Off. of Rory W. Clark*, 2016 WL 232435, at *6 (N.D. Cal. Jan. 20, 2016) (finding predominance satisfied because "[i]f the [c]ourt were to find that the [defendant violated the statute], that single adjudication would reach the claims of all [c]lass [m]embers"). Further, it is well established that "the need for individualized damage decisions does not ordinarily defeat predominance where there are still disputed common issues as to liability." *Tardiff v. Knox Cnty.*, 365 F.3d 1, 6 (1st Cir. 2004). Notwithstanding this, damages can easily be calculated on a classwide basis, given the VPPA provides for liquidated damages of $2,500. 18 U.S.C. § 2710(c)(2)(A); *see also*, *e.g.*, *Hawkins v. S2Verify*, 2016 WL 3999458, at *6 (N.D. Cal. July 26, 2016) (holding where plaintiffs "seek only statutory damages," "[d]amages can therefore be proven through class-wide proof").

**B. Class Litigation Is Superior To Other Methods Of Adjudication**

In the First Circuit, "[s]uperiority exists where 'there is a real question whether the putative class members could sensibly litigate on their own for these amounts of damages, especially with the prospect of expert testimony required.'" *Vargas v. Spirit Delivery & Distribution Servs., Inc.*, 245 F. Supp. 3d 268, 289 (D. Mass. 2017) (quoting *Gintis v. Bouchard Transp. Co., Inc.*, 596 F.3d 64, 68 (1st Cir. 2010)). Here, a class action is superior because of the "considerable disparity in

resources between a large corporation like [Defendant] and an individual plaintiff … [and] the vast resources necessary to bring these claims would far outweigh any individual recovery." *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 29 (D. Mass. 2010). Further, individual consumers stand only to recover (at best) $2,500 in liquidated damages under the VPPA. *See, e.g.*, *Zaklit v. Nationstar Mortg. LLC*, 2017 WL 3174901, at *10 (C.D. Cal. 2017) ("[T]he Court is not persuaded that $5,000 in [statutory] damages is so clearly sufficient to motivate individual litigation involving complex factual and legal issues as to weigh against class certification"). Finally, a "[c]lass adjudication is superior to dozens of individual cases covering the same issues." *Muniz v. XPO Last Mile, Inc.*, 342 F.R.D. 189, 199 (D. Mass. 2022).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his Motion and certify the Classes.

Dated: September 6, 2024

Respectfully submitted,

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Pro Hac Vice*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455

Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2024, I electronically filed the foregoing document with the Court's CM/ECF system, which will provide e-mail notice to all counsel of record.

By: */s/ Yitzchak Kopel*
Yitzchak Kopel