**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

CHARLES THERRIEN, individually and on behalf of all others similarly situated,

Plaintiff,

v.

HEARST TELEVISION, INC.,

Defendant.

Case No. 1:23-cv-10998

Hon. Richard G. Stearns

# PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

**LEAVE TO FILE GRANTED ON NOVEMBER 13, 2024**

Dated: December 18, 2024

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Pro Hac Vice*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE(S)**


I. WHETHER 250 POINTS OF GEOLOCATION IS REASONABLY AND FORESEEABLY LIKELY TO IDENTIFY A PERSON IS A COMMON QUESTION ........ 1

II. WHAT IT MEANS TO "IDENTIFY A PERSON" IS A COMMON QUESTION ........ 2

III. ANY NECESSARY DATA THAT WAS NOT MAINTAINED BY DEFENDANT CAN BE PROVIDED BY BRAZE AND GOOGLE ........ 5

A. Braze And Google Have The Data ........ 6

B. If The Data Does Not Exist, It Is Because Defendant Chose Not To Retain It, Even After The Commencement Of This Action ........ 6

C. The Supreme Court Has Instructed That Data Needed To Identify Class Members Must Be Sought After Certification ........ 7

IV. THERE ARE NO UNINJURED CLASS MEMBERS ........ 8

A. Plaintiff Need Only Meet The Objective "Reasonably And Foreseeably Likely" Standard ........ 8

B. Common Evidence Proves That Defendant Disclosed To Braze And Google The Videos Class Members Requested Or Obtained ........ 9

1. Disclosure Of Articles Accessed By Class Members Is Sufficient To Show Which Videos Were Requested Or Obtained ........ 9

2. Defendant Disclosed The Videos Viewed ........ 10

C. Defendant Has Adduced No Evidence Of Consent ........ 13

D. No Individual Evidence Or Testimony Is Needed ........ 13

E. Case Law Regarding Uninjured Class Members Is Inapposite ........ 14

V. PLAINTIFF IS TYPICAL OF THE CLASS ........ 14

VI. SUPERIORITY IS SATISFIED ........ 16

VII. ASCERTAINABILITY IS SATISFIED ........ 17

VIII. DEFENDANT WILL BE PROVEN WRONG FOLLOWING CERTIFICATION ........ 19

IX. A MINOR ADJUSTMENT TO THE CLASS DEFINITION IS APPROPRIATE ........ 20

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*Adams v. America's Test Kitchen, LP*,
680 F. Supp. 3d 31 (D. Mass. 2023) ............ 10

*Altman v. White House Black Market, Inc.*,
2017 WL 8780202 (N.D. Ga. Oct. 25, 2017) ............ 19

*Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*,
568 U.S. 455 (2013) ............ 2, 8

*Bumpus v. Realogy Brokerage Grp. LLC*,
2022 WL 867256 (N.D. Cal. Mar. 23, 2022) ............ 18

*Chinitz v. Intero Real Est. Servs.*,
2020 WL 7391299 (N.D. Cal. July 22, 2020) ............ 18

*City of Providence v. Barr*,
954 F.3d 23 (1st Cir. 2020) ............ 11

*Clough v. Revenue Frontier, LLC*,
2019 WL 2527300 (D.N.H. June 19, 2019) ............ 13

*Collins v. Toledo Blade*,
720 F. Supp. 3d 543 (N.D. Ohio 2024) ............ 10

*Delarosa v. Boiron, Inc.*,
275 F.R.D. 582 (C.D. Cal. 2011) ............ 9

*Dziennik v. Sealift, Inc.*,
2006 WL 1455464 (E.D.N.Y. May 23, 2006) ............ 8

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ............ 1, 4

*Field v. Anadarko Petroleum Corp.*,
2020 WL 4937122 (S.D. Tex. Aug. 24, 2020) ............ 8

*In re Asacol Antitrust Litig.*,
907 F.3d 42 (1st Cir. 2018) ............ 14

*In re Marriott Int., Cust. Data Sec. Breach Litig.*,
314 F.R.D. 128 (D. Md. 2022) ............ 19

*In re Nickelodeon Cons. Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) .......... 4

*In re Scotts EZ Seed Litig.*,
304 F.R.D. 397 (S.D.N.Y. 2015) .......... 9

*Johnson v. Comodo Grp., Inc.*,
2020 WL 525898 (D.N.J. Jan. 31, 2020) .......... 18

*Krakauer v. Dish Network, L.L.C.*,
2015 WL 5227693 (M.D.N.C. Sept. 8, 2015) .......... 18

*Mantha v. QuoteWizard*,
347 F.R.D. 376 (D. Mass. 2024) .......... 18

*Morrow v. Navy Fed. Credit Union*,
2023 WL 2874908 (E.D. Va. Apr. 6, 2023) .......... 20

*Mullins v. Direct Digital, LLC*,
795 F.3d 654 (7th Cir. 2015) .......... 7, 19

*Oppenheimer Fund, Inc. v. Sanders*,
437 U.S. 340 (1978) .......... 7, 17

*Patel v. Facebook, Inc.*,
923 F.3d 1264 (9th Cir. 2019) .......... 17

*Perez v. First Am. Title Ins. Co.*,
2009 WL 2486003 (D. Ariz. Aug. 12, 2009) .......... 18

