**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHARLES THERRIEN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | Case No. 1:23-cv-10998-RGS |
| *v.* | Leave to file granted on January 13, 2025 |
| HEARST TELEVISION, INC. | Hon. Richard G. Stearns |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**

Matthew Greenfield (Mass. BBO No. 684596)
Jonathan R. Donnellan*
Andrea R. Butler*
Kristen L. Hauser*
*The Hearst Corporation*
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 649-2484
Fax: (212) 554-7000
matthew.greenfield@hearst.com
jdonnellan@hearst.com
abutler@hearst.com
khauser@hearst.com

**Admitted Pro Hac Vice*

*Attorneys for Defendant Hearst Television Inc.*

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................1

THE UNDISPUTED FACTS ........................................................................................3

A. Plaintiff's Use of HTV's WMUR App ........................................................5
B. HTV's Relationship with Its Vendor Braze ..................................................6
C. HTV's Relationship with Its Vendor Google Ad Manager (GAM) ........................9

ARGUMENT ...........................................................................................................10

I. LEGAL STANDARD ...........................................................................................10

II. NO REASONABLE JURY COULD FIND THAT INFORMATION DISCLOSED TO BRAZE OR GAM IS PERSONALLY IDENTIFIABLE INFORMATION UNDER THE VPPA, MUCH LESS ABOUT PLAINTIFF. ..........................................11

A. There is no evidence that Plaintiff could be identified from geolocation. .............13
B. There is no evidence that Braze or GAM could identify "specific video materials" requested or obtained by Plaintiff from an HTV App. .........................15
C. There is no evidence that Plaintiff and what specific videos he requested can be identified from email or AAID. .........................................................17

III. NO REASONABLE JURY COULD FIND THAT PLAINTIFF HAS MET HIS BURDEN OF PROVING THAT HTV "KNOWINGLY" TRANSMITTED PII. ............20

A. HTV's Disclosures to Braze Are "Incident to" "Order Fulfillment" and "Request Processing" .........................................................................23
B. HTV's Disclosures to GAM Are "Incident to" "Order Fulfillment" and "Request Processing" .........................................................................24

V. AS APPLIED, THE VPPA RUNS AFOUL OF THE U.S. CONSTITUTION. ................26

A. Plaintiff Lacks Article III Standing ...........................................................26
B. Applying the VPPA to HTV Would Not Be Consistent with the First Amendment. ...........................................................................................27
1. Application of the VPPA to HTV's App does not "directly" and "materially" advance the government's interest. .....................................28
2. There is no "reasonable fit" between the government's interest and application of the VPPA to HTV's App as a means of accomplishing it. ...............................................................................................29

CONCLUSION ........................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*44 Liquormart, Inc. v. Rhode Island*,
517 U.S. 484 (1996)....................28, 29

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
No. 17-CV-04570, 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017)....................20, 22

*Boelter v. Hearst Commc'ns, Inc.*,
269 F. Supp. 3d 172 (S.D.N.Y. 2017)....................25, 26

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983)....................27, 28

*Burrell v. Sowers*,
No. 22-2687, 2023 WL 7320867 (2d Cir. Nov. 7, 2023) ....................25, 26

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980)....................29, 30

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410 (1993)....................27

*Collins v. Toledo Blade*,
No. 23-CV-00302, 2024 WL 1094613 (N.D. Ohio Mar. 13, 2024)....................23

*Comput. Networks, Inc. v. Sears, Roebuck & Co.*,
No. CIV.A.02-11992-RGS, 2004 WL 1280970 (D. Mass. June 10, 2004)....................20

*Dancel v. Groupon, Inc.*,
949 F.3d 999 (7th Cir. 2019) ....................19

*Doucette v. Jacobs*,
106 F.4th 156 (1st Cir. 2024)....................14

*Edenfield v. Fane*,
507 U.S. 761 (1993)....................28, 29

*Edwards v. Learfield Commc'ns, LLC*,
697 F. Supp. 3d 1297 (N.D. Fla. 2023)....................15

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ....................14

*El Dia, Inc. v. P.R. Dep't of Consumer Affairs*,
413 F.3d 110 (1st Cir. 2005) ........................................................................................28

*Greater New Orleans Broad. Ass'n, Inc. v. United States*,
527 U.S. 173 (1999) ........................................................................................30

*Harris v. Quinn*,
573 U.S. 616 (2014) ........................................................................................27

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015) ........................................................20, 21, 22

*Louth v. NFL Enters. LLC*,
No. 21-CV-00405, 2022 WL 4130866 (D.R.I. Sept. 12, 2022)..................................10, 23

*Maldonado-Denis v. Castillo-Rodriguez*,
23 F.3d 576 (1st Cir. 1994) ........................................................................................14

*Martin v. Meredith Corp.*,
657 F. Supp. 3d 277 (S.D.N.Y. 2023)........................................................................16

*Mollett v. Netflix, Inc.*,
795 F.3d 1062 (9th Cir. 2015) ................................................................................11, 27

*Mollett v. Netflix, Inc.*,
No. 11-CV-01629, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) ..................................20

*Nabozny v. Optio Sols. LLC*,
84 F.4th 731 (2d Cir. 2023) ....................................................................................26, 27

*In re Nickelodeon Consumer Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016)........................................................................................11

*Reed v. Town of Gilbert, Ariz.*,
576 U.S. 155 (2015) ........................................................................................27

*In re Rezulin Prods. Liab. Litig.*,
309 F. Supp. 2d 531 (S.D.N.Y. 2004)........................................................................22

*Robinson v. Disney Online*,
152 F. Supp. 3d 176 (S.D.N.Y. 2015)....................................................................10, 11

*Rodriguez v. Sony Comput. Ent. Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) ........................................................................................23

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995)................................................................................28, 29, 30

*Salazar v. Nat'l Basketball Ass'n*,
118 F.4th 533 (2d Cir. 2024) ....................26

*Saunders v. Hearst Television, Inc.*,
711 F. Supp. 3d 24 (D. Mass. 2024) ....................28, 29, 30

*Smith v. Trinity Broad. of Tex., Inc.*,
No. 24-CV-01046, 2024 WL 4394557 (C.D. Cal. Sept. 27, 2024) ....................11

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011) ....................27

*Stark v. Patreon, Inc.*,
656 F. Supp. 3d 1018 (N.D. Cal. 2023) ....................27

*Sterk v. Redbox Automated Retail, LLC*,
770 F.3d 618 (7th Cir. 2014) ....................23

*Sterk v. Redbox Automated Retail, LLC*,
No. 11 C 1729, 2013 WL 4451223 (N.D. Ill. Aug. 16, 2013) ....................3, 23, 24

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ....................26, 27, 29

*Williams-Yulee v. Fla. Bar*,
575 U.S. 433 (2015) ....................27

*Wilson v. Triller, Inc.*,
598 F. Supp. 3d 82 (S.D.N.Y. 2022) ....................15

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) .................... *passim*

*In re Zofran (Ondansetron) Prods. Liab. Litig.*,
No. 1:15-MD-2657-FDS, 2019 WL 5685269 (D. Mass. Nov. 1, 2019) ....................22

**Statutes**

18 U.S.C. § 2710 .................... *passim*

**Other Authorities**

Restatement (Second) of Agency § 2(3) ....................26

Restatement (Second) of Torts § 652D cmt. a ....................27

S. Rep. No. 100-599 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1 ....................22

## INTRODUCTION

Plaintiff Charles Therrien alleges that by sharing geolocation and other data related to the use of Hearst Television Inc. ("HTV") mobile applications (the "HTV Apps" or "Apps") with vendors, HTV "knowingly" "disclosed" "personally identifying information" ("PII") in violation of the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"). Following discovery, it is evident that Plaintiff relies on a novel theory of liability to expand the scope of the VPPA to cover customary disclosures to vendors that are necessary to perform basic business functions. He disregards the VPPA's requirement that the disclosures identify an actual person and a specific video viewed. Instead, he asks to have a jury apply piecemeal datapoints—datapoints that do not even exist in the record—to a hypothetical model untested with relevant data.