*Ruiz v. NEI Gen. Contracting, Inc.*,
719 F. Supp. 3d 139 (D. Mass. 2024) .......... 20

*Salam v. Lifewatch, Inc.*,
2016 WL 8905321 (N.D. Ill. Sep. 6, 2016) .......... 7

*Salazar v. Nat'l Basketball Assoc.*,
118 F.4th 533 (2d Cir. 2024) .......... 15

*Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharm., Inc.*,
540 F. Supp. 3d 182 (D.R.I. May 18, 2021) .......... 19

*Slapikas v. First Am. Title Ins. Co.*,
250 F.R.D. 232 (W.D. Pa. 2008) .......... 19

*U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*,
489 U.S. 749 (1989) .......... 15

*Waste Management Holdings, Inc. v. Mowbray*,
208 F.3d 288 (1st Cir. 2000) .......... 13

*Yershov v. Gannett Satellite Info. Network, Inc.*,
104 F. Supp. 3d 135 (D. Mass. 2015) .......... 3

*Yershov v. Gannett Satellite Info. Network, Inc.*,
204 F. Supp. 3d 353 (D. Mass. 2016) .......... 3, 15

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) .......... Passim

*Young v. Nationwide Mut. Ins. Co.*,
693 F.3d 532 (6th Cir. 2012) .......... 18

*Zaklit v. Nationstar Mortgage LLC*,
2017 WL 3174901 (C.D. Cal. July 24, 2017) .......... 17

**STATUTES**

18 U.S.C. § 2710(a)(3) .......... 9

18 U.S.C. § 2710(b)(1) .......... 1

18 U.S.C. § 2710(b)(2) .......... 3

18 U.S.C. § 2710(b)(2)(D)(ii) .......... 11

**RULES**

Fed. R. Evid. 703 .......... 14

**OTHER AUTHORITIES**

S. Rep. 100-599 (1988) .......... 4, 11, 12

## I. WHETHER 250 POINTS OF GEOLOCATION IS REASONABLY AND FORESEEABLY LIKELY TO IDENTIFY A PERSON IS A COMMON QUESTION[1]

"In *Yershov*, the First Circuit held that the term 'personally identifiable information' encompasses 'information *reasonably and foreseeably likely* to reveal which … videos [a person] has obtained.'" *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (quoting *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016) ("*Yershov II*") (emphasis and brackets in original). The words "reasonably and foreseeably likely" connote an *objective* and *forward-looking* standard. The word "likely" is distinct from "certain." And the word "foreseeable," means something that can be anticipated. Simply put, either the disclosure of 250 points of geolocation is reasonably and foreseeably likely to identify Class Members, or it is not. Holding otherwise would nullify the words "foreseeably" and "likely."

There is a good reason why courts are required to use an objective and forward-looking standard. "The VPPA protects consumer privacy by directing video service providers not to do certain things with consumer information. To that end, 18 U.S.C. § 2710(b)(1) focuses on what information a video service provider 'knowingly discloses.' In other words, the statute views disclosure from the perspective of the disclosing party." *Eichenberger*, 876 F.3d at 985. That is why the standard for what constitutes PII cannot differ from consumer to consumer. "*Holding otherwise would make the lawfulness of a disclosure depend on circumstances outside of a video service provider's control.*" *Id.* (emphasis added; internal quotations and brackets omitted).

But what of "class members whose home/work are nearby or co-located" or those "who

[1] Defendant attacks the methodology of Plaintiff's expert witness throughout its class certification opposition. Because Plaintiff responds to these arguments in his opposition to Defendant's motion to strike, Plaintiff does not duplicate that briefing here, and respectfully refers the Court to that simultaneously-filed submission.

access HTV Apps on a shared device?" Opp. at 22. Defendant insists that "[o]nly individual inquiry can answer … whether the information transmitted was personally identifiable with respect to each individual class member at the time it was shared." *Id.* at 21 (emphasis removed). These arguments are factually wrong. *See* MTS Opp. §§ II-III. But even if they were correct, it would only suggest that the information disclosed was not "reasonably and foreseeably likely" to identify Class Members. Under those circumstances, even Class Members that happened to be identified would have no claim because the disclosure was not "reasonably and foreseeably likely" to identify them. Regardless, at this stage, Plaintiff need only show that common evidence will answer this question for all Class Members, "not that [this] question[] will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Retirement Plans & Tr. Funds*, 568 U.S. 455, 459 (2013).

## II. WHAT IT MEANS TO "IDENTIFY A PERSON" IS A COMMON QUESTION

Relatedly, the *legal question* of which categories of information "identify" someone within the VPPA's definition of PII is common to the Class. Defendant focuses on Plaintiff's ability to infer a consumer's full name from the disclosed information.[2] These arguments about Dr. Vallina-Rodriguez's ("Dr. V.R.") testimony are factually wrong, and a supermajority of Class Members can be identified by name from the data disclosed. *See generally* MTS Opp. §§ II-VI.A. But Defendant's presumption that the VPPA requires identification by name is mistaken. The three *Yershov* decisions said the opposite: "the language [of the VPPA] reasonably conveys the point that PII is not limited to information that explicitly names a person." *Yershov II*, 820 F.3d at 486.

In the first *Yershov* decision, Chief Judge Saylor reasoned that, as a matter of statutory interpretation, PII must necessarily include names, addresses, and other information as well:

[2] Remarkably, Defendant even appears to contend that a consumer's names is also insufficient. Opp. at 7 ("Plaintiff Saunders's email … could belong to any Michele Saunders, a name shared by at least three individuals in her hometown alone.") (cleaned up).