Nothing in the record supports Plaintiff's theory. HTV's news and weather apps share only specific data with its vendors, Braze and Google Ad Manager ("GAM"), limited by each user's permissions. None of those data points identify a specific person as having requested a specific, prerecorded video. HTV's separate video identifier value is never shared. Nor is there any evidence that HTV knew that the data it *did* share *could* identify a user, let alone connect a user to specific video content, as required to be deemed PII under the VPPA, 18 U.S.C. § 2710(a)(3).

To avoid these fatal facts, Plaintiff has shifted to a new theory of liability. He no longer maintains that any *particular* transmission from HTV violated the VPPA. Instead, Plaintiff argues that, at some point in time, the accumulated transmissions from a user's device tip the scales, becoming collectively identifying and violative of the statute. This theory is dependent on one academic article, which studied Twitter user data in 2015, from which Plaintiff's expert attempts to extrapolate—without analysis of any HTV App data—to this case. The complexity and uncertainty in Plaintiff's de-anonymization hypothesis is tantamount to an admission that HTV

App users have always been effectively anonymous.[1] But even applying this extraordinary theory of liability to this case *still* does not substantiate a VPPA violation; there is no evidence in the record of a disclosure as to Plaintiff or anyone else.

The record as to Therrien illustrates why no reasonable jury could find liability. There is only a single geolocation in the record relating to Therrien, which corresponds to [redacted]. That geolocation is not "personally identifying information" because it does not "effectively reveal[] the name of the video viewer." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016). There is no evidence that any third party—knowing only that someone used an HTV App from that location at some point in time—could identify Therrien as that user. There also is no evidence as to other geolocation data (if any) Braze or GAM received in connection with Plaintiff's use of the WMUR App, or that they received any information about any specific prerecorded video that Plaintiff may have played. (In fact, there is no evidence that GAM ever retained, even momentarily, *any* information received from any HTV App user.)

On this undisputed record, summary judgment should be granted for at least four reasons:

*First*, HTV did not disclose "PII" because no reasonable jury could find that any information shared with Braze or GAM was "reasonably and foreseeably" capable of identifying Plaintiff, or of identifying any specific, prerecorded video content he requested. There is no evidence, for example, that the geolocation in this case could be used by Braze, GAM, or anyone else to de-anonymize Plaintiff or any App user. And the undisputed evidence is that HTV does not identify specific prerecorded videos to Braze or GAM. Rather, HTV discloses only random number strings or URLs associated with a text article, which may have any number of videos

[1] It is ironic that Plaintiff asks this Court to try to reveal the identities of HTV App users, ostensibly in service of protecting their privacy.

associated with it, or none at all. Further, such videos may be live (and not covered by the VPPA), or prerecorded but not directly tied to the subject matter of the article. *See infra* Part II.

*Second*, there is no evidence that HTV *knew* that by sharing geolocation (or anything else), it was disclosing PII to either vendor. HTV did not believe and had no reason to believe that the shared information was "information which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3).[2] Plaintiff has acknowledged that one or two (or even 10 or 20) geolocation data points are not sufficient to identify a user. HTV also had no basis to believe that COID (or article URL) identifies any video requested or obtained by an HTV App user. *See infra* Part III.

*Third*, it is undisputed that transmissions to Braze or GAM were for the purpose of responding to users' requests in the Apps (such as providing specific alerts) or to market directly to them. The transmissions therefore fall within the VPPA's categories of expressly *permitted* disclosures. *See Sterk v. Redbox Automated Retail, LLC*, No. 11 C 1729, 2013 WL 4451223, at *1 (N.D. Ill. Aug. 16, 2013), *aff'd*, 770 F.3d 618 (7th Cir. 2014). There is no evidence that Braze or GAM uses information about any HTV user for any other purpose. *See infra* Part IV.

*Fourth*, applying the VPPA to the facts here would be contrary to both Article III of the Constitution and the First Amendment. *See infra* Part V.

## THE UNDISPUTED FACTS[3]

HTV broadcasts local news and weather programming in 28 local markets and offers station-specific mobile phone Apps. 56.1 ¶¶ 1-3. The Apps provide free, ad-supported, live news and weather feeds and text articles. *Id.* ¶¶ 3-10. An article may contain no video content, a single

[2] HTV does not collect names or addresses, never took steps to learn the identity of its users, nor thought it was possible to do so based on the information it had. 56.1 ¶¶ 17, 173, 230-232, 253-263.

[3] The undisputed facts are detailed with citations to evidence in the accompanying Statement of Undisputed Material Facts pursuant to Rule 56.1, references to which appear herein as "56.1 ¶ __". The factual record in this purported class action is complete. ECF No. 67 at 2.

video, or multiple videos (including live or replayed video content or both). *Id.* ¶¶ 5-9, 90, 96-97. The subject matter of any video may or may not directly relate to the subject of the article. *Id.* ¶¶ 91, 150. News and weather articles in the Apps also may be updated (including with updated or new video) one or more times after their initial publication. *Id.* ¶¶ 93-98. For example, articles about major weather events (storms, power outages) or law enforcement matters are often updated. *Id.* ¶ 95. Only the most recent version of an article is publicly accessible at any given time. *Id.* ¶ 98.

To access news and weather content on an HTV App, a user visits the "app store" on their device (where they may review HTV's Privacy Notice) and downloads the App. 56.1 ¶¶ 88, 125-127. During installation, users are prompted (1) to select (or not) to get push notifications for news and weather alerts; (2) if a user selects certain alerts, to allow (or not) geolocation sharing; (3) if a user elects to share geolocation, when to share it (always, only when using the app, or just once); and (4) to input (or not) an email address if they want to receive emails from HTV. *See id.* ¶¶ 128-135. Users are never asked for and HTV never receives names or addresses. *Id.* ¶ 17. No user is required to share geolocation, email, "mobile advertising ID" (known as "AAID"),[4] or any other information to download or use the Apps or to view any content, including videos. *Id.* ¶¶ 10-16. Neither geolocation nor email nor AAID is ever shared without permission, or against the user's device settings: whether a geolocation, email, or AAID is ever shared is entirely within the control of the App user. *Id.* ¶¶ 132, 138-142. Some users may also allow or disallow sharing of geolocation and AAIDs separately within their device settings. *Id.* ¶ 133.

[4] An AAID is associated with a device, *not* with a name or address. 56.1 ¶¶ 143-44. An AAID—comprised of a string of numbers and letters—is used to facilitate advertising to the device user. *Id.* ¶¶ 137, 142, 144. Users may reset, permanently delete, or "opt out" of letting apps share their AAID. *Id.* ¶¶ 138-149.

A. Plaintiff's Use of HTV's WMUR App

Therrien consumes WMUR news and weather content in three ways: [redacted] 56.1 ¶¶ 19-24. He [redacted].[5] *Id*. ¶¶ 66-74. When he installed the WMUR App on his phone, [redacted]. *Id.* ¶¶ 68, 70. He also [redacted]. *Id.* ¶¶ 49, 65, 71, 73, 77. He [redacted]. *Id.* ¶¶ 72-75. Plaintiff does not recall [redacted]. *Id.* ¶¶ 82-87.

Plaintiff does not [redacted]. 56.1 ¶¶ 30, 33, 43, 53. Plaintiff resided [redacted]. *Id.* ¶¶ 34-42. Plaintiff [redacted]. *Id.* ¶ 45. One is [redacted]; [redacted]. *Id.* ¶¶ 46-47. The other, [redacted]. *Id.* ¶¶ 49-52. [redacted]. *Id.* ¶¶ 50-56. [redacted]. *Id.* ¶ 57.

---

[5] [redacted]. 56.1 ¶¶ 58-63.

Consistent with Plaintiff's testimony, the geolocation data produced by HTV associated with Plaintiff's business email address does not correspond to any of his home addresses during the class period. 56.1 ¶¶ 39-42, 78-79, 81. That data is limited to one geolocation point, which, Plaintiff testified, [redacted]. *Id.* ¶¶ 78-79, 81. There is no documentary evidence that Plaintiff watched prerecorded videos on the App from his home. *Id.* ¶¶ 20-27, 145-152.