> [T]he statute permits disclosure of PII under five specific circumstances. 18 U.S.C. § 2710(b)(2). One of those circumstances is that disclosure may be made "to any person" if "the disclosure is solely of the names and addresses of consumers," but only if the consumer has had an opportunity to prohibit that disclosure, and if the disclosure does not identify the "title, description, or subject matter of the video."5 Id. § 2710(b)(2)(D). *That suggests (1) that a consumer's name and address are both PII, and (2) that the universe of PII is greater than the consumer's name and address.*

*Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135, 140 (D. Mass. 2015) ("*Yeshov I*") (emphasis added). Accordingly, *Yershov I* made clear that a home address is *per se* PII "under the statutory construction … and as a matter of common sense." *Id.* at 141. On appeal, the First Circuit affirmed the decision as to PII but reversed on other grounds. While the First Circuit did not directly address the minimum degree of information necessary to constitute PII, it held "[m]any types of information other than a name can easily identify a person:"

> imagine Gannett had disclosed that a person viewed 146 videos on a single device at 2 sets of specified GPS coordinates. Given how easy it is to locate a GPS coordinate on a street map, this disclosure would enable most people to identify what are likely the home and work addresses of the viewer (*e.g.*, Judge Bork's home and the federal courthouse).

*Yershov II*, 820 F.3d at 486. On remand, the defendant argued the First Circuit's had limited the definition of PII to scenarios where the defendant had a "game program … allowing it to link the GPS address and device identifier information to a certain person by name, address, phone number and more." *Yershov v. Gannett Satellite Info. Network, Inc.*, 204 F. Supp. 3d 353, 363 (D. Mass. 2016) ("*Yershov III*"). Chief Judge Saylor rejected this argument and reiterated that his holding that "home addresses … are PII" remained intact following the appellate decision, and that "no … game program is necessary." *Id.* at 364.

Other circuit courts are in accord. For instance, in listing "what kinds of information are sufficiently 'personally identifying' … under the [VPPA]," the Third Circuit noted that:

> [a]t one end of the spectrum, of course, is a person's actual name. Then there are pieces of information, such as a telephone number or a physical address, which may not by themselves identify a particular person but from which it would likely be possible to identify a person by consulting publicly available sources, such as a phone book or property records.

*In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262 282-83 (3d Cir. 2016). The Ninth Circuit has similarly found that "an email address may very well readily … identify an individual." *Eichenberger*, 876 F.3d at 986. And the official Senate Report explains the definition of PII, "[u]nlike the other definitions in this subsection … uses the word 'includes' to establish *a minimum, but not exclusive, definition of personally identifiable information*." S. Rep. 100-599, at 12 (1988) (emphasis added); *see also Yershov II*, 820 F.3d at 486 (citing same).

Here, Dr. V.R. cites peer-reviewed research examining comparable geolocation data showing that researchers were able to "identify the home and workplace address of 92.5% and 55.6% of Twitter users, respectively" where they had access to "between 10 and 250 geotagged tweets." Dr. V.R. Rep. (ECF No. 97-10) ¶¶ 62, 65. The same studies revealed "users' presence in sensitive locations such as medical centers, religious places and nightlife venues, including strip clubs and gay bars." *Id.* ¶ 62. Dr. V.R. explains this information can be cross-referenced against public sources to retrieve class members' full names. *Id.* ¶¶ 90-94, 104-107.

Dr. V.R. also testified that geolocation data reveals the ability to predict where a person will be at a given time. That opinion is based on research that found "human trajectories are predictable, as humans spend most of their time at a small and well-defined number of locations to which they are likely to return" and that "40% of the time, individuals are found at their first two most frequent locations." *Id.* ¶¶ 50-51. Defendant's expert acknowledged this as well. Kopel Decl. Ex. 1 at 37:19-23 ("[redacted]").

This level of predictability has serious implications. As another peer-reviewed study explained, "misuse of location data can lead to damaged reputation, harassment, mugging, as well as attacks on an individual's home, friends or relatives."[3] This is an even more pervasive form of PII than a name, which can be common to other people with the same name and will not necessarily put them in danger on account of the video preferences.

This briefing is far from exhaustive, given that it is not necessary for the Court to resolve this legal question at this stage. However, it suffices to demonstrate that the question of what information constitutes PII is far from undisputed, as Defendant apparently assumes. It is a legal question that is common to all class members that will need to be resolved before the Court can even address Defendant's (meritless) factual arguments about what the data shows.

## III. ANY NECESSARY DATA THAT WAS NOT MAINTAINED BY DEFENDANT CAN BE PROVIDED BY BRAZE AND GOOGLE

Defendant argues that class certification should be denied because it did not retain, and Plaintiff therefore currently lacks, three categories of data: (i) whether class members toggled between enabling and disabling location permission during the class period; (ii) whether class members disabled permissions for use of AAIDs during the class period; and (iii) the number of videos class members viewed during the class period. As detailed below, this information is not needed to certify the Class, and more importantly, can be obtained from third parties.

Before addressing Defendant's arguments, it is important to provide context. On July 18, 2024, a few weeks before the end of fact discovery, Defendant produced spreadsheets showing for each App user, among other things, [redacted]

[3] ECF No. 97-13 at 16.