The mobile device Plaintiff produced in this litigation shows [redacted]. 56.1 ¶¶ 59, 140-141. There is no evidence indicating which (if any) [redacted] was active during the class period.[6] *Id.* ¶ 60. There is no evidence that anyone has ever connected any [redacted] to Plaintiff personally. There is no evidence from which it can be determined what videos Plaintiff played during the class period, or if AAID was sent to GAM (or geolocation to Braze) when he watched any video, let alone which of them. *See id.* ¶¶ 83-87, 145-52, 216-221, 238, 247-249, 251.

B. <u>HTV's Relationship with Its Vendor Braze</u>

To send the push and email updates requested by Plaintiff and other users, HTV uses a software-as-a-service ("SAAS") provider called Braze to hold information provided to HTV in databases segregated by broadcast station and to facilitate sending of emails and push notifications. 56.1 ¶¶ 153-57. HTV uses Braze's software and accompanying user interface ("UI" or "dashboard"). *Id.* ¶¶ 153-54. The software sends to HTV's databases at Braze certain data consistent with user permissions. *Id.* ¶¶ 174-79, 186, 190-221.

The information transmitted to Braze helps HTV to provide users the experience they expect from the Apps and to provide only the notifications that have been requested. 56.1 ¶¶ 69-

[6] Plaintiff no longer has the device he used during the majority of the class period, and it was not produced in this case. 56.1 ¶¶ 61-63.

70, 153-175. Braze acts entirely on HTV's behalf as its agent and cannot commingle or share HTV user data with other data or use data associated with any user for its own purposes. *Id.* ¶¶ 155-171. To HTV's knowledge, Braze has never shared HTV data with any data broker and has never sought to or actually de-anonymized or identified by name or address any HTV App user. *Id.* ¶¶ 166, 253. To HTV's knowledge Braze is not capable of doing so, and HTV does not expect it to do so as part of the services it provides. *Id.* ¶¶ 254-255.

At installation, the App transmits to Braze a user's requests for news and weather "push" notifications. 56.1 ¶¶ 69-70, 129, 176, 192. Users may change their choices at any time. *Id.* ¶¶ 15, 126, 134, 176. App users have the option to provide an email address at installation if they wish to receive email updates from HTV. *Id.* ¶ 186. Any such email is sent to Braze only once. *Id.* ¶ 187. [redacted]. *Id.* ¶¶ 181-85. HTV does not know who a given Braze ID belongs to, or if the App usage by a given "Braze ID" is by one or more people. *Id.* ¶¶ 256-257.

After installation, [redacted]. 56.1 ¶¶ 190-221. There is no data field in Braze of [redacted]. *See id.* ¶¶ 82-87, 131-132, 152, 194-196, 213-220; *see also infra* pp. 8-10, 12-17.

<u>*Geolocation*</u>. There is no field in Braze showing [redacted]. 56.1 ¶¶ 132, 177-178, 192-195, 200-203, 250. If a user has not enabled

it, no geolocation is ever received. *Id*. ¶¶ 194-196, 213-220. HTV's dashboard in Braze only shows [redacted]. *Id*. ¶¶ 192, 195-197. Thus, the presence of geolocation in HTV's Braze dashboard only reveals that the user shared geolocation *at some point* in time. If the user used the App *outside* the Class Period, there is no way of knowing whether he ever shared geolocation *during* the Class Period. *See, e.g.*, ¶¶ 64, 132, 177, 178, 194-196, 201-202.

*COID*. [redacted] Whether an article is updated or not (including with any video) is not evident from the COID or URL itself. *Id.* ¶¶ 113-114, 120-121. [redacted]

*UUID*. [redacted], known as a "video UUID", to any videos that may be published within articles. 56.1 ¶¶ 115-117. [redacted]

[redacted].

*Video Count*. Each time a video begins to play in an HTV App, [redacted]. 56.1 ¶¶ 211-212. [redacted]. *Id.* ¶¶ 212-215. The receipt of a video count causes [redacted]. *Id.* ¶¶ 213, 217. No information about the content of the video is received with the count. *Id.* ¶¶ 212(a), 218.

C. HTV's Relationship with Its Vendor Google Ad Manager (GAM)

Rather than build the technology to display advertisements within the App itself, HTV outsources that function to another SAAS provider, GAM, which provides computer code to integrate into the HTV Apps for that purpose. 56.1 ¶¶ 222-223. Such marketing to App users makes it possible for HTV to provide the ***free*** news and weather content that App users request. *Id.* ¶¶ 153-57, 223-224. If users grant permission to do so, device AAIDs and geolocation are used to help choose the advertisement shown. *Id.* ¶¶ 238-241. HTV's relationship with GAM is governed by a contract. It provides that [redacted]. *Id.* ¶¶ 225-226. HTV does not do so. *Id.* ¶ 227. To HTV's knowledge, GAM has never disclosed HTV data to any data broker and has never sought to or actually de-anonymized or identified by name or address any HTV App user and [redacted]. *Id.* ¶¶ 229-232.

Display ads, when present, appear on the face of an article page as it comes into view on a user's device. 56.1 ¶¶ 234-235. Pre-roll ads, when present, play before any video content begins (whether "autoplayed" or if a user presses "play"). *Id.* ¶ 236. Not every article or video includes

an advertisement. *Id.* ¶ 237. HTV can control the type of ads shown (and whether any are shown) using GAM. *Id.* ¶¶ 237, 237a. As part of the process to show either display or video ads, [redacted]. *Id.* ¶¶ 242-243. [redacted]. *Id.* ¶¶ 244-246. If a user has granted permission, GAM also receives a device's then-current AAID. *Id.* ¶ 248. [redacted]. *Id.* ¶ 251; Butler Decl. Ex. F at 318:13-17. There is no evidence that GAM attempts to de-anonymize such information. *Id.* ¶¶ 225-232. HTV never receives the values (AAID and geolocation) transmitted directly from user devices to GAM. *Id.* ¶ 248-250.

## ARGUMENT

### I. LEGAL STANDARD

The VPPA prohibits only "knowingly disclos[ing], to any person, personally identifiable information concerning any consumer of [a video tape service provider]." 18 U.S.C. § 2710(b)(1). "Personally identifiable information" is that which "identifies a person as having requested or obtained specific video materials or services" from a defendant. PII "must, at the very least, identify a *particular* person—not just an anonymous individual—and connect this particular person with his or her viewing history". *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 179 (S.D.N.Y. 2015). And it must identify someone as having obtained *prerecorded* video materials—not a live broadcast. *Louth v. NFL Enters. LLC*, No. 21-CV-00405, 2022 WL 4130866, at *4 (D.R.I. Sept. 12, 2022). The VPPA explicitly *permits* a video tape service provider to disclose PII

in a number of circumstances, including, *inter alia*, to any person with the "informed written consent" of the customer and "to any person if the disclosure is incident to the ordinary course of business of the video tape service provider.[7] 18 U.S.C. § 2710(b)(2)(B), (D), (E). A VPPA claim thus requires proof of four elements: "that (1) a defendant is a 'video tape service provider,' (2) the defendant disclosed 'personally identifiable information concerning any customer' to 'any person,' (3) the disclosure was made knowingly, and (4) the disclosure was not authorized by section 2710(b)(2)." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1066 (9th Cir. 2015).

## II. NO REASONABLE JURY COULD FIND THAT INFORMATION DISCLOSED TO BRAZE OR GAM IS PERSONALLY IDENTIFIABLE INFORMATION UNDER THE VPPA, MUCH LESS ABOUT PLAINTIFF.