[redacted]. Kopel Decl. (ECF No. 85) at Exs. 16-43. The evidence in this case shows that geolocation data, when permissioned, was [redacted]. Rosellini Dep. (ECF No. 85-4) at 51:17-23, 68:11-19, 119:10-120:19, 160:10-20. Thus, the data Defendant produced shows which consumers enabled geolocation and accessed at least 250 sessions but cannot definitively show whether those users changed their geolocation permissions during the Class Period. Notably, this data *solely* relates to identification of Class Members. None of it otherwise weighs on the propriety of class certification or the merits of the class claim. Accordingly, these arguments do not prevent certification.

**A. Braze And Google Have The Data**

As demonstrated in Plaintiff's moving brief, Braze has shown it has Class Member geolocation data based on the production it made concerning former Plaintiff Michelle Saunders. ECF No. 85 at Ex. 3. And Mr. Rosellini avers in his declaration and testified under oath that [redacted] Rosellini Decl. (ECF No. 97-6) ¶¶ 16, 18, 25, 30-31; *see also* Rosellini Dep. at 68:11-19, 133:7-9, 136:9-13; ECF No. 97-9 at HTV-234 ("[redacted]"). In particular, Google [redacted] during the Class Period. Rosellini Decl. ¶ 29. Given AAIDs are used for targeted ads, it defies common sense to say the data was deleted. Regardless, there is need to speculate as the data can be procured after certification. *See* § III.D, *infra*.

**B. If The Data Does Not Exist, It Is Because Defendant Chose Not To Retain It, Even After The Commencement Of This Action**

As noted above, all the PII disclosed was reflected in transmissions from the Apps to Braze and Google. The only reason Defendant would not have this data is because it chose to not retain

it. As the Seventh Circuit has explained, "refusing to certify on this basis effectively immunizes defendants from liability because they chose not to maintain records of the relevant transactions." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 668 (7th Cir. 2015). If the Court follows this path, lawyers for other videotape service providers will simply counsel their clients "not to keep records, shielding themselves from liability." *Salam v. Lifewatch, Inc.* 2016 WL 8905321, at *2 (N.D. Ill. Sep. 6, 2016). It will "create an incentive for a person to violate the [law] on a mass scale and keep no records of its activity, knowing that it could avoid legal responsibility for the full scope of its illegal conduct." *Hand v. Beach Enter. KC, LLC*, 456 Supp. 3d 1099, 1150 (W.D. Mo. 2020).

To be clear, the evidence shows that Braze and Google have this data. *See* § III.B, *supra*. But if they do not, it is because Defendant did not instruct them to retain Class Member data even after Defendant knew of its relevance following the action's commencement on May 5, 2023, nearly a year before the end (and amounting to approximately 38%) of the Class Period. Defendant's complaint that that its Seventh Amendment rights will be violated by class certification because of the evidence it discarded rings hollow, and the absence of this data cannot serve as a basis to deny certification.[4]

### C. The Supreme Court Has Instructed That Data Needed To Identify Class Members Must Be Sought After Certification

Plaintiff is mindful that the fact discovery is closed. But subpoenaing this data during the discovery period would not have been appropriate. In *Oppenheimer Fund, Inc. v. Sanders*, 437

[4] Defendant's argument that it lacks records to show when videos were watched will likely be obviated by productions from Braze and/or Google and should otherwise be rejected for the reasons stated herein. But in the alternative, the class can be limited to only App users whose [redacted] in the Braze data is within the Class Period, thus ensuring that the videos were played during the class period. See Kopel Decl. at Exs. 16-43 at Column J. While many Class Members would be unfairly excluded, this group still includes Plaintiff and hundreds of thousands of others.

U.S. 340, 350 (1978), the Supreme Court explained that where, as here, "information is sought to facilitate the sending of notice rather than to define or clarify issues in the case," notwithstanding that it "resembles discovery in that it seeks to obtain information, we are convinced that it more properly is handled under Rule 23(d)." Based on this, "[c]ourts have ordinarily refused to allow discovery of class members' identities at the pre-certification stage," especially by non-parties. *Dziennik v. Sealift, Inc.*, 2006 WL 1455464, at *1 (E.D.N.Y. May 23, 2006); *Field v. Anadarko Petroleum Corp.*, 2020 WL 4937122, at *2 (S.D. Tex. Aug. 24, 2020) ("Why should I force non-parties to incur substantial costs in gathering, reviewing, and producing documents covering thousands of employees when this case might ultimately proceed as an individual action?"). Thus, Plaintiff was neither required nor permitted by Supreme Court precedent to subpoena this data earlier. Instead, such data must be gathered pursuant to Rule 23 following certification.