The VPPA defines PII narrowly as "[i]nformation which identifies a person as having requested or obtained specific video materials or services from a video tape service provider." 18 U.S.C. § 2710(a)(3). In addition to identifying a *particular* person, the disclosed information must be "reasonably and foreseeably likely to reveal which . . . videos [the plaintiff] has obtained." *Yershov*, 820 F.3d at 486. In other words, information must link a specific person to specific video viewing. *Robinson*, 152 F. Supp. 3d at 179; *see also In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 284 (3d Cir. 2016) (identifying recipient and videos watched should be possible "with little or no extra effort"). As one court found in examining disclosures to Facebook, "[t]o qualify as a PII, it must disclose more than information that would narrow the pool to potential individuals. It must include 'sufficient identifying information' such as 'name, gender, birthday, place of residence, . . . .'" *Smith v. Trinity Broad. of Tex., Inc.*, No. 24-CV-01046, 2024 WL 4394557, at *2 (C.D. Cal. Sept. 27, 2024) (citations omitted). In analog contexts, the disclosure and link are

---

[7] If this case proceeds, whether HTV obtained the necessary consent from Plaintiff (or any other App user) and whether Plaintiff has otherwise proven that the disclosures were not permitted under the VPPA will be issues for trial. HTV also reserves the right to challenge on appeal prior rulings in this case, including whether Therrien or any App user is a "consumer", or HTV a "video tape service provider", under the VPPA.

often obvious: telling a reporter that Justice Thomas rented a videotape of *The Sound of Music*. But for complicated digital code supporting the functions of a website, "there is certainly a point at which the linkage of information to identity becomes too uncertain, or too dependent on too much yet-to-be-done, or unforeseeable detective work." *Yershov*, 820 F.3d at 486. The record here makes plain that the geolocation and other information shared by HTV with Braze or GAM cannot constitute PII under the VPPA. Neither Braze nor GAM received information identifying Plaintiff, the videos he may have viewed, or whether those videos were pre-recorded or live. There is no evidence that either Braze or GAM de-anonymized and connected information received to do so. Summary judgment should be granted on this basis alone.

As is relevant here, HTV shares three fields with Braze: (1) [redacted]. *See* 56.1 ¶¶ 130-136, 177-178, 190-210. HTV shares four fields with GAM: (1) [redacted] *Id.* ¶¶ 130-134, 138-142, 238-244. Braze does not receive AAID from Plaintiff's (or anyone else') device, and GAM does not receive Plaintiff's (or anyone else's) email. *Id.* ¶¶ 221, 252. Plaintiff claims that by sharing geolocation data (latitude and longitude) and an article identifier (either the URL, COID or artID) with Braze and GAM, HTV disclosed his PII. No reasonable jury could find that the evidence supports his claim.

A. There is no evidence that Plaintiff could be identified from geolocation.

As to geolocation, under Plaintiff's expert's method for identifying users, a single geolocation does ***not*** identify a particular person. ECF No. 96 at 16.[8] There is no evidence to the contrary. A single geolocation thus *cannot* be "personally identifying" under the VPPA. But the *only* evidence in the record as to Plaintiff is just that: **a single location.** 56.1 ¶¶ 78-80. That sole location is [redacted]. *See id.* ¶¶ 21-24, 33-41, 78-81. It is a church. *Id.* ¶¶ 78-81. Not even Plaintiff claims that this data can identify him. There is no evidence that anyone investigating this geolocation could identify Therrien in particular [redacted] *See id.* ¶¶ 78-81. Moreover, Plaintiff testified that [redacted] (*id.* ¶ 24), so that one geolocation could not associate him with any videos watched.

Faced with this evidence, Plaintiff (through his expert) seems to contend that [redacted] could *potentially* have identified Plaintiff by name *if* certain assumptions were satisfied.[9] ECF No. 84 at 1, 11-12. First, there is no evidence that either GAM or Braze received geolocation data sufficient in number and nature from Plaintiff (or any putative class member) to do so.[10] *See* 56.1 ¶¶ 20-23, 30-44, 78-81, 132-149, 179, 201-204, 249-251. More importantly, those assumptions—such as that the Apps would be used

[8] HTV has moved to strike the reports of Plaintiff's experts Vallina-Rodriguez and Polakis and incorporates those arguments here. *See* ECF Nos. 96 & 101. Among other things, Plaintiff's experts rely on an unrelated body of literature suggesting that, under very different circumstances, geolocation data *might* distinguish individuals from one another. ECF No. 96 at 1-3. This brief addresses the challenged reports in the event the Court denies Hearst's motion to strike. Regardless, expert reports cannot make up for Plaintiff's lack of factual evidence.

[9] These include [redacted]. ECF No. 96 at 2-3.

[10] As noted *supra*, there is nothing in the HTV data showing the date on which a given user may have enabled or disabled the use of geolocation. 56.1 ¶¶ 178, 200. And depending on how a user configured their permission, geolocation may not have been captured during every App session. *Id.* ¶¶ 131-134. For this reason, the number of "sessions" cannot be used as a proxy for the number of geolocation datapoints that may have been associated with Plaintiff or any other user.

primarily from Plaintiff's home and work location—do not take into account the actual HTV data or the nature or viewing habits of HTV App users and are contradicted by the evidence *as to Plaintiff's own habits*: Plaintiff testified that [redacted]. *See supra* p. 5; 56.1 ¶¶ 20-27, 30-44.; *see also* Butler Decl. Ex. C at 50:8-23. As a result, there is no reason to assume there would be sufficient geolocations associated with one of his home addresses (or any other consistent address) to use for Plaintiff's hypothesis; there is every reason to doubt it. Moreover, the hypothesis is not only untethered to actual data received by Braze or GAM (which no expert examined because Plaintiff did not seek it), it depends on analogies to [redacted]. *See* Butler Decl. Ex. F at 373:24-376:2. Such assumptions are untested by the type of evidence in this case, cannot substitute for factual evidence, and are insufficient to meet Plaintiff's burden on summary judgment. *See, e.g.*, *Doucette v. Jacobs*, 106 F.4th 156, 169-70, 176 (1st Cir. 2024) (affirming grant of summary judgment where, *inter alia*, expert failed "to ground her conclusions in the specifics of the record"); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (data producing only a "sizeable 'pool' of possible viewers" not PII); *see also* *Maldonado-Denis v. Castillo-Rodriguez*, 23 F.3d 576, 581 (1st Cir. 1994).

Finally, Plaintiff's theory that geolocation identifies him is dependent on Braze and GAM segregating large volumes of geolocation data by user and providing that data to "data brokers" to try to deanonymize geolocations through purported "identity bridging". But there is no evidence in the record that either vendor (or any data broker) is capable of doing or did so.[11] To the contrary,

[11] Plaintiff's expert reports are silent on who would undertake the "clustering" exercises that they opine are the precursor to any "identity bridging"—Braze and GAM or the data broker—and what precisely would be provided to any data broker—clustered sets of geolocations, single geolocations, or other data.

the only evidence is that GAM and Braze [redacted]. 56.1 ¶¶ 78, 158-172, 225-228. And there is no evidence that GAM ever retains any geolocation, AAID, or other data from the HTV Apps, let alone that it retains sufficient data long enough to engage in the "identity bridging" that Plaintiff's expert opines might be possible. Butler Decl. Ex. F at 317:23-318:17. Certainly, there is no evidence that either Braze or GAM actually used any HTV data to de-anonymize Plaintiff (or were asked by HTV to do so), or that his App use would have generated the type of data his expert believes necessary to do so. 56.1 ¶¶ 20-44, 78-81, 132-49, 151, 164-65, 228-32. No reasonable jury could find that Plaintiff can meet his burden of demonstrating that any geolocation data is "personally identifying of him".[12]

B. <u>There is no evidence that Braze or GAM could identify "specific video materials" requested or obtained by Plaintiff from an HTV App.</u>

Plaintiff's claim (and that of any class member) also fails because Plaintiff cannot show that an article's URL, COID or artID linked him to any request for "specific video materials." 18 U.S.C. § 2710(a)(3). The evidence demonstrates that it was *not* "firm and readily foreseeable" to HTV that Braze and GAM, without "unforeseeable detective work," could decode and access the video viewing history of specific individuals. *Yershov*, 820 F.3d at 486.[13] At most, only [redacted]. *See* 56.1 ¶¶ 204-210, 242-247.