## IV. THERE ARE NO UNINJURED CLASS MEMBERS

### A. Plaintiff Need Only Meet The Objective "Reasonably And Foreseeably Likely" Standard

Defendant argues that "in order for the class to be certified, Plaintiff must prove that when the HTV Apps transmitted geolocation … that data uniquely and actually identified each specific class member." *Id.* at 1 (cleaned up). That is wrong. The "reasonably and foreseeably likely" standard that defines PII is objective and forward looking. *See* § I, *supra*. Thus, Plaintiff must only prove that upon disclosing 250 points of geolocation, it was "reasonably and foreseeably likely" that Class Members would be identified under this objective test. *See Yershov II*, 820 F.3d at 486. Cases that hinge on objective standards, such as this one, are particularly well-suited for certification. *See Amgen*, 568 U.S. at 459 ("Because materiality is judged according to an objective standard, the materiality of Amgen's alleged misrepresentations and omissions is a question common to all members of the class"). Defendant's arguments about the potential existence of

outlying Class Members pertain solely to the merits rather than certification. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 408 (S.D.N.Y. 2015) ("Defendants' argument that the products worked for some individual class members goes to the proof of the merits …"); *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582, 594 (C.D. Cal. 2011) ("Defendant's arguments that it can present proof the Coldcalm worked for some individual class members goes to the proof of the merits of Plaintiff's claim, not to the common question as to the overall efficacy of the product.").

### B. Common Evidence Proves That Defendant Disclosed To Braze And Google The Videos Class Members Requested Or Obtained

#### *1. Disclosure Of Articles Accessed By Class Members Is Sufficient To Show Which Videos Were Requested Or Obtained*

Defendant argues that Plaintiff cannot establish that it disclosed the videos that class members requested or obtained because "the Apps do not transmit the title of any video. Rather, the transmission comprises the URL or random 'ID" (a number) associated with the *article* selected by the App user." Opp. at 8 (emphasis in original). As an initial matter, this issue is unrelated class certification. The Apps transmitted the same categories of information for all class members, so this issue is common to the Class. Regardless, Defendant's supposition that Class Members were required to actually watch the videos is belied by the fact that the VPPA refers to "information which identifies a person as having *requested or obtained* specific video materials or services." 18 U.S.C. § 2710(a)(3) (emphasis added). [redacted] Rosellini Dep. at 135:23-25 ("[redacted]"). By accessing articles containing videos, Class Members are "requesting" them, and once the article loads with the video, are clearly "obtaining" them. Thus, Defendant's disclosure of its users accessing the articles containing the videos *was itself a violation of the VPPA*, "as the information disclosed

enables third parties to connect a certain user to certain videos." *Adams v. America's Test Kitchen, LP*, 680 F. Supp. 3d 31, 42 (D. Mass. 2023) (cleaned up). As another court recently recognized:

> The titles of the 146 films that Robert Bork and his family rented from the video store, which prompted Congress to enact this law, were just that: the titles affiliated with his video store account. In Bork's case, there was no information about whether he actually watched all of the videos he and his family rented. Similarly here, Plaintiffs have established that the Toledo Blade and the Post-Gazette send Meta the URL for the webpage Plaintiffs visit plus their unique FID. In some cases, the Toledo Blade and Post-Gazette send the video's file name also. This suffices.

*Collins v. Toledo Blade*, 720 F. Supp. 3d 543, 551 n.6 (N.D. Ohio 2024); *see also Adams*, 680 F. Supp. 3d at 42 (D. Mass. 2023) ("The fact that Pixel does not track whether a user plays, pauses, or otherwise interacts with the video is irrelevant to the alleged privacy violation…") (cleaned up). Defendant also argues that "a third party cannot infer from a URL, Article ID, or Content ID if an article contains a video or whether a user watched any video within an article." Opp. at 8. That makes no sense. Anybody can visit a URL (or the article referenced by the Content ID) and see if it contains videos. This process can be automated to show how many videos any article contains.

*2. Defendant Disclosed The Videos Viewed*

The information Defendant disclosed to third parties showed when a video was played and the article containing the video that played. Dr. Reardon explained this based on his testing and examination of Defendant's source code, and Defendant has not disputed it. Kopel Decl. Ex. 2 at 273:14-6 ("[redacted]").

Defendant argues this is insufficient because some articles may "contain more than one video." Opp. at 8. But even when an article contains more than one clip, there is no legitimate distinction between the clips as far as the law is concerned. This is because even disclosing the

*subject matter* of the video is still actionable. As the Senate Report to the VPPA explains:

> Disclosure of subject matter [of the videos] may be made only in instances where communications are sent directly to the consumer. Some video tape service providers sell limited types of videos. For example, a golf shop may rent or sell golf videos, or a continuity club may rent or sell only Star Trek videos. The disclosure of the cutometer lists of those providers indirectly would disclose the subject matter of the video. Similarly, some video tape service providers market their video tapes in subject matter categories such as action, romance, science fiction and the like.

S. Rep. 100-599 at 13. This is also evident in the plain text of the VPPA, where a consumer's "name[] and address[]" may be disclosed if:

> the disclosure does not identify the title, description, or subject matter of any video tapes or other audio visual material; however, the subject matter of such materials may be disclosed if the disclosure is for the exclusive use of marketing goods and services directly to the consumer.

18 U.S.C. § 2710(b)(2)(D)(ii). Of course, there would be no need for references to the video's description or subject matter in the exception unless the intent was to prohibit such disclosures. No act would provide an exception permitting activity that it never prohibited to begin with. *City of Providence v. Barr*, 954 F.3d 23, 37 (1st Cir. 2020) ("Courts generally ought not to interpret statutes in a way that renders words or phrases either meaningless or superfluous.").