As an initial matter, there is no evidence as to what videos Plaintiff played or what COIDs or URLs would have been received by GAM or Braze during the class period, if any, or when, or

[12] This class has not been certified and there is only one plaintiff, but any claim bought on behalf of putative class members would fail for these reasons (and possibly reasons unique to each putative class member) as well.

[13] *See also Edwards v. Learfield Commc'ns, LLC*, 697 F. Supp. 3d 1297, 1307-08 (N.D. Fla. 2023) (VPPA claim fails where there are no allegations as to how Meta, "accesse[d]" the metadata it received and discovered video titles; required too much "unforeseeable detective work"); *Wilson v. Triller, Inc.*, 598 F. Supp. 3d 82, 92 (S.D.N.Y. 2022) (claim failed where "the third party" recipient of information "must 'pair' the" user ID "with information from a user's Triller profile page, which may or may not contain various personal information about the user").

whether that information was received contemporaneous with other information from Plaintiff's device. Even if that information was in the record—which it is not—a COID is simply a number that is used internally by HTV to pull written content from its CMS. 56.1 ¶¶ 104-107. Plaintiff goes to great lengths in his Complaint to attempt to show, *e.g.*, that a COID can be used to find the article to which it corresponds (by entering the COID and a station's call letters into a search engine), and presumably believes this satisfies his burden of proving that a COID is "specific video materials" for the purposes of the VPPA. *See, e.g.*, ECF No. 79 ("SAC") ¶¶ 55-58; ECF No. 84 at 4; ECF No. 104 at 10. But "COID" is not a universally recognized designation of online content, it is [redacted]. *See* 56.1 ¶¶ 104-107. It does not identify specific videos, and HTV does not publicize what a "COID" is. *Id.* ¶¶ 106, 110-113.[14] And there is no evidence in the record that GAM or Braze (or anyone) *knows* that a COID is associated with a specific article, or whether that article has any video (or not), or whether such video is prerecorded or live. *See id.* ¶¶ 90-122. Nor would a COID, even if Braze or GAM thought to associate it with a given webpage, effectively identify specific *video* content, because a given article can have no video or multiple videos (which in turn may not even be directly related to the article), and some of those videos may be live and some prerecorded. *See id.* ¶¶ 5-8, 110-113.

Any URL sent to GAM (or a COID associated with an article) similarly would not identify Plaintiff as having requested or obtained a specific video (if there even is one) on that page since the person may instead have "merely read an article on the webpage" (or opened the page and done nothing more). *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023); *see also* 56.1

[14] If HTV published a list of COIDs to the world, there is no evidence that anyone would know what they signified or that they were connected to a particular TV station's content. Nor is there evidence that anyone other than Plaintiff's counsel—let alone GAM or Braze—has ever entered a number corresponding to a COID into a search engine along with a station's call letters in an attempt to find an article's name, or would think to do so.

¶¶ 105-13, 242-247. This is consistent with Plaintiff's testimony that he [redacted]. 56.1 ¶¶ 25-27. In short, nothing in a COID or URL would reveal to Braze or GAM what, if any, specific, prerecorded video Plaintiff may have played in the WMUR App. There is no evidence to the contrary. The evidence also is undisputed that [redacted] *Id.* ¶¶ 115, 123, 209, 247. On these facts, no reasonable jury could find either a COID or URL was connected to other information identifying any person or any specific video materials.[15] Summary judgment should be granted in favor of HTV for this additional, independent reason.

C. <u>There is no evidence that Plaintiff and what specific videos he requested can be identified from email or AAID.</u>

Absent any evidence that GAM or Braze could identify Plaintiff and what specific prerecorded video materials he requested from HTV based on geolocation and COID/URL, Plaintiff is left to argue (with respect to disclosures to GAM) that AAID identifies not just a device, but Plaintiff specifically, and that it is linked to specific information about his video viewing so as to constitute PII under the VPPA. But the record is devoid of any evidence as to what (if any) AAID GAM received from the device Plaintiff used to access the WMUR App during the class period, or that GAM could identify *Therrien* specifically from whatever AAID was purportedly enabled. And there is no evidence that Therrien even *had* AAID and geolocation sharing *enabled* at any time when he viewed a video or when GAM might have received transmissions related to

---

[15] The fact that ***Braze*** also receives a count when a video plays would not rescue Plaintiff's claim with respect to such transmissions. Receipt of the video count, which value is always "1", causes the previous count in the Braze dashboard to increase by one (1) each time a video plays (overwriting the previous total count), without regard to whether the video is prerecorded or live, or whether the video plays automatically or by a user choosing to play a video. *Id.* ¶¶ 211-216. As a result, Plaintiff cannot establish that transmission of a video count can be linked to a specific COID or can be used to prove that HTV shared data that could reveal to Braze the "specific video content requested" by Plaintiff or anyone else.

his visits to the WMUR App, or that GAM could tie any such information to him (particularly if he reset his AAID repeatedly, *see supra* p. 6). Plaintiff is left with nothing to support his allegations but speculation by his expert as to what *may* be possible. Significantly, however, as with geolocation (*see supra* pp. 10, 12-15), there is no evidence that GAM's receipt of AAID (or geolocation or URL/COID) was anything but transient; there is no evidence that it was ever retained at all, let alone for long enough to GAM to attempt to deanonymize Plaintiff or connect any data to him. There thus is no evidence that GAM *could* (or did) engage in any theoretical "identity bridging" with respect to Plaintiff's data, and GAM's contract with HTV prohibits it from doing so. 56.1 ¶¶ 225-232. Nor is there any evidence that GAM received any information to connect Plaintiff to any video he may have viewed because GAM never receives HTV's video identifier and neither URL nor COID/artID can be "specific video content" under the VPPA. *See supra* pp. 15-17. No jury could find that AAID was part of PII as a matter of law. *See Yershov*, 820 F.3d at 486.

The same is true with respect to the information received by Braze. To the extent Plaintiff seeks to prove a violation of the VPPA based on the sharing of his email with Braze irrespective of geolocation, that claim also fails. As set forth above, there is no evidence that would permit a reasonable jury to find that Plaintiff has established that Braze could associate his email (or any other data) with any specific prerecorded video content he viewed in the App. *See supra* pp. 15-17 & n.15. On these facts, email cannot be used to create a violation of the VPPA based on any disclosures to Braze.

Although no class has been certified, the same would be true for any putative class member. While Therrien [redacted], there is no analogous evidence that the same is true for all other purported class

members. The evidence is undisputed that an email does not necessarily identify an individual: all emails received by the HTV Apps were made available to Plaintiff and his expert, [redacted], and they did not produce any evidence of de-anonymization by the expert or any third party and [redacted]. ECF No. 96 at 1, 6; Butler Decl. Ex. F at 300:10-305:12; *see also Dancel v. Groupon, Inc.*, 949 F.3d 999, 1007-08 (7th Cir. 2019) (email not inherently identifying of a specific person). Illustratively, the Second Amended Complaint relies on two user email addresses as HTV App users. SAC ¶ 24; ECF No. 47 at 3; ECF No. 50 at 11-15 & n.6. To date, neither HTV nor the Court knows the identity of the individual or individuals whose App usage is highlighted in Plaintiff's Complaint, despite having email, geolocation, COID, and other information associated with their app usage. SAC ¶ 24. [redacted]. Butler Decl. Ex. F at 236:10-19; 224:24-225:32 (opining [redacted]); ECF No. 50 at 15 & n.6 (Plaintiff asserting that expert discovery would do so). Plaintiff's expert further agreed that [redacted]. Butler Decl. Ex. F at 307:11-23.