Here, the Apps are connected to news and weather stations, and the videos are simply clips of the news coverage for the story reported in the article. *See* Rosellini Dep. at 71:17-24 ("[redacted]"). This was demonstrated at the Rosellini deposition, where he viewed an article [redacted]. *See id.* at 201:17-20 ("[redacted]"). Defendant's expert observed the same in his deposition. Kopel Decl. Ex. 3 at 169:3-25 ([redacted]

[redacted]).

The subject matter of the videos is also *separately* disclosed. Of course, third parties know that all videos watched on the Apps concern news and weather, akin to a third party automatically knowing the subject of videos purchased from a "golf shop" or "continuity club," as referenced in the Senate Report. But Defendant's disclosures also explicitly included the "categories" of the videos watched. Kopel Decl. Ex. 2 at 274:21-24 [redacted]. Dr. Reardon gave examples: "[redacted]" *Id.* at 275:8-10. Defendant even left as a note in the source code that [redacted] Kopel Decl. Ex. 4 ¶ 86. That is directly comparable to the Senate Report's explanation that disclosure of "subject matter categories such as action, romance, science fiction and the like" is prohibited. S. Rep. 100-599 at 13.[5] Thus, Defendant's disclosures violated the VPPA. But the Cout need not resolve that issue on this motion. Rather, it is sufficient that Defendant's arguments are based on questions of law and fact common to class members.

Finally, Defendant argues that "HTV Apps contain both live and prerecorded content" but that only "prerecorded video" is actionable under the VPPA." Opp. at 8. This is misleading. The [redacted] counter pertains only to [redacted] (*i.e.*, [redacted]). Rosellini Dep. at 166:20-167:2.

---

[5] Defendant's records also show which Class Members enabled "autoplay," meaning that the videos on every article accessed automatically began playing once they accessed the article. Kopel Decl. at Exs. 16-43. The records show that Plaintiff fell into this category. *Id.* at Ex. 36 (HTV-000633) at Row 10862, Column S. Plaintiff can therefore represent a subclass of these users if required.

**C. Defendant Has Adduced No Evidence Of Consent**

Defendant argues that class member testimony would be necessary on "the circumstances of their consent (or purported lack thereof), and testimony about their use as to whether any of the defenses to liability under the VPPA apply." Opp. at 19. That is wrong. Defendant has failed to produce evidence that any class member provided VPPA-compliant consent. "Unless a defendant points to evidence of consent, courts do not presume that resolving the issue requires individualized inquiries." *Clough v. Revenue Frontier, LLC*, 2019 WL 2527300, at *7 (D.N.H. June 19, 2019). As the First Circuit has explained, courts may not "permit[] arguments woven entirely out of gossamer strands of speculation and surmise to tip the decisional scales in a class certification ruling." *Waste Manag. Hdgs., Inc. v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000).

**D. No Individual Evidence Or Testimony Is Needed**

Defendant argues that the process of identifying class members for the dissemination of notice includes "'validating' whether the resulting names are actual HTV App users through testimony from each individual identified." Opp. at 2. Defendant's argument is invalid for several reasons. *First*, Dr. V.R. pointed to several methods of validating his results. *See* Dr. V.R. Dep. (ECF No. 97-5) at 279:5-12 ("[redacted]"). The various methods of validating results and their reliability are addressed in detail in Plaintiff's MTS Opp. §§ II, V, VI.A. *Second*, another method Dr. V.R. identified was [redacted] Rosellini Dep. at 280:3-6. But an expert witness [redacted] is not remotely considered "testimony," and expert witnesses

are permitted to rely on hearsay. Fed. R. Evid. 703. Were that not the case, no expert could ever conduct a survey for purposes of litigation.

### E. Case Law Regarding Uninjured Class Members Is Inapposite

Defendant cites *In re Asacol Antitrust Litig.*, 907 F.3d 42 (1st Cir. 2018) in support of its assertion that "testimony and evidence on individual issues" will be necessary from class members. Opp. at 2. *Asacol* has nothing to do with this case. There, "[t]he district court presumed that approximately ten percent of class members had not been injured by Warner's allegedly anticompetitive conduct because, even had a lower-priced generic alternative been available, these consumers would not have switched to it." *Asacol*, 907 F.3d at 46-47. This was a problem because "[p]roof of injury, also called 'injury-in-fact' [wa]s a required element of a plaintiff's case." *Id.* at 51. Thus, testimony from every class member was necessary in order to establish "an element of [the] party's affirmative case." *Id.* at 53. Ultimately, the First Circuit held that use of affidavits to establish that class members *would have* switched to the generic medication would not be possible because they "would be inadmissible hearsay at trial, leaving a fatal gap in the evidence for all but the few class members who testify in person." *Id.* Class certification was therefore inappropriate. Here, as shown above, no testimony will be needed from Class Members because the elements of their claims can be shown through common proof weighed against objective standards. The concerns from *Asacol* are simply not present.

## V. PLAINTIFF IS TYPICAL OF THE CLASS

Defendant argues that Plaintiff lacks Article III standing "because he continued to use the HTV apps long after his knowledge of this case began, and because he does not consider his viewing of WMUR news and weather content to be private." Opp. at 24 (cleaned up). That is wrong. An "individual's right to privacy" under Article III stems from "the individual's *control*

of information concerning his or her person." *See Yershov III*, 204 F. Supp. 3d at 362 (quoting *U.S. Dep't of Justice v. Reporters Comm. For Freedom of Press*, 489 U.S. 749, 763 (1989) (emphasis added). The fact that someone chooses to share PII with friends does not mean they forfeit control over it being shared with others.