***

Nothing in this record supports a finding that either GAM or Braze could reasonably and foreseeably (let alone did) identify Plaintiff (or any other App user) based on geolocation, AAID, email, or anything else. Nor is there any evidence that a COID or article URL was known to Braze or GAM to identify *prerecorded video* content requested by Therrien or anyone else; nothing sent to either vendor distinguished live from prerecorded videos. *See supra* p. 16. Because discovery has cast Plaintiff's original allegations "in a different light," *Yershov*, 820 F.3d at 489, Plaintiff cannot meet his burden of proving to a jury that any information received by either Braze or GAM

could identify him as requesting any specific prerecorded video content. No putative class member could do so either. Summary judgment must be granted to HTV.

## III. NO REASONABLE JURY COULD FIND THAT PLAINTIFF HAS MET HIS BURDEN OF PROVING THAT HTV "KNOWINGLY" TRANSMITTED PII.

HTV is entitled to summary judgment for the independent reason that any disclosure of PII was not made "knowingly". "[T]he knowledge element of the VPPA violation is intertwined with the definition of PII. If [HTV] did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information." *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570, 2017 WL 3727230, at *9 (S.D.N.Y. Aug. 11, 2017). This element requires proof that HTV *knew* that Braze or GAM could reasonably and foreseeably link information it had with other information conveyed by HTV and become aware that a particular person had in fact viewed a particular video. *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090 (N.D. Cal. 2015) (granting summary judgment); *see also Bernardino*, 2017 WL 3727230, at *9; *Comput. Networks, Inc. v. Sears, Roebuck & Co.*, No. CIV.A.02-11992-RGS, 2004 WL 1280970, at *2 (D. Mass. June 10, 2004). There is no such evidence here.

The only summary judgment decision that presented this issue, *In re Hulu*, is dispositive here. In that case, the court granted summary judgment to defendant Hulu, recognizing that the VPPA's "knowing" element requires a showing of "actual knowledge." 86 F. Supp. 3d at 1095-97. That "means consciousness of transmitting the private information. It does not merely mean transmitting the code." *Id.* "It is not enough . . . that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing and not acting because of some mistake or accident'" (alterations omitted).[16] *Id.* As for what HTV must "know," it can be

[16] "This is consistent with cases that have explained the knowledge requirement under the Electronic Communications Privacy Act of 1986, on which the VPPA was modeled." *Id.*; *see also Mollett v. Netflix, Inc.*, No. 11-CV-01629, 2012

liable only if it "actually knew that it was disclosing: (1) a user's identity; (2) the identity of the video material; and (3) the connection between the two—*i.e.*, that the given user had 'requested or obtained' the given video material." *Id.* at 1097. HTV must "actually know that [the third party] might 'read'" the two separate parts of code that were sent "together (yielding something akin to the list of Judge Bork's videos)." *Id.*

The evidence here disproves knowledge, as the facts of this case present an even stronger case on which to grant summary judgment than in *In re Hulu*. ***First***, there is no evidence that HTV actually knows the identity of any of its App users, much less that it believed it was disclosing such information. Nor is there evidence that HTV believed that any of the data sent to Braze or GAM *could* be used by them to identify any App user, let alone what video content they were viewing. To the contrary: HTV does not believe either Braze or GAM could identify any App users or otherwise connect such persons to video content requested or viewed. Butler Decl. Ex. B ¶¶ 59-60; 56.1 ¶¶ 230, 241, 247, 259, 263. And HTV does *not* disclose its [redacted] to either. 56.1 ¶¶ 209, 247. There certainly is no evidence that HTV was aware that a multi-step reverse engineering exercise such as that proposed by Plaintiff's expert was even possible. ***Second***, there is no evidence that either Braze or GAM knew (or could know) that a COID or article URL identified any video played by Therrien or any other App user. *See supra* Part II.2. ***Third***, there is no evidence that HTV believed Braze or GAM had pre-existing information that they could use to de-anonymize HTV App data and connect that with information about a specific video that Plaintiff played on the Apps. In other words, like in *In re Hulu*, "there is no evidence that [HTV] knew that [Braze and GAM] might combine a [] user's identity . . . with

WL 3731542 (N.D. Cal. Aug. 17, 2012) (granting motion to dismiss where defendant did not knowingly violate VPPA by streaming video-watching history to devices that bystanders might view).

the" code specifying what *articles* were accessed "to yield 'personally identifiable information' under the VPPA." 86 F. Supp. 3d at 1095-97.

Finally, unlike in *In re Hulu*—which included evidence that Facebook could use PII from Hulu users for its own purposes—there is no evidence that either GAM nor Braze was permitted to use geolocation or any other information provided by HTV for any purpose other than providing the requested services to the Apps and App users. *See supra* pp. 6-10 & Part II; *infra* Part IV. Plaintiff's theory requires the use of data brokers to attempt to de-anonymize data. ECF No. 104 at 18.[17] There is no evidence Braze or GAM uses such sources at all, let alone to de-anonymize HTV data. 56.1 ¶¶ 165-66, 229. The only evidence is that they are not permitted to do so. *See supra* pp. 6-10. Summary judgment should be granted to HTV.

## IV. THE VPPA PERMITS THE PURPORTED DISCLOSURES TO BRAZE & GAM.

Even if the information shared with Braze or GAM could be considered PII, the VPPA permits disclosure under certain circumstances, including disclosures "incident to the ordinary course of business of the video tape service provider." 18 U.S.C. § 2710(b)(2)(D)-(E); *see Bernardino*, 2017 WL 3727230, at *8; S. Rep. No. 100-599, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 4342-1, 4342-8 (hereinafter "S. Rep."). The "ordinary course of business" as used in the VPPA includes "order fulfillment" and "request processing" activities. 18 U.S.C. § 2710(a)(2). The Senate Judiciary Committee Report explains the scope:

> This subsection . . . allows disclosure to permit video tape service providers to use mailing houses, warehouses, computer services, and similar companies for marketing to their customers. These practices are called "order fulfillment" and "request processing."

[17] Plaintiff cannot rely on expert testimony as to HTV's knowledge. *See In re Zofran (Ondansetron) Prods. Liab. Litig*., No. 1:15-MD-2657-FDS, 2019 WL 5685269, at *9 (D. Mass. Nov. 1, 2019); *In re Rezulin Prods. Liab. Litig*., 309 F. Supp. 2d 531, 545-46 (S.D.N.Y. 2004).

S. Rep. at 9. *see also Sterk*, 2013 WL 4451223, at *4 (granting summary judgment to defendant that had outsourced customer support function).

This provision recognizes that businesses need not perform all business functions in-house, but instead can use vendors and others who perform functions normally performed by a company itself without giving rise to liability under the VPPA. *Sterk v. Redbox Automated Retail, LLC ("Sterk II")*, 770 F.3d 618, 624 (7th Cir. 2014); S. Rep. at 14 (18 U.S.C. § 2710(b)(2)(E) ("tak[ing] into account that video tape service providers may use third parties in their business operations"). This "reflects Congress' awareness of the unremarkable fact that no business is an island and that video tape services providers, like many other businesses, 'may use third parties in their business operations.'" *Rodriguez v. Sony Comput. Ent. Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015) (quoting *Sterk II*, 770 F.3d at 624 (in turn quoting S. Rep. at 14)); *see also Collins v. Toledo Blade*, No. 23-CV-00302, 2024 WL 1094613, at *9 (N.D. Ohio Mar. 13, 2024) (*Sterk* stands for the proposition that "outsourced" functions could be within scope of § 2710(b)(2)(E)). Where, as here, disclosures to a third party "are only for purposes of an internal service that [that entity] provides as a third-party vendor" for a "video tape service provider", there can be no liability under the VPPA even if PII is shared. *Sterk*, 2013 WL 4451223, at *5; *Sterk II*, 770 F.3d at 624; *see also Louth*, 2022 WL 4130866, at *4 ("It may be determined upon discovery that NFL Enterprises uses Anvato only for 'end-to-end video processing and management' functions . . . .").