Further, Plaintiff could not be expected to stop using the WMUR App because it is the only news source in his area. *See* Therrien Dep. (ECF No. 97-2) at 108:15-17 [redacted] Regardless, courts have unanimously held that "the VPPA "plainly provides plaintiffs … who allege wrongful disclosure of their PII, with standing and a right to relief." *Yershov III*, 204 F. Supp. 3d at 362 (cleaned up); *Salazar v. Nat'l Basketball Assoc.*, 118 F.4th 533, 544 (2d Cir. 2024) (plaintiff satisfied Article III because "[h]is alleged injury in fact is particularized and actual—his personal viewing information was disclosed without his consent to a third party.").

Defendant next argues "it is unlikely that the geolocations data … could have identified Plaintiff on their own, because for most of the Class Period, Plaintiff lived in [redacted] while his only geolocation data in evidence identifies [redacted] Opp. at 25. This is wrong. *First*, Plaintiff lived in a [redacted] during the class period. Therrien Dep. at 14:14-15. *Second*, plenty of Class Members live in multi-family homes, and they can also be identified, as Dr. V.R. explained. *See* MTS Opp §§ III, IV. *Third*, Defendant's data reveals that it sent at least 721 points of Plaintiff's geolocation between February 2022 and August 2023 alone. Kopel Decl. Ex. 36 at Row 10862. The coordinates placing Plaintiff at his church were simply his last recorded geolocation at the time Defendant pulled the records. *Id.*

However, the fact that Defendant's single retained point of geolocation for Plaintiff reveals

his church supports Plaintiff's position. It is consistent with the findings of scholarly works on this point which teach that geolocation is likely to reveal religious attendance, as Dr. V.R. testifies. Dr. V.R. Rep. ¶¶ 62, 69. It also shows the folly of Defendant's insistence that people that work from home cannot be identified. If App users do not go to an office, they still go other places such as church. So instead of revealing Plaintiff's home and office, as contemplated by the First Circuit, the data may have revealed [redacted] That scenario has an equal capacity to identify someone, and is actually far more invasive of an invasion of privacy:

[redacted]

Rosellini Dep. at 138:7-139:1. Finally, Defendant argues Plaintiff "re-set his AAID multiples times despite his recollection to the contrary." Opp. at 22. That is not true. Defendant's expert readily conceded the resets [redacted] Vint Decl. (ECF No. 97-7) ¶ 26.

## VI. SUPERIORITY IS SATISFIED

Defendant argues that "Plaintiff apparently believes that each class member is entitled to at least $250,000 for their use of the HTV App." Opp. at 24. That is the opposite of what Plaintiff said at his deposition. Therrien Dep. at 102:2-4 [redacted]

[redacted].[6] Regardless, courts regularly certify other cases with claims carrying statutory damages. *Zaklit v. Nationstar Mortgage LLC*, 2017 WL 3174901, at *10 (C.D. Cal. July 24, 2017 ("[T]he Court is not persuaded that $5,000 in [statutory] damages is so clearly sufficient to motivate individual litigation involving complex factual and legal issues as to weigh against class certification."). And "[w]here neither the statutory language nor legislative history indicates that the legislature intended to place a cap on statutory damages, denying class certification on that basis would subvert legislative intent." *Patel v. Facebook, Inc.*, 923 F.3d 1264, 1276 (9th Cir. 2019). No such language or history exists for the VPPA. Defendant also argues that "[i]f an individual such as Plaintiff believes he has been injured under the VPPA, that claim can be addressed on an individual basis with the individualized proof necessary to try to prove a violation." Opp. at 24. But Class Members are unaware of this covert violation and will never learn of it unless the class is certified. Moreover, detecting and proving Defendant violated the VPPA has been an expensive and arduous process, and the parties have each invested far in excess of the $2,500 in dispute that each Class Member could recover. Thus, without the possibility of certification in VPPA cases, large-scale, covert violations like this one will continue unperturbed and violators like Defendant will get off scot-free.

## VII. ASCERTAINABILITY IS SATISFIED

Defendant argues "the Court" will need to identify Class Members. Opp. at 9, 13. That is a misnomer. "Although Rule 23(c)(2) states that 'the court shall direct' notice to class members, it commonly is agreed that the court should order one of the parties to perform the necessary tasks." *Oppenheimer Fund,* 437 U.S. at 354 n.21. And here, Dr. V.R. has set forth the methodology he will use to identify Class Members. *See* MTS Opp. at Introduction, Argument §§ II-IV.

[6] Defendant's arithmetic is also wrong. $2,500 × 10 = $25,000, not $250,000.

Defendant argues this process will require an "extended, multi-step analysis, using outside data sources." Opp. at 9. That is an exaggeration. But even if true, Defendant cites no authority that this would not prevent certification. On the contrary, case law says the opposite.