A. <u>HTV's Disclosures to Braze Are "Incident to" "Order Fulfillment" and "Request Processing"</u>

The undisputed facts in this case establish that Braze acted as HTV's vendor and SAAS provider to assist HTV in sending App users push notifications and emails. The alleged PII that HTV transmitted to Braze—email, geolocation, and COID—were all used to provide the services requested by App users:

- It is undisputed that [redacted]. 56.1 ¶¶ 13, 16, 71, 73, 135, 157, 174-175. Braze is the vendor used by HTV to send such emails. *Id.* ¶¶ 153-157. There is no evidence that any email address has ever been used by Braze for any purpose other than facilitating this service.
- It is undisputed that geolocation was provided to Braze [redacted]. 56.1 ¶¶ 12, 68-70, 72-74, 129-132, 177, 191-195. There is no evidence that geolocation was used by Braze for any other purpose.
- It is undisputed that COID was provided to Braze [redacted]. 56.1 ¶¶ 105, 107, 175, 203a, 204. There is no evidence that COID was used by Braze for any other purpose.

HTV could not provide any of these services to users of its Apps who request them without using a third party such as Braze to assist in doing so. 56.1 ¶¶ 153-156, 175-177, 190-192. The VPPA permits such conduct. Here, as in *Sterk*, HTV has simply outsourced traditionally intra-company activities—such as sending emails and other notifications—to a third party, subject to strict contractual restrictions on what that third party can do and what responsibilities HTV retains. 56.1 ¶¶ 153-175, 222-247. Any reasonable jury must find that HTV's disclosures to Braze were permitted as "incident to the ordinary course of business . . . ." 18 U.S.C. § 2710(b)(2)(D)-(E).

B. <u>HTV's Disclosures to GAM Are "Incident to" "Order Fulfillment" and "Request Processing"</u>

The undisputed facts also establish that GAM acted solely as HTV's SAAS provider to assist HTV in including digital advertisements within its free Apps. HTV supports its free news content by selling advertising. 56.1 ¶¶ 18, 221. Rather than perform this service internally (*e.g.*, finding advertisers and obtaining the advertisements to display in the Apps) it uses GAM. *Id.* ¶¶ 222-225. HTV shares limited information with GAM to permit it to tailor marketing to App users' interests (so a WMUR user does not see a marketing campaign for one of HTV's California stations). *Id.* ¶¶ 236a, 240. The information alleged to be PII in transmissions to GAM—AAID, an article URL, and geolocation—are necessary to provide the services requested by App user:

- It is undisputed that AAID was sent to GAM [redacted] 56.1 ¶¶ 14, 137-38, 142, 234-38. There is no evidence that any AAID received from any HTV App has ever been used for any other purpose.
- It is undisputed that an article's URL was shared with GAM [redacted] 56.1 ¶¶ 236a, 242-246. There is no evidence that an article URL was used by GAM for any other purpose.
- It is undisputed that to the extent geolocation was shared with GAM (which was unrelated to any playing of any videos within the Apps), it was [redacted] 56.1 ¶¶ 236a-241. There is no evidence that geolocation was used by GAM for any other purpose.

These are essential functions necessary for HTV to be able to provide its free news content; it is permitted to use a third party to assist it. This is precisely what the VPPA anticipated and accommodated in § 2710(b)(2)(E). *See supra* pp. 23-24. S. Rep. at 9, 14. As with Braze, HTV entered into a contract with GAM to do so, providing certain data protections. *See supra* p. 18 & Part IV.A. Any reasonable jury must find that HTV's disclosure of information to GAM was permitted as "incident to the ordinary course of business . . . ." 18 U.S.C. § 2710(b)(2)(D)-(E).

Even if the VPPA did not explicitly recognize that disclosures to third parties for the purpose of helping to conduct a purported video tape service provider's business do not violate the statute, common law agency principles would require such a result. *Cf., e.g.*, *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 201 (S.D.N.Y. 2017) (granting partial summary judgment because disclosures to SAAS database provider were to an agent); *Burrell v. Sowers*, No. 22-2687, 2023 WL 7320867, at *2 (2d Cir. Nov. 7, 2023) (vendor was an agent where defendant exerted significant control over vendor pursuant to contract). Here Braze and GAM were each acting at the direction of HTV in providing services to HTV. 56.1 ¶¶ 153-175, 222-247. They were each contractually bound to [redacted]

[redacted]. *Id.*[18] There is no evidence that either Braze or GAM failed to comply with these contractual obligations.[19] *Id.* ¶¶ 165-66, 229-32. Such confidential sharing of information with vendors pursuant to contractual protections for the sole purpose of running HTV's business cannot implicate the privacy interest underlying the VPPA, cannot be a "disclosure" of PII, and cannot violate the VPPA.

## V. AS APPLIED, THE VPPA RUNS AFOUL OF THE U.S. CONSTITUTION.

### A. Plaintiff Lacks Article III Standing.

To assert Article III standing, Plaintiff must demonstrate either a tangible injury, a harm "specified by the Constitution," or a "harm[] traditionally recognized as providing a basis for lawsuits in American courts." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424-25 (2021). Plaintiff does not claim any tangible or constitutional injury, and he has not suffered a harm traditionally recognized under common law or sought to be remedied by the VPPA.

The VPPA is designed to protect only one, narrow interest: the purported privacy interest in "watch[ing] films without the whole world knowing." S. Rep. at 7. The only *potential* common law analogue is the tort of "public disclosure of private facts". *See, e.g.*, *Salazar v. Nat'l Basketball Ass'n*, 118 F.4th 533, 544 (2d Cir. 2024); *cf. Nabozny v. Optio Sols. LLC*, 84 F.4th 731, 734 (2d Cir. 2023) (analyzing whether debt collection statute was analogous to the tort). To meet that claim's high bar for injury, a plaintiff must prove disclosure of information the "publicity" of which "would be highly offensive to a reasonable person." *Salazar*, 118 F.4th at 541 (citation omitted). Here, the disclosed "facts" are various forms of number strings (lat/long, AAIDs, COIDs)

---

[18] By way of example, [redacted] *See* 56.1 ¶¶ 153-175.

[19] That the Braze and GAM contracts [redacted] *See Boelter*, 269 F. Supp. 3d at 201; *Burrell*, 2023 WL 7320867, at *2; Restatement (Second) of Agency § 2(3).

that Plaintiff claims reveal his viewing of news and weather, [redacted] *See, e.g.*, 56.1 ¶¶ 54-57; Butler Decl. Ex. C at 81:3-86:1, 95:22-97:19, 107:7-109:13, 115:8-116:17, 119:13-18, and 35:13-36:1, 41:23-42:10, 140:24-141:3 (Plaintiff [redacted]); S. Rep. at 7. HTV's vendors were bound by confidentiality in receiving the information (Part IV), foreclosing any injury based on "publicity" of private facts. *Nabozny*, 84 F.4th at 736 (quoting Restatement (Second) of Torts § 652D cmt. a). As a result, Plaintiff is "not seeking to remedy any harm . . . but instead is merely seeking to ensure a defendant's 'compliance with regulatory law' (and . . . to obtain some money via the statutory damages)." *TransUnion*, 594 U.S. at 427-28 (citation omitted). He has no standing on these facts.

B. Applying the VPPA to HTV Would Not Be Consistent with the First Amendment.

Discovery in this case demonstrates that the VPPA cannot, on these facts, be applied to HTV consistent with the First Amendment. The VPPA was motivated by and primarily targeted at non-commercial speech when enacted and on its face regulates non-commercial and commercial speech alike, singling out specific speakers and content, all of which should make its enforcement subject to strict scrutiny.[20] The VPPA fails that test.[21] But even assuming HTV's speech is commercial, and that justifies application of the VPPA to a lower level of First Amendment

[20] The Supreme Court has made clear that a speech regulation that applies equally to non-commercial and commercial speech should not be subject to a less stringent constitutional standard when enforced only against commercial speech. *See City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993). This avoids unconstitutional discrimination against commercial speech through selective enforcement merely because such speech is perceived as being of lower value and easier to regulate.