*First*, courts routinely permit use of data brokers to identify class members following certification, including Judge Sorokin just six months ago in *Mantha v. QuoteWizard*, 347 F.R.D. 376, 388 (D. Mass. 2024) (permitting use of "data processing service provider" to identify class members despite challenges to accuracy). *See also Krakauer v. Dish Network, L.L.C.*, 2015 WL 5227693, at *4, *8-11 (M.D.N.C. Sept. 8, 2015) (permitting the use of two data processing entities to verify the class with a 14% error rate as the court "has considered the potential error rate and does not find it unreasonably high for these particular circumstances."); *Johnson v. Comodo Grp., Inc.*, 2020 WL 525898, at *9 (D.N.J. Jan. 31, 2020) (finding plaintiff's expert's methodology of using multiple data vendors to search for individual subscribers and produce a "report detailing subscribers/users of telephone numbers, including names [and] addresses … is testable, reliable, and sufficiently capable of identifying putative class members."); *Chinitz v. Intero Real Est. Servs.*, 2020 WL 7391299, at *5-7 (N.D. Cal. July 22, 2020) (denying *Daubert* objections for the purposes of class certification where the expert testimony at issue relied on three separate data vendors); *Bumpus v. Realogy Brokerage Grp. LLC*, 2022 WL 867256, at *3-5 (N.D. Cal. Mar. 23, 2022) (certifying class based on findings by expert who relied on data brokers to identify class members).

*Second*, complexity of the identification process is not a bar to certification. *See Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 539 (6th Cir. 2012) ("[T]he need to manually review files is not dispositive. If it were, defendants against whom claims of wrongful conduct have been made could escape class-wide review due solely to the size of their businesses or the manner in which their business records were maintained."); *Perez v. First Am. Title Ins. Co.*, 2009 WL

2486003, at *7 (D. Ariz. Aug. 12, 2009) ("Even if it takes a substantial amount of time to review files and determine who is eligible … that work can be done through discovery."); *Slapikas v. First Am. Title Ins. Co.*, 250 F.R.D. 232, 250 (W.D. Pa. 2008) (finding class action manageable despite assertion that "no database exists easily and efficiently to make the determination that would be required for each file").

## VIII. DEFENDANT WILL BE PROVEN WRONG FOLLOWING CERTIFICATION

Defendant's opposition is primarily based on the fact that Dr. V.R. has not *already* performed his analysis on Class Member data. But Dr. V.R. could dispel these arguments upon receiving access to the data. Defendant's expert recognized this. Kopel Decl. Ex. 1 at 22:10-14 [redacted]

Under these circumstances, courts have repeatedly certified classes to give the plaintiffs the opportunity to prove their methodologies to identify class members, while expressly reserving the ability to later decertify if appropriate. *See Sheet Metal Workers Local No. 20 Welfare & Benefit Fund v. CVS Pharm., Inc.*, 540 F. Supp. 3d 182, 204 n.15 ("The Court always has the option of decertifying a class where such an inquiry proves overwhelming; that said, at this point, Plaintiffs have met their burden in establishing that the classes are ascertainable."); *In re Marriott Int., Cust. Data Sec. Breach Litig.*, 314 F.R.D. 128, 146 (D. Md. 2022) ("If an ascertainability issue eventually becomes 'truly insoluble, the Court may decertify the class at a later stage of the litigation'") (quoting *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 664 (7th Cir. 2015)); *Altman v. White House Black Market, Inc.*, 2017 WL 8780202, at *5 (N.D. Ga. Oct. 25, 2017) (certifying class despite ascertainability arguments, but noting "[i]f it turns out that … transactions involving business cards cannot easily be differentiated from personal cards in this case, then the Court may

reevaluate the propriety of class certification."); *Morrow v. Navy Fed. Credit Union*, 2023 WL 2874908, at *6 (E.D. Va. Apr. 6, 2023) ("[B]ecause the Court finds that it would be patently unfair to require Plaintiffs to present a perfect mechanism for identifying that proxy before receiving access to Defendant's full records, the Court will … certify Plaintiffs' class. … but — if … it becomes apparent that the now-adopted methodology is unable to accurately identify accountholders … this Court will not hesitate to decertify.").

This makes sense. Dr. V.R.'s lack of access to complete records—which Plaintiff could not get before certification in any event (§ III.D, *supra*)—is not a good reason to absolve Defendant from violating the privacy rights of hundreds of thousands of people. If Defendant believes Dr. V.R.'s methodology failed to identify Class Members, Defendant can seek decertification before notice is even disseminated and would suffer no prejudice.

## IX. A MINOR ADJUSTMENT TO THE CLASS DEFINITION IS APPROPRIATE

Defendant asserts the "the class definition does not include a one-month minimum," despite Dr. V.R.'s requirement that users are identifiable based on geolocation data that is "'spread over at least a 1-month window.'" MTS at 15. This can be addressed by modifying the proposed Class definition. *See Ruiz v. NEI Gen. Contracting, Inc.*, 719 F. Supp. 3d 139, 154 (D. Mass. 2024) (certifying class with modified definition). Plaintiff therefore proposes the following modification (with no change to the Subclasses):

> All persons in the United States that (i) downloaded one of the Class Apps onto their mobile phone, (ii) enabled location permissions for the Class App for at least 250 sessions *over a period of at least one month*, and (iii) watched at least ten (10) videos between May 5, 2021 and April 16, 2024 (the "Class Period").

This modification adequately addresses Defendant's argument.

Dated: December 18, 2024

Respectfully submitted,

**BURSOR & FISHER, P.A.**

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

Yitzchak Kopel (*Pro Hac Vice*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 18, 2024, I electronically filed the foregoing document with the Court's CM/ECF system, which will provide e-mail notice to all counsel of record.

By: */s/ Yitzchak Kopel*
Yitzchak Kopel