[21] *See Stark v. Patreon, Inc.*, 656 F. Supp. 3d 1018, 1030-31 (N.D. Cal. 2023) (VPPA subject to strict scrutiny); *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165 (2015) (all content-based laws subject to strict scrutiny); *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 558-60 (2011); *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015). The VPPA was passed in response to a newspaper's publication of then-Supreme Court nominee Robert Bork's video rental history. *See Mollett*, 795 F.3d at 1065. It discriminates based on speaker (*i.e.*, applies only to a "video tape service provider," *see* 18 U.S.C. § 2710(a)(4) & (b)), and based on content (*i.e.*, applies only to records containing "personally identifiable information," *see* 18 U.S.C. § 2710(a)(3) & (b)). The record in this case—not available to the Court at the motion to dismiss stage—shows that HTV's transmissions fit no accepted definition of "commercial speech." HTV transmits code to Braze to permit HTV to convey requested news content to Therrien and others, and it transmits code to GAM to permit HTV to provide its news content at no cost to App users. 56.1 ¶¶ 153-157, 222-224. These neither propose a commercial transaction, *see Harris v. Quinn*, 573 U.S. 616, 648 (2014), nor satisfy a broader definition of commercial speech, *see Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983).

scrutiny, the law does not pass constitutional muster as applied here. "If the commercial speech concerns lawful activity and is not misleading"—as here—then under *Central Hudson*, that speech may only be regulated if the government "(1) asserts a substantial interest in support of its regulation; (2) demonstrates that the restriction on commercial speech directly and materially advances that interest; and (3) the regulation is narrowly drawn." *Saunders v. Hearst Television, Inc.*, 711 F. Supp. 3d 24, 32 (D. Mass. 2024) (citations and alterations omitted). The VPPA fails the second and third prongs.[22]

**1. Application of the VPPA to HTV's App does not "directly" and "materially" advance the government's interest.**

Regardless of whether it is the government or a private party, the "party seeking to uphold a restriction on commercial speech carries the burden of justifying it." *Bolger*, 463 U.S. at 71 n.20. Plaintiff must show that the "harms" "are real and that [this] restriction will in fact alleviate them to a material degree." *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 487 (1995). A restriction "may not be sustained if it provides only ineffective or remote support for the government's purpose." *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996) (citation omitted). This "burden is not satisfied by mere speculation or conjecture." *Edenfield v. Fane*, 507 U.S. 761, 770 (1993). Plaintiff must present real concrete evidence to support his application of the law; if there are no "findings of fact, or indeed any evidentiary support whatsoever," then the law fails. *44 Liquormart, Inc.*, 517 U.S. at 505; *see also Edenfield*, 507 U.S. at 771.

As applied to HTV, the VPPA does not "directly advance[] the governmental interest

[22] With regard to the first prong, the legislature's principal interest in passing the VPPA was to prevent repetitions of the Judge Bork incident. It is questionable as to whether there is a "substantial" government interest in restricting public disclosure of information that may be relevant to evaluating the fitness for office of a Supreme Court nominee, especially one who was already a public figure. More to the point in this case, Congress expressed no substantial interest in restricting the common business practices targeted by Plaintiff, or even preventing disclosure of information about watching local news and weather reports, whether live or prerecorded. *See El Dia, Inc. v. P.R. Dep't of Consumer Affairs*, 413 F.3d 110, 115-16 (1st Cir. 2005). And Therrien's own conduct undermines his argument that Congress' "substantial" interest is at issue here. *See supra* Part V.A.

asserted." *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 566 (1980). Congress enacted the VPPA to "preserve personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials." *Saunders*, 711 F. Supp. 3d at 33 (citation omitted). There is no evidence that that interest is advanced at all through application of the VPPA to HTV's App, let alone "materially" and "directly." Congress considered no empirical studies into expectations of privacy as relates to the sort of confidential sharing of anonymized information from HTV to Braze and GAM in order to deliver free news and weather reports directly to Plaintiff's mobile phone, because Congress could not have imagined such a scenario in 1988.[23] Nor has Therrien produced studies or reports suggesting this sort of sharing results in harm to individuals of the sort that motivated the VPPA: fear of public embarrassment or ridicule from mass publication in a newspaper of one's personal list of feature-length film rental history, akin to public disclosure of private facts. *TransUnion*, 549 U.S. at 424-25. Therrien developed no such evidence in discovery; he has not identified a single instance of HTV's speech being reviewed by third parties to identify specific videos he watched, much less any public disclosure or harm flowing from it. *See 44 Liquormart, Inc.*, 517 U.S. at 505; *Edenfield*, 507 U.S. at 771. The Supreme Court's requirement of evidence on this point has grown increasingly stringent over the years; "speculation or conjecture" does not satisfy his burden. *Edenfield*, 507 U.S. at 770; *see also 44 Liquormart*, 517 U.S. at 507; *Rubin*, 514 U.S. at 487.

**2. There is no "reasonable fit" between the government's interest and application of the VPPA to HTV's App as a means of accomplishing it.**

The VPPA must not be applied "more extensive[ly] than is necessary to serve the

---

[23] As noted *supra* Part V.A., the legislative history of the VPPA makes plain that the privacy interest protected by the VPPA was to "watch **films *without the whole world knowing***"—not in protecting the confidential anonymized sharing of information from HTV to its vendors relating to app users watching news and weather forecasts, for the sole limited purpose of those vendors performing functions on HTV's behalf outside the public eye.

[government's] interest." *Cent. Hudson Gas & Elec.*, 447 U.S. at 572. Application of the VPPA to the HTV Apps does not meet this narrow tailoring requirement, which requires that the "fit" between statutory ends and means is "reasonable." *Saunders*, 711 F. Supp. 3d at 33. To begin with, this requirement is generally not met where a law is "pierced by exemptions and inconsistencies," a symptom that it is underinclusive or overinclusive (or both) in achieving its end. *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 190 (1999). The VPPA's "exemptions" underscore the unreasonableness of the "fit" when applied here, where it would be inexplicably underinclusive. Consider that the statute only applies to "prerecorded" video content. 18 U.S.C. § 2710(a)(4). To the extent the law's aim is to "preserve personal privacy with respect to" video viewing on the app, *Saunders*, 711 F. Supp. 3d at 33, there's no basis to protect viewing of the app's "prerecorded" content but not "live" content. The VPPA is also overinclusive as applied to HTV's App. It would punish speech relating to *all* "prerecorded" "audio visual materials," no matter how anodyne, including weather reports. 56.1 ¶¶ 1-8, 90-102. More to the point, it would punish those so-called "disclosures" even when there was no public disclosure at all—no publicity giving rise to fear of embarrassment or ridicule—only sharing of anonymized information on a confidential basis with HTV's vendors consistent with users' preferences. [redacted]. 56.1 ¶ 57. In short, there is no "reasonable fit" between the application of the VPPA to HTV's App and carrying out the government's stated aim. *Rubin*, 514 U.S. at 489.

**CONCLUSION**

For the foregoing reasons, HTV respectfully requests that the Court grant it summary judgment on the claims of Plaintiff Charles Therrien (and, if certified, the class).

Dated: January 17, 2025

Respectfully submitted,

*/s/ Matthew Greenfield*

Matthew Greenfield (Mass. BBO No. 684596)
Jonathan R. Donnellan*
Andrea R. Butler*
Kristen Hauser*
The Hearst Corporation
Office of General Counsel
300 West 57th Street, 40th Floor
New York, NY 10019
Tel: (212) 649-2484
Fax: (212) 554-7000
matthew.greenfield@hearst.com
jdonnellan@hearst.com
abutler@hearst.com
khauser@hearst.com

*Admitted Pro Hac Vice

*Attorneys for Defendant Hearst Television Inc.*

**RULE 7.1(a)(2) CERTIFICATION**

I hereby certify that counsel for Defendant conferred with counsel for Plaintiff on January 7, 2025 and attempted in good faith to resolve or narrow the issues addressed in the motion.

*/s/ Matthew Greenfield*
Matthew Greenfield

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing on January 17, 2025.

*/s/ Matthew Greenfield*
Matthew Greenfield