**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHARLES THERRIEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEARST TELEVISION, INC.,<br><br>Defendant. | Case No. 1:23-cv-10998<br><br>Hon. Richard G. Stearns |

**PLAINTIFF'S OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**LEAVE TO FILE GRANTED ON JANUARY 30, 2025**

Dated: February 7, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Pro Hac Vice*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr. (BBO # 566161)
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**


I. CHART OF DEFENDANT'S DISCLOSURES ........ 1

II. DEFENDANT DISCLOSED INFORMATION THAT WAS REASONABLY AND FORESEEABLY LIKELY TO IDENTIFY PLAINTIFF AND CLASS MEMBERS ........ 1

A. The Data Defendant Disclosed About Plaintiff Identified Him........ 1

B. Defendant's MSJ Misapprehends The Legal Standard for PII ........ 4

C. Defendant's Geolocation Disclosures Reveal The Names And Addresses Of The Video Viewers........ 5

D. Dr. V.R.'s Reliance On Peer-Reviewed Studies Is Proper ........ 7

E. Geolocation Has Greater Capacity To Identify Than Names Or Addresses ........ 9

F. Email Addresses And AAIDs Give The Trier Of Fact An Additional Basis To Find That Defendant Disclosed Class Members' Identities ........ 13

G. The Ability To De-Anonymize Class Members From The Disclosed Data Will Be Proven In The Class Notice Process ........ 15

III. DEFENDANT DISCLOSED THE SPECIFIC VIDEO MATERIALS THAT WERE REQUESTED OR OBTAINED ........ 17

A. The Content IDs ("COIDs") Identify The Videos ........ 17

B. Defendant Violated The VPPA By Disclosing The Videos Class Members Requested Or Obtained ........ 18

C. Defendant Disclosed The Subject Matter Of The Videos In Violation Of The VPPA ........ 19

D. Defendant Disclosed The Actual Videos Requested Or Obtained ........ 19

IV. DEFENDANT KNOWINGLY DISCLOSED CLASS MEMBERS' PII ........ 21

V. THE DISCLOSURES WERE NOT MADE IN THE ORDINARY COURSE OF BUSINESS ........ 23

VI. VPPA VIOLATIONS GIVE RISE TO ARTICLE III STANDING ........ 26

VII. THE VPPA DOES NOT VIOLATE THE FIRST AMENDMENT ........ 27

A. Intermediate Scrutiny Applies To The VPPA ........ 27

B. The VPPA Survives Intermediate Scrutiny ........ 28

## TABLE OF AUTHORITIES

PAGE(S)

**CASES**

*1A Auto, Inc. v. Dir. of Off. of Campaign and Pol. Fin.*,
480 Mass. 423 (2018) ........ 30

*Adams v. America's Test Kitchen, LP*,
680 F. Supp. 3d 31 (D. Mass. 2023) ........ 17, 18

*Boelter v. Advance Magazine Publishers Inc.*,
210 F. Supp. 3d 579 (S.D.N.Y. 2016) ........ 30

*Boelter v. Hearst Communications, Inc.*,
2016 WL 361554 (S.D.N.Y. Jan. 28, 2016) ........ 27

*Boelter v. Hearst Communications, Inc.*,
192 F. Supp. 3d 427 (S.D.N.Y. 2016) ........ 27, 28, 29

*Boelter v. Hearst Commc'ns, Inc.*,
269 F. Supp. 3d 172 (S.D.N.Y. 2017) ........ 26

*Bryan v. U.S.*,
524 U.S. 184 (1998) ........ 21

*Burdette v. FuboTV Inc.*,
2024 WL 2831466 (N.D. Ill. June 4, 2024) ........ 24

*Cain v. Redbox Automated Retail, LLC*,
981 F. Supp. 2d 674 (E.D. Mich. 2013) ........ 26

*Clark v. Martinez*,
543 U.S. 371 (2005) ........ 30

*Collins v. Toledo Blade*,
720 F. Supp. 3d 543 (N.D. Ohio 2024) ........ 18, 20, 24

*Czarnionka v. Epoch Time Assoc., Inc.*,
2022 WL 17069810 (S.D.N.Y. Nov. 17, 2022) ........ 5, 11, 22

*Eichenberger v. ESPN, Inc.*,
876 F.3d 979 (9th Cir. 2017) ........ 4, 13, 27

*Feldman v. Star Tribune Media Co. LLC*,
659 F. Supp. 3d 1006 (D. Minn. 2023) ........ 23

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........................................................................................ 9

*Golden v. NBCUniversal Media, LLC*,
688 F. Supp. 3d 150 (S.D.N.Y. 2023) ........................................................ 3, 18

*In re Hulu Priv. Litig.*,
2014 WL 1724344 (N.D. Cal. Apr. 28, 2014)..................................................Passim

*In re Hulu Priv. Litig.*,
86 F. Supp. 3d 1090 (N.D. Cal. 2015)........................................................... 22

*In re Motor Fuel Temperature Sales Prac. Litig.*,
2013 WL 4411092 (D. Kan. Aug. 14, 2013)................................................... 16

*In re Nickelodeon Cons. Priv. Litig.*,
827 F.3d 262 (3d Cir. 2016) ...................................................................... 6, 23

*Jackson v. Fandom, Inc.*,
2023 WL 4670285 (N.D. Cal. July 20, 2023) ................................................. 24

*Keane v. HSBC Bank USA*,
874 F.3d 763 (1st Cir. 2017)......................................................................... 16

*Louth v. NFL Enterprises LLC*,
2022 WL 4130866 (D.R.I. Sept. 12, 2022) ............................................... 15, 24

*Martin v. Meredith Corp.*,
657 F. Supp. 3d 277 (S.D.N.Y. 2023) ........................................................... 18

*Mile Road Corp. v. City of Boston*,
345 Mass. 379 (1963) ................................................................................... 28

*New York v. Ferber*,
458 U.S. 747 (1982) ..................................................................................... 28

*People v. Weaver*,
12 N.Y.3d 433 (2009)..................................................................................... 12

*Rancourt v. Meredith Corporation*,
2024 WL 381344 (D. Mass. Feb. 1, 2024)...................................................... 24

*Robinson v. Disney Online*,
152 F. Supp. 3d 176.............................................................................. 4, 5, 6, 10

*Rodriguez v. Sony Computer Ent. Am., LLC*,
801 F.3d 1045 (9th Cir. 2015) ........................................ 24

*Saunders* v. *Hearst Television, Inc.,*
711 F. Supp. 3d 24 (D. Mass. Jan. 11, 2024) ........................................ 23, 27, 28, 29

*Sellers v. Bleacher Report, Inc.*,
2023 WL 4850180 (N.D. Cal. July 28, 2023) ........................................ 11, 18

*Shah v. Fandom, Inc.*,
2024 WL 4539577 (N.D. Cal. Oct. 21, 2024) ........................................ 29

*Stark v. Patreon, Inc.*,
656 F. Supp. 3d 1018 (N.D. Cal. Feb. 17, 2023) ........................................ 27

*Sterk v. Redbox Automated Retail, LLC*,
2013 WL 4451223 (N.D. Ill. Aug. 16, 2013) ........................................ 24

*TikTok Inc. v. Garland*,
2025 WL 2222571 (U.S. Jan. 17, 2025) ........................................ 28

*United States v. Raytheon Co.*,
2013 WL 5348571 (D. Mass. Sept. 23, 2013) ........................................ 9

*United States v. Hastie*,
854 F.3d 1298 (11th Cir. 2017) ........................................ 13

*United States v. Jones*,
565 U.S. 400 (2012) ........................................ 12

*Williams-Yulee v. Fl. Bar*,
575 U.S. 433 (2015) ........................................ 29, 30

*Yershov v. Gannett Satellite Info. Network, Inc.*,
104 F. Supp. 3d 135 (D. Mass. 2015) ........................................ 6

*Yershov v. Gannett Satellite Info. Network, Inc.*,
820 F.3d 482 (1st Cir. 2016) ........................................ Passim

*Yershov v. Gannett Satellite Info. Network, Inc.*,
204 F. Supp. 3d 353 (D. Mass. 2016) ........................................ 26, 27

**STATUTES**

18 U.S.C. § 2710(a)(3) ........................................ 4

18 U.S.C. § 2710(b)(1) .......... 26

18 U.S.C. § 2710(b)(2) .......... 5, 6, 19, 25

Cal. Civ. Code § 1798.140 .......... 12, 13

**OTHER AUTHORITIES**

S. Rep. 100–599 (1988) .......... 4, 12, 15, 19

## I. CHART OF DEFENDANT'S DISCLOSURES

This chart summarizes Defendant's disclosures to Braze and Google:

[redacted]

Citations to the evidence proving these disclosures can be found in PSOF ¶¶ 1-29.

## II. DEFENDANT DISCLOSED INFORMATION THAT WAS REASONABLY AND FORESEEABLY LIKELY TO IDENTIFY PLAINTIFF AND CLASS MEMBERS

### A. The Data Defendant Disclosed About Plaintiff Identified Him

Defendant argues that "[n]either Braze nor GAM received information identifying Plaintiff." MSJ at 12. That is wrong. Defendant concedes [redacted]. Defendant's Statement of Facts ("DSOF") ¶ 65. A Google search of that email address reveals his name, address, age, and phone number:

[redacted]

Plaintiff's Statement of Facts ("PSOF") ¶ 110. This is common. Googling the email address of Defendant's corporate representative also reveals his name and resume. *Id.* ¶¶ 107-108.

Defendant also argues that "the only evidence in the record as to Plaintiff" is a single geolocation point. MSJ at 13. That is inaccurate. Defendant itself only *retained* evidence of one geolocation point, revealing [redacted] DSOF ¶ 81. But that does not mean that it only *disclosed* a single geolocation datapoint. To the contrary, Plaintiff testified that he kept location services enabled at all times. PSOF ¶ 126. Consequently, [redacted] *Id.* ¶¶ 10-11, 28-29, 160. Based on Defendant's records, [redacted] PSOF ¶ 122.

That is an enormous trove of data about Plaintiff. Just the single datapoint retained by Defendant was sufficient to reveal [redacted] The remaining [redacted] geolocation points provide their own windows into Plaintiff's life that will [redacted] MSJ at 13. That includes regular use from his residence where he lived and worked, and where other Church congregants presumably did *not* live and work. PSOF ¶ 120. Defendant argues that Plaintiff's home location was not disclosed because he [redacted] MSJ at 14. That is wrong. Plaintiff regularly used the WMUR App from home and only lived in one residence between February 2022 and August 2023 [redacted] PSOF ¶¶ 120-21.

Defendant argues that "Plaintiff testified that [redacted] so that one geolocation could not associate him with any videos watched." MSJ at 13. This is one geolocation point of [redacted] (PSOF ¶ 122), which [redacted] PSOF ¶ 2 (Rosellini Dep. at 112:4-6) [redacted] And [redacted] PSOF ¶ 48. The disclosure of geolocation coordinates and videos watched do not need to be simultaneous.

Finally, Defendant argues that Plaintiff has not shown that the third parties "actually used any HTV data to deanonymize Plaintiff" or that they retain sufficient data long enough. MSJ at 15. "But that argument conflates the type of information disclosed with the recipient of its disclosure. The VPPA addresses only the former." *Golden v. NBCUniversal Media, LLC*, 688 F. Supp. 3d 150, 160 (S.D.N.Y. 2023). The Ninth Circuit said this explicitly: the VPPA "looks to

what information a video service provider discloses, not to what the recipient of that information decides to do with it … Holding otherwise would make the lawfulness of a disclosure depend on circumstances outside of a video service provider's control." *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985 (9th Cir. 2017) (cleaned up). These arguments are plainly irrelevant.

**B. Defendant's MSJ Misapprehends The Legal Standard for PII**

Defendant argues that Plaintiff is required to show that Defendant disclosed information sufficient to "identif[y] Plaintiff by name." MSJ at 13. In fact, the data transmitted, [redacted] *was* sufficient to identify Plaintiff and class members by name. § II.C & D, *infra*. But more importantly, this is not the correct legal standard.

"The precise scope of PII under the VPPA is difficult to discern from the face of the statute – whether read in isolation or in its broader statutory context." *Robinson v. Disney Online*, 152 F. Supp. 3d 176. 179 (S.D.N.Y. 2015). "[T]he term 'personally identifiable information' includes information which identifies a person as having requested or obtained specific video materials or services." 18 U.S.C. § 2710(a)(3). This "language reasonably conveys the point that PII is not limited to information that explicitly names a person. Had Congress intended such a narrow and simple construction, it would have had no reason to fashion the more abstract formulation contained in the statute." *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016) ("*Yershov II"*). Indeed, the VPPA's Senate Report explains that the definition of PII, "[u]nlike the other definitions in this subsection … uses the word 'includes' to establish *a minimum, but not exclusive, definition of personally identifiable information*." S. Rep. 100-599, at 12 (1988) (emphasis added). "This makes sense. Many types of information other than a name can easily identify a person." *Yershov II*, 820 F.3d at 486.

First Circuit law recognizes two distinct ways of identifying consumers that are actionable under the VPPA: by disclosing information which is itself *per se* identifying, and by disclosing

information which could be linked to information that is *per se* identifying, using external sources.

The first category includes information that is "sufficiently identifying without more." *Robinson*, 152 F. Supp. 3d at 182. "[T]hese pieces of information are *per se* identifying such that their knowing disclosure amounts to a violation of the statute." *Id.* Courts are in agreement that this information is actionable even where it "cannot be linked to a specific person without access to certain additional information." *Id.* at 181; *see also Czarnionka v. Epoch Time Assoc., Inc.* 2022 WL 17069819, at *4 (S.D.N.Y. Nov. 17, 2022) ("Plaintiff has plausibly alleged that the FID [Facebook ID] itself constituted PII. Knowledge of what Facebook might do with the disclosed information to yield PII is therefore unnecessary."). *In re Hulu Priv. Litig.* 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("[A] Facebook user—even one using a nickname—generally is an identified person on a social network platform.").

The First Circuit also recognizes a second category of information that can be actionably identifying if external information is accessible "allowing it to link" the disclosure to information that is *per se* identifying. *Yershov II*, 820 F.3d at 486.

Here, the categories of data disclosed by Defendant satisfy both standards.

### C. Defendant's Geolocation Disclosures Reveal The Names And Addresses Of The Video Viewers

As a starting point, it is important to note "[t]hat names and addresses are expressly included within the definition of PII, as is clear from the face of the VPPA." *Robinson*, 152 F. Supp. 3d at 182. As Chief Judge Saylor explained, as a matter of statutory interpretation, PII must necessarily include names, addresses, *and* other information:

> [T]he statute permits disclosure of PII under five specific circumstances. 18 U.S.C. § 2710(b)(2). One of those circumstances is that disclosure may be made "to any person" if "the disclosure is solely of the names and addresses of consumers," but only if the consumer has had an opportunity to prohibit that disclosure, and if the disclosure does not identify the "title, description, or subject

> matter of the video." 5 *Id.* § 2710(b)(2)(D). *That suggests (1) that a consumer's name and address are both PII, and (2) that the universe of PII is greater than the consumer's name and address.*

*Yershov v. Gannett Satellite Info. Network, Inc.*, 104 F. Supp. 3d 135, 140 (D. Mass. 2015) ("*Yeshov I*") (emphasis added). Other courts have also held that names and addresses "are *per se* identifying." *Robinson*, 152 F. Supp. 3d at 182; *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d 262 282-83 (3d Cir. 2016) ("there are pieces of information, such as a telephone number or a physical address, which may not by themselves identify a particular person but from which it would likely be possible to identify a person by consulting publicly available sources").

Here, Defendant does not dispute [redacted] DSOF ¶¶ 131-152. The First Circuit held that disclosure of geolocation is akin to "what for very many people is a similar type of identification, effectively revealing the name of the video viewer." *Yershov II*, 820 F.3d at 486. This is backed up by empirical research. Plaintiff's expert, Dr. Vallina-Rodriguez ("Dr. V.R."), whose testimony is briefed in Plaintiff's *Daubert* opposition, [redacted] PSOF ¶¶ 81-82.

Dr. V.R. [redacted] PSOF ¶¶ 70-74; *see also* V.R. Dep. at 29:24-30:2. There, the authors tested an automated system they developed to identify frequented locations on a population of Twitter App users with between 10-250 time-stamped geolocation points. Using the system, [redacted] PSOF ¶ 141 (V.R. Decl. ¶ 62) (emphasis added).

Dr. V.R. analyzed the properties of the dataset from the Geolocation Study and compared them with the data in this case by referencing additional peer-reviewed studies examining the

timing and frequency of use of Twitter with news and weather apps. *Id.* ¶ 142. Dr. V.R. concluded that [redacted] *Id.* ¶ 143. Based on this, Dr. V.R. testified [redacted] *Id.* ¶ 144. Dr. V.R. also explains that [redacted] *Id.* ¶ 145.

Defendant disputes the capacity of this data to reveal Class Members' names, but not their addresses. Similarly, Defendant's own expert did not contest this point. PSOF ¶ 153 (Dippon Dep. at 32:6-11) [redacted] This point is not just proven by science; it is common sense. Multiple records showing the same location late at night and/or early morning are reasonably dispositive of the user's residence. Defendant is wrong about the need to infer names the geolocation data. But the Court need not even reach that argument. Given the universal agreement among courts that addresses constitute PII under the VPPA, the Court should deny summary judgment on this ground alone.

**D. Dr. V.R.'s Reliance On Peer-Reviewed Studies Is Proper**

Even if Defendant were correct that geolocation data must be capable of being deanonymized by name to be actionable, it would still be wrong, as detailed below.

*1. Scientists Routinely Extend Proven Scientific Principles To Analogous Fact Patterns*

Defendant calls Dr. V.R.'s testimony that geolocations patterns are capable of being de-anonymized a "hypothesis" that "cannot substitute for factual evidence" and is "insufficient to meet Plaintiff's burden on summary judgment." MSJ at 14. This amounts to science-denial.

There is an entire field of study devoted to measuring the capability of geolocation to reveal people's identities. Following decades of study, [redacted] PSOF ¶ 62 (V.R. Decl. ¶ 46). To that end, Plaintiff cites verbatim block quotes from four peer-reviewed studies explaining this concept on page 14 of his *Daubert* opposition brief. ECF No. 105 at 14. And Plaintiff retained a leading expert in this field, who examined the nature of the data that was disclosed in this case and compared it with the properties of the data examined in the published literature. PSOF ¶¶ 63, 142-43. He concluded that [redacted] PSOF ¶ 154.

Defendant was unable to find anybody with expertise in this field. Instead, it proffers testimony from an economist. *Id.* ¶ 156 (Dippon Dep. at 39:23-40:3) [redacted] While Dr. V.R. cites dozens of peer-reviewed papers to support his testimony, Dr. Dippon's research on this topic was limited to [redacted] *Id.* ¶ 157 (Dippon Dep. 240:6-9) [redacted] Nonetheless, for the studies he reviewed and those he did not, Dr. Dippon opined that [redacted] *Id.* ¶ 157 (Dippon Dep. at 219:22-25) [redacted]

[redacted] To Defendant and its economist, scientific results cannot be relied upon unless they are retested in every instance.

That is not how science works. As Dr. Polakis, the author of two of the studies cited by Dr. V.R., explained, "[s]cientists routinely extend the proven principles and methodologies from studies to external datasets where they are expected to be comparable." *Id.* ¶ 133. "The reason privacy researchers conduct these studies is to inform about the real-world implications of dissemination of personally-identifying information in cases such as this." *Id.* ¶ 134.

*2. Experts Are Allowed To Rely On Studies With Similar Facts*

Defendant's argument also lacks a legal basis. "Trained experts commonly extrapolate from existing data." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). Experts may "base an opinion on studies that are … analogous to the facts of the case." *United States v. Raytheon Co.* 2013 WL 5348571, at *8 (D. Mass. Sept. 23, 2013) (citing *Gen Elec.*, 522 U.S. at 146). This holds true unless "[t]he studies [a]re so dissimilar to the fact presented in this litigation" that the "opinion evidence … is connected to existing data only by the *ipse dixit* of the expert." *Gen Elec.*, 522 U.S. at 144 & 146. That is not the case here. Dr. V.R.'s opinion was expressly endorsed by the lead author of [redacted] in his testimony (V.R. Dep. at 29:24-30:2), who explained that "[t]here is nothing unique about the data in this case that would exempt it from the universal consensus of the privacy research community that there is no way to anonymize this level of precise geolocation information." PSOF ¶ 135.

**E. Geolocation Has Greater Capacity To Identify Than Names Or Addresses**

Defendant's challenges to Plaintiff's ability to extract class members' names from geolocation datasets disregards the fundamental nature of human mobility. In this regard, geolocation should be categorized as information that is *per se* identifying under the VPPA.

*1. Geolocation Patterns Are As Unique As Fingerprints*

[redacted] PSOF ¶ 64 (Dr. V.R. Decl. ¶ 52). In this regard, class members' datasets of at least 250 spatio-temporal points identify them in a far more precise manner than names or addresses, both of which are typically common to other people. *See Robinson*, 152 F. Supp. 3d at 181 ("As a practical matter, it is surely right – or at least often so – that addresses and even names cannot be linked to a specific person without access to certain additional information. Which John Smith, or which Main Street among thousands?").

*2. Geolocation Patterns Are Probative Of Future Locations*

Geolocation is not just more unique to people than names, addresses, and even fingerprints. It provides the ability to predict where a person will be at a given time. Academic research has found that "human trajectories are predictable, as humans spend most of their time at a small and well-defined number of locations to which they are likely to return" and that "40% of the time, individuals are found at their first two most frequent locations." PSOF ¶ 69. Defendant's expert acknowledged this. *Id.* (Dippon Dep. at 37:19-23) [redacted] This has serious implications. As another peer-reviewed study explained, "[m]isuse of location data can lead to damaged reputation, harassment, mugging, as well as attacks on an individual's home, friends or relatives." PSOF ¶ 159.

There is no more accurate way to identify an individual person than by pointing at them and saying "that is her." *See In re Hulu*, 2014 WL 1724344, at *11 ("One can be identified in many ways: by a picture, **by pointing**, by an employee number, by the station or office cubicle

where one works, **by telling someone what 'that person' rented**.") (emphasis added). That is what geolocation does. It identifies people in a manner that is completely unique to them and shows where they will be at a specific time and place. This is self-evident. Defendant touts the fact that Plaintiff's last known location was [redacted] but that one piece of data communicated [redacted] Paired with the other [redacted] spatio-temporal points, including his home, all someone would need to do to narrow down the search is to trace who is moving between the two addresses [redacted]

*3. Geolocation Patterns Reveal Invasive Details About People's Identities*

Geolocation patterns also reveal sensitive details about people that can lawfully be considered to be PII *per se*. For instance, in other VPPA litigation, courts have held that there is "a material issue of fact" as to whether a Facebook ID "identifies" a person, even where it does not lead to a profile with a "real name[]:"

> [A] Facebook user – **even one using a nickname** – generally is an identified person on a social network platform. The Facebook User ID is more than a unique, anonymous identifier. It personally identifies a Facebook user. That it is a string of numbers and letters does not alter the conclusion. Code is a language, and languages contain names, and the string is the Facebook user name. There is a material issue of fact that the information transmitted to Facebook was sufficient to identify individual consumers.

*In re Hulu*, 2014 WL 1724244, at *14 (emphasis added). Other courts have agreed that Facebook ID is *itself* PII without the need for further linkage to a person's name. *Czarnionka*, 2022 WL 17069810, at * 3 ("Facebook need not link the disclosed FID to personal information obtained elsewhere. The FID itself represents a particular individual."); *Sellers v. Bleacher Report, Inc.*, 2023 WL 4850180, at *4 (N.D. Cal. July 28, 2023) ("The FID is a unique identifier that is enough, on its own, to identify a person.").

Based on this reasoning, geolocation checks all the boxes of Facebook IDs and more. Whereas Facebook pages only include content someone *chooses* to list there, geolocation provides an extremely detailed and invasive look into someone's private life. "GPS monitoring generates a precise, comprehensive records of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *United States v. Jones*, 565 U.S. 400, 415 (2012) (Sotomayor, J, concurring). New York's Court of Appeals (its highest court) similarly noted that, "[d]isclosed in [GPS] data … will be trips the indisputably private nature of which takes little imagination to conjure: trips to the psychiatrist, the plastic surgeon, the abortion clinic, the AIDS treatment center, the strip club, the criminal defense attorney, the by-the-hour motel, the union meeting, the mosque, synagogue or church, the gay bar and on and on." *People v. Weaver*, 12 N.Y.3d 433, 441-42 (2009).

None of this is hypothetical. Dr. V.R. cites dozens of studies showing that [redacted] PSOF ¶ 91 (V.R. Decl. ¶ 68). In other words, geolocation provides "a profile of a person" and "a window into our loves, likes, and dislikes," which is exactly what Congress sought to keep private. S. Rep. 100–599 at 6-7.

Geolocation is perhaps the most unique, invasive, and descriptive manner of identification. That is why the California Consumer Privacy Act ("CCPA") considers "precise geolocation" to be "[s]ensitive personal information." Cal. Civ. Code § 1798.140(ae)(1)(C); *see also* Cal. Civ. Code § 1798.140(w). Geolocation fits the bill for what Congress anticipated when it left the definition

of PII open-ended when it declined to set an "exclusive" definition of PII under the statute.

### F. Email Addresses And AAIDs Give The Trier Of Fact An Additional Basis To Find That Defendant Disclosed Class Members' Identities

Defendant also argues that email addresses and AAIDs cannot be linked to Plaintiff and Class Members "by name." MSJ at 19. This is wrong for several reasons.

*First*, Defendant ignores the fact that these are elements of subclasses rather than the core Class. For these Subclass Members, the question is whether at least 250 points of geolocation *plus* e-mail addresses and/or AAIDs is sufficient to identify them. These elements give the trier of fact additional data points to consider and can be used in conjunction with geolocation to identify Subclass Members. But if the Court finds that geolocation is sufficient, these arguments are irrelevant. Defendant faults Plaintiff for not performing searches of e-mail addresses but ignores that e-mail addresses were an incomplete part of the data without geolocation.

*Second*, e-mail addresses are *per se* identifying under the VPPA. An e-mail address permits someone to directly contact (or harass) its owner in the same manner as a phone number, which the First Circuit has explained is PII. *Yershov II*, 820 F.3d at 486 (someone can be identified by "name, address, phone number, and more"). And courts uniformly consider e-mail addresses to be PII in a variety of contexts. *See*, *e.g.*, *Eichenberger*, 876 F.3d at 986 ("[A]n email address may very well readily enable an 'ordinary person' to identify an individual" under the VPPA); *United States v. Hastie*, 854 F.3d 1298, 1303 (11th Cir. 2017) (under Driver's Privacy Protection Act, "[e]mail addresses fall within the ordinary meaning of information that identifies an individual. They can prove or establish the identity of an individual."). Likewise, the CCPA defines "Personal Information" to include e-mail addresses. Cal. Civ. Code § 1798.140(v)(1). Indeed. Defendant's own privacy policy acknowledges that "email addresses" are "personally identifiable information." PSOF ¶ 161.

*Third*, Defendant's arguments that names cannot be linked to email addresses and AAIDs (MSJ at 18-19) is defied by academic studies to the contrary. PSOF ¶¶ 99, 150-151. Defendant presents no substantive response. And the First Circuit explicitly recognized that disclosure of AAIDs is actionable if they can be linked to people using external data sources. *Yershov II*, 820 F.3d at 486 (AAID was PII where external information could be used "to link the … device identifier to a certain person by name, address, phone number, and more.").

Defendant argues that it does not know "the identity of the individuals whose App usage is highlighted in Plaintiff's Complaint." MSJ at 19. This argument refers to the non-testifying expert that conducted testing of the App. They are not a Class Member. Notably, the geolocation collected still shows exactly where *within the office itself* they work. PSOF ¶ 92. This information is identifiable on its own. *In re Hulu*, 2014 WL 1724344, at *11 ("one can be identified" under the VPPA "by the station or office or cubicle where one works"). Defendant also speculates that some Class Members could have used "disposable email addresses" (MSJ at 19), but that would be a nonsensical thing to do. Class members were not required to provide their email addresses to use the Apps to begin with. DSOF ¶ 11. The only reason to provide an email address is if someone wants to receive e-mails. It makes no sense to use a fake one.

*Fourth*, AAIDs are *themselves* PII because they are used to connect specific people with targeted advertising of products or services that are relevant to them. PSOF ¶ 55 (Rosellini Dep. at 79:24-80:3) [redacted] This identifier is ubiquitous and used across various apps that also disclose other information about the consumer. PSOF ¶ 151 (Rosellini Dep. at 76:23-11) [redacted]

[redacted]

Protecting consumers from unwanted advertising was a significant concern in passing the VPPA. S. Rep. 100–599 at 7-8 ("Private commercial interests want personal information to better advertise their products … The computer makes possible the instant assembly of this information."). In this regard, a consumer's AAID is *the* identifier that permits third parties to advertise to consumers based on their video-viewing preferences that these third parties had no right to know about to begin with. *See Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (D.R.I. Sept. 12, 2022) ("The plaintiff sufficiently alleges that AAID is PII because it is 'unique both to a specific device and user' and allows Google 'to identify and track specific users across multiple electronic devices, applications, and services that a consumer may use.'") (quoting *Yershov II*, 820 F.3d at 484, 484 n.1).

*Finally*, AAIDs are disclosed alongside geolocation to Google, allowing it to connect the various geolocation points each time a transmission is sent with a given AAID. [redacted] PSOF ¶ 152 (V.R. Decl. ¶ 88). AAIDs augment the identifying capabilities of the geolocation data, in addition to their own identifying capabilities.

### G. The Ability To De-Anonymize Class Members From The Disclosed Data Will Be Proven In The Class Notice Process

Defendant's insistence that Plaintiff was required to fully de-anonymize all class members using the data it disclosed is misplaced for the reasons detailed above. It is also wrong because the First Circuit has established an objective and forward-looking standard for PII as information that is "reasonably and foreseeably likely" to identify a person. *See* Class Certification Reply § I.

However, even if Defendant were correct on these points, summary judgment would still be inappropriate. Because this is a class action, Class Members will require notice of this action and an opportunity to opt-out before trial can commence (or any dispositive decision can be rendered as to the class). *In re Motor Fuel Temperature Sales Prac. Litig.,* 2013 WL 4411092, at *3 (D. Kan. Aug. 14, 2013) ("the Court does not have jurisdiction over absent class members—and therefore a judgment is not binding on them—unless the Court has provided notice and an opportunity to opt out"). Both Dr. V.R. and Dr. Polakis have testified about the manner and methodology of how Class Members can be identified from the data disclosed to Braze and/or Google for purposes of class notice. PSOF ¶ 155.

Dr. V.R. lacked access to the complete records. *See Daubert* Opposition § I. Defendant failed to retain them and Plaintiff's counsel could not yet obtain these enormously voluminous records from third parties. Class Certification Reply § III.C. Defendant now seeks to exploit this by arguing that summary judgment should be granted because Plaintiff lacks records that [redacted] or Plaintiff could not yet access, notwithstanding that the undisputed evidence shows Defendant disclosed this data to Google and Braze. PSOF ¶¶ 1-29.

In the meantime, Plaintiff has two leading experts on retainer that are ready to prove their point upon receiving access to the data. What justification could there be for granting summary judgment and not letting them do what they say they can do? "The law … manifests a strong preference that cases be resolved on their merits." *Keane v. HSBC Bank USA*, 874 F.3d 763, 765 (1st Cir. 2017). Moreover, such a judgment would, in all likelihood, not result in ending this dispute. Because this is a putative class action, a judgment on this basis rather than on the merits would likely result in a new, duplicative action from an absent Class Member on whom the judgment is not binding. That cannot be the correct result.

## III. DEFENDANT DISCLOSED THE SPECIFIC VIDEO MATERIALS THAT WERE REQUESTED OR OBTAINED

### A. The Content IDs ("COIDs") Identify The Videos

Defendant argues a "'COID' is not a universally recognized designation of online content, it is a string of numbers and letters" that "HTV made up." MSJ at 16. That does not matter. "One could not skirt liability under the VPPA … by disclosing a unique identifier and a correlated lookup table." *In re Hulu Priv. Litig.*, 2014 WL 1724344, at *11.

Defendant next argues that "there is no evidence … that GAM or Braze … knows that a COID is associated with a specific article." MSJ at 16. *First*, this is irrelevant to Google, who [redacted] PSOF ¶ 23. *Adams v. America's Test Kitchen, LP*, 680 F. Supp. 3d 31, 42 (D. Mass. 2023) ("[A] simple visit to the URL would provide any third party who receives the information confirmation of the specific video requested or obtained.").

*Second*, Defendant [redacted] *Id.* ¶ 37. Braze also provided [redacted] *Id.* ¶ 31. [redacted] *Id.* ¶ 39 (Rosellini Dep. at 99:14-18). Rosellini explained that [redacted] *Id.* ¶ 40. None of this work could be possible without a mutual understanding of the meaning of COIDs. Braze could not [redacted] Moreover, as Defendant acknowledged, [redacted] *Id.* ¶ 33. And an article can be easily located by simply googling the COID with "Hearst" or the App name. PSOF ¶ 32. That is the exact type of "linkage" that the First Circuit held to be actionable in *Yershov II*.

### B. Defendant Violated The VPPA By Disclosing The Videos Class Members Requested Or Obtained

Defendant contends that Braze and Google are not notified if a video is watched, and for all they know, "the person may instead have merely read an article on the webpage (or opened the page and done nothing more." MSJ at 16. This is factually wrong. § III.D, *infra*. Regardless, disclosure of the [redacted] is sufficient for liability. As another court explained:

> NBCU faults the FAC for not alleging that Today.com disclosed to Facebook how the users interacted with Today.com's videos—for example, whether the user watched or merely accessed the video. **But NBCU has not identified any statutory text or case authority making liability turn on whether the plaintiff whose video access was disclosed had actually watched the video(s) at issue**. It would be surprising if the VPPA required such for liability. The statute, after all, was prompted by disclosure of the list of videos Judge Bork rented—not those he had viewed.

*Golden*, 688 F. Supp. 3d at 161 (emphasis added; cleaned up). Another court made the same point:

> The titles of the 146 films that Robert Bork and his family rented from the video store, which prompted Congress to enact this law, were just that: the titles affiliated with his video store account. In Bork's case, **there was no information about whether he actually watched all of the videos he and his family rented**. Similarly here, Plaintiffs have established that the Toledo Blade and the Post-Gazette send Meta the URL for the webpage Plaintiffs visit plus their unique FID. In some cases, the Toledo Blade and Post-Gazette send the video's file name also. This suffices.

*Collins v. Toledo Blade*, 720 F. Supp. 3d 543, 551 n.6 (N.D. Ohio 2024) (emphasis added); *see also Adams*, 680 F. Supp. 3d at 42 ("The fact that Pixel does not track whether a user plays, pauses, or otherwise interacts with the video is irrelevant to the alleged privacy violation…") (cleaned up).

Defendant relies on *Martin v. Meredith Corp.*, 657 F. Supp. 3d 277, 284 (S.D.N.Y. 2023) for this argument. Plaintiff respectfully submits that case was poorly reasoned and contradicted by the weight of authority to the contrary. *Sellers v. Bleacher Report, Inc.*, 2023 WL 4850180, at *4 (N.D. Cal. July 28, 2023) (distinguishing *Martin*). Regardless, it is inapposite since Defendant *did* disclose Plaintiff's and class members' interactions with the videos.

### C. Defendant Disclosed The Subject Matter Of The Videos In Violation Of The VPPA

Defendant also categorized its videos and [redacted] PSOF ¶ 19 [redacted]; *id.* [redacted] That is an independent basis for liability because even disclosing the *subject matter* of the video is still actionable. As the Senate Report explains:

> Disclosure of subject matter [of the videos] may be made only in instances where communications are sent directly to the consumer. Some video tape service providers sell limited types of videos. For example, a golf shop may rent or sell golf videos, or a continuity club may rent or sell only Star Trek videos. The disclosure of the cutometer lists of those providers indirectly would disclose the subject matter of the video. Similarly, some video tape service providers market their video tapes in subject matter categories such as action, romance, science fiction and the like.

S. Rep. 100-599 at 13. This is also evident from the VPPA's provision permitting a consumer's "name[] and address[]" to be disclosed if "the disclosure does not identify the title, description, or *subject matter* of any video tapes or other audio visual material." 18 U.S.C. § 2710(b)(2)(D)(ii) (emphasis added). There would be no need to reference the video's subject matter in the exception if the disclosure was otherwise already permitted. *See also Golden*, 6858 F. Supp. 3d at 160 n.10 (complaint stated a claim "regardless whether the 'title' of the viewed videos were disclosed" because "the disclosure of the URL identified the subject matter of the viewed video."). Here, [redacted] PSOF ¶ 20 (Reardon Dep. at 275:4-276:7). These are akin to the "golf" or "Star Trek" examples in the Senate Report.

### D. Defendant Disclosed The Actual Videos Requested Or Obtained

Defendant also discloses [redacted]

[redacted]

PSOF ¶¶ 13-25. Defendant submits a declaration claiming that [redacted] Rosellini Decl. ¶ 47. That is defied by the transmissions from Dr. Reardon's testing and Defendant's own source code. *See* PSOF ¶ 16. Testing by Dr. Vint, Defendant's own expert, also showed [redacted] *Id.* ¶ 17. Defendant does not explain the basis for this testimony or why the documentary evidence shows to the contrary.

Defendant argues that "a given article can have no video." MSJ at 16. But if there is no video, Braze and Google could not receive notifications that a video played on that article. Moreover, whether a video appeared on an article can be easily verified by visiting the article.

Defendant also argues that articles could have "multiple videos (which in turn may not even be directly related to the article)." *Id.* This is contradicted by the testimony of Defendant's corporate representative, who testified that [redacted] PSOF ¶ 166 (Rosellini Dep. at 71:17-24). The videos do not even have their own assigned names; they are clips that previously "aired live on a HTV news broadcast" relating to the article. DSOF ¶ 6. [redacted] PSOF ¶¶ 166-69. Regardless, when a consumer accesses an article with multiple videos, the consumer requests or obtains *all* of those videos. *See Collins,* 720 F. Supp. 3d at 551 n.6 ("In Bork's case there was no information about whether he actually watched all of the videos he and his family rented.").

Finally, Defendant argues "some of those videos may be live and some prerecorded." MSJ at 16. That is misleading. Plaintiff never "watched a live news broadcast on the WMUR mobile application." PSOF ¶ 111. More importantly, while there are "newscasts" shown live on the Apps

[redacted]

[redacted] PSOF ¶ 112 (Rosellini Dep. at 166:20-167:2). And Google [redacted] PSOF ¶ 113.

## IV. DEFENDANT KNOWINGLY DISCLOSED CLASS MEMBERS' PII

Defendant argues that "any disclosure of PII was not made 'knowingly.'" MSJ at 20. That is wrong. "[T]he term 'knowingly' does not necessarily have any reference to a culpable state of mind or to knowledge of the law. *Bryan v. U.S.*, 524 U.S. 184, 192 (1998). Instead, "the knowledge requisite to knowing violation of a statute is factual knowledge as distinguished from knowledge of the law." *Id.* (cleaned up).

The evidence here shows that Defendant knew exactly what it was doing. Its own privacy policy explicitly recognizes that emails addresses are PII. PSOF ¶ 161 (Ex. 51 at HTV-000120) [redacted] *id.* at HTV-000119 [redacted] It also acknowledges that [redacted] *Id.* ¶ 162. [redacted] PSOF ¶¶ 101-02. Defendant also explained that [redacted] PSOF ¶ 55 (Rosellini Dep. at 58:22-19:3) [redacted] *id.* ¶ 56 (Rosellini Dep. at 79:24-80:5) [redacted]

Defendant argues that it did not know "that a multi-step reverse engineering exercise … was possible" and that "Plaintiff's theory requires the use of data brokers to attempt to de-anonymize the data." MSJ at 21-22. As explained in Plaintiff's Class Certification Reply § VII, this is a silly caricature of Plaintiff's allegations; data brokers are not needed to establish liability but for class notice, where identification must be done at scale. Regardless, [redacted] PSOF ¶ 163. In addition, the First Circuit has already recognized that it was "firm and readily foreseeable" that geolocation would allow "most people to identify what are likely the home and work addresses of the viewer." *Yershov II*, 820 F.3d at 486. Because these categories of information are themselves PII, Defendant's absurd claim that it did not know they identified people is immaterial. *See Czarnionka*, 2022 WL 17069810, at *4 ("Plaintiff has plausibly alleged that the FID itself constituted PII. Knowledge of what Facebook might do with the disclosed information to yield PII is therefore unnecessary").

Defendant also argues that it did not know "Braze or GAM could … connect such persons to video content requested or viewed." MSJ at 21. In support of this argument, Defendant cites *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090,1091 (N.D. Cal. 2015), in which "[t]he user's identity and that of the video material were transmitted separately (albeit simultaneously)," and the plaintiff could not prove "that Hulu actually knew that Facebook might combine information that identified Hulu users with separate information specifying which video that user was watching." This opinion is non-binding and unpersuasive given it appears to conflict with *Yershov II*, 820 F.3d at 486, which suggests that Defendant was only required to know that it "disclosed information

reasonably and foreseeably like to reveal which … videos [the plaintiff] has obtained." And other courts have "held that disclosed information provides the requisite connection between the consumer and the … video material if the 'information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits.'" *Feldman v. Star Tribune Media Co. LLC*, 659 F. Supp. 3d 1006, 1020 (D. Minn. 2023) (quoting *In re Nickelodeon Cons. Priv. Litig.*, 827 F.3d at 284). These decisions have applied a far more lenient standard on the "connection" requirement than the one espoused by *Hulu*. Regardless, the evidence here satisfies even the *Hulu* standard. Defendant's transmissions to Google [redacted] PSOF ¶¶ 1-29. This was no accident: [redacted] PSOF ¶¶ 55-61.

Dr. Reardon's dynamic analysis also showed that [redacted] PSOF ¶ 48 (Reardon Rep. ¶ 38). This leaves no guesswork as to Braze's ability to link this information together. Indeed, the evidence shows [redacted] PSOF ¶¶ 34-35. That makes sense: Defendant specifically contracted with Braze to [redacted] PSOF ¶¶ 30-54. In fact, [redacted] *Id.* ¶ 49. This is clear evidence of knowledge.

## V. THE DISCLOSURES WERE NOT MADE IN THE ORDINARY COURSE OF BUSINESS

This Court already held that "marketing, advertising, and analytics do not fall within the [OCBE's] narrow list of permissible uses." *Saunders*, 711 F. Supp. 3d at 32 (cleaned up). Other

courts are in unanimous agreement. *Rancourt*, 2024 WL 381344, at *17 (disclosures of "App user data as part of its targeted advertising campaign which is intended to drive revenue … [and] better target ads does not constitute an intra-corporate disclosure or a disclosure in support of management operations."); *Louth*, 2022 WL 4130866, at *4 (disclosures "to measure analytics and increase advertising revenue … do not fall into the narrow categories statutorily defined as the [OCBE]") *Burdette v. FuboTV Inc.*, 2024 WL 2831466, at *5 (N.D. Ill. June 4, 2024) ("As targeted marketing and advertising analytics have only ballooned in complexity and pervasiveness … 'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities."); *Jackson v. Fandom, Inc.*, 2023 WL 4670285, at *5 (N.D. Cal. July 20, 2023) (disclosures "to collect analytical data about how users use its website and, in turn … target more specific ads to their users, which permits websites to increase profits" fell outside OCBE) (cleaned up); *Collins*, 720 F. Supp. 3d at 554-55 (rejecting argument that "the ordinary course of business encompasses advertising" or "marketing") (cleaned up).[1]

Defendant openly concedes that its disclosures to Google were [redacted] MSJ at 25. That is not a permissible purpose. Defendant argues this was necessary to [redacted] *Id.* at 25. Nonsense. Defendant could have [redacted] without disclosing Class Members' PII.

---

[1] Defendant's cited authorities fail to support its argument. In *Sterk v. Redbox Automated Retail, LLC*, 2013 WL 4451223, at *4 (N.D. Ill. Aug. 16, 2013), *aff'd*, 770 F.3d 618, 624 (7th Cir. 2014), the only disclosures made to a third party were for "customer support services" or "to respond to customer service requests." *Sterk*, 2013 WL 4451223, at *4. And as more recent courts in the Seventh Circuit have recognized, *Sterk* holds that "advertising does not fall within VPPA's 'ordinary course of business' exception," and that "'order fulfillment' and 'request processing' cannot reasonably be synonymous with marketing activities." *Burdette*, 2024 WL 2831466, at *5. *Rodriguez v. Sony Computer Ent. Am., LLC*, 801 F.3d 1045, 1054 (9th Cir. 2015), is also distinguishable because that case involved "intra-corporate disclosures" between two Sony entities, not the disclosure of information to distinct third party entities like Google and Braze.

Defendant argues it disclosed PII to Braze [redacted] *Id.* at 23. But even if that explained why Braze needed Class Members' [redacted] it would not explain why it needed to know [redacted] Defendant's disclosures to Braze [redacted] These disclosures were made for [redacted] That is why Braze's Statement of Work included [redacted] PSOF ¶ 31. That means Braze provided [redacted] Rosellini Dep. at 95:14-23. Braze also provided [redacted] PSOF ¶ 31. Those include suggestions [redacted] *Id.* ¶ 39 (Rosellini Dep. at 99:14-18). Defendant also [redacted] *Id.* ¶ 43. This was prohibited.[2]

Notably, Defendant fails to explain why it needed to disclose [redacted] For instance, to [redacted] or to provide a weather update, Defendant might want to distinguish between someone in Charlestown versus Hyde Park. But there was *no reason* why disclosure [redacted] (PSOF ¶ 92) was necessary, meaning the disclosure cannot be "incident to" the ordinary course of business. *Incident*, BLACK'S

---

[2] At best, Defendant's disclosures to Braze [redacted] Such disclosures are only permitted for marketing purposes if (i) Defendant has provided App users "with the opportunity, in a clear and conspicuous manner, to prohibit such disclosure," and (ii) the disclosure only identifies the "*subject matter* of such materials." 18 U.S.C. §§ 2710(b)(2)(D)(i)-(ii) (emphasis added). Defendant did not permit consumers to opt-out of these disclosures "in a clear and conspicuous manner." And Defendant [redacted] *See* PSOF ¶¶ 13-17, 32-33.

LAW DICTIONARY (12 ed. 2024) ("Dependent on, subordinate to, arising out of, or otherwise connected with"). Moreover, [redacted] *See* PSOF ¶ 47 (Rosellini Dep. at 126:17-127:13) [redacted]

Finally, Defendant argues the disclosures were permitted based on "common law agency principles." MSJ at 25. The VPPA contains no general exception for disclosure to "agents." Instead, it broadly prohibits a disclosure to any "person," subject to narrow exceptions that do not include agency. 18 U.S.C. § 2710(b)(1). In any event, neither Google nor Braze are "agents" of Defendant. [redacted] PSOF ¶ 61. [redacted] *Id.* ¶ 54.[3]

## VI. VPPA VIOLATIONS GIVE RISE TO ARTICLE III STANDING

Defendant contends that Plaintiff "has not suffered a harm traditionally recognized under common law or sought to be remedied by the VPPA." MSJ at 26. Yet, every "circuit court[] that ha[s] addressed the issue of standing under the VPPA—as well as every district court—have reached the opposite conclusion." *Yershov v. Gannett Satellite Info. Network, Inc.*, 204 F. Supp. 3d 353, 361 (D. Mass. 2016). "The VPPA plainly provides plaintiffs … who allege wrongful

[3] By contrast, the Michigan analog to the VPPA at issue in *Boelter* "prohibit[ed] a person, *or an employee or agent* … from disclosing a customer's personal information." *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 191 (S.D.N.Y. 2017) (emphasis added; internal quotations omitted). Thus, "the prohibition against disclosure by an employee or agent would be unnecessary if the disclosure to an employee or agent would itself be actionable." *Id.* The VPPA contains no such textual hook, instead including the OCBE for specific types of disclosures rather than a carveout for "agents" generally. *See Cain v. Redbox Automated Retail, LLC*, 981 F. Supp. 2d 674, 678 (E.D. Mich. 2013) (discussing differences between VPPA and Michigan analog).

disclosure of their PII, with standing and a right to relief." *Id.* at 362 (cleaned up); *Eichenberger*, 876 F.3d at 983 (noting the VPPA "protects privacy interests more generally by ensuring that consumers retain control over their personal information," not just "against harms such as embarrassment and harassment"); *see also Boelter v. Hearst Communications, Inc.*, 2016 WL 361554, at *3 (S.D.N.Y. Jan. 28, 2016) ("If Defendant violated the statute by disclosing Plaintiff's personal information, it deprived Plaintiff of a right to which she was particularly entitled by law, constituting an injury-in-fact sufficient to confer standing."). Defendant again argues that Plaintiff does not consider "his viewing of news and weather … sensitive or private." MSJ at 27. That is wrong. *See* Plaintiff's Class Certification Reply § V.

## VII. THE VPPA DOES NOT VIOLATE THE FIRST AMENDMENT

### A. Intermediate Scrutiny Applies To The VPPA

The "speech" at issue here—Defendant's disclosures of PII to Google and Braze—were for commercial purposes (PSOF ¶¶ 30-61) and "solely motivated by the desire for profit." *Saunders*, 711 F. Supp. 3d at 33 n.8 (cleaned up). Likewise, the speech is "solely in the individual interest of the speaker [*i.e.*, Defendant] and its specific business audience and does not implicate matters of public concern." *Id.* (cleaned up).

Defendant argues the speech here is subject to strict scrutiny because either the VPPA is a content-based restriction—applying only to "video tape service provide[s]" who disclose "personally identifiable information" (MSJ at 27 n.21)—or because it "regulates non-commercial and commercial speech alike" (MSJ at 27). As to the former, there is "decades of jurisprudence holding that commercial speech, and speech like it—which, inherently, requires a content-based distinction—warrants less First Amendment protection." *Boelter v. Hearst Communications, Inc.*, 192 F. Supp. 3d 427, 447 n.10 (S.D.N.Y. 2016); *see also Stark*, 656 F. Supp. 3d at 1032 ("Even where a restriction is content-based, it is subject to lesser scrutiny when the speech at issue falls

within select categories of speech including commercial speech.") (cleaned up). Regardless, the speech here does not discriminate based on viewpoint and the rationale for its enactment was "decidedly content agnostic." *TikTok Inc. v. Garland*, 604 U.S. ---, 2025 WL 2222571, at *6 (U.S. Jan. 17, 2025). As to the latter, the concern animating the VPPA's enactment was commercial speech. *See* S. Rep. No. 100–599, at 6-7 ("Every day Americans are forced to provide *to businesses* and others personal information…") (emphasis added). Specifically, "[t]he V[P]PA restricts the sellers of certain products from disclosing the identity of individuals who purchase those products. This speech is solely related to the economic interests of the speaker and the audience." *Boelter*, 192 F. Supp. 3d at 445 (cleaned up). Even the Judge Bork incident had a "commercial character." *Id.* at 446. And because the speech here is commercial, Defendant "may not challenge th[e] [VPPA] on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber*, 458 U.S. 747, 767 (1982).

**B. The VPPA Survives Intermediate Scrutiny**

Defendant, as the party questioning the VPPA's constitutionality, "has the burden of proving the absence of any conceivable grounds upon which the statute may be supported," and "every presumption must be made in favor of the validity of statute[] enacted." *Mile Road Corp. v. City of Boston*, 345 Mass. 379, 382 (1963) (cleaned up). It fails to meet this burden.

The VPPA protects a substantial government interest: preserving "personal privacy with respect to the rental, purchase or delivery of video tapes or similar audio visual materials" and "the sanctity of personal privacy." *Saunders*, 711 F. Supp. 3d at 33. Defendant contends the VPPA does not "directly advance" this interest because neither Congress nor Therrien "produced studies or reports" regarding the "fear of public embarrassment or ridicule from mass publication in a newspaper of one's personal list of feature-length film rental history." MSJ at 29. But this was *not* the principal interest behind the VPPA's enactment. The VPPA protects the interests of

consumers not only in the privacy of their PII, but in their right to *control* the disclosure of that information. *Id.*; *see also* S. Rep. No. 100–599 at 7 (noting "the trail of information generated by every transaction … create[s] privacy interests that directly affect the ability of people to express their opinions, to join in association with others, and to enjoy the freedom and independence that the Constitution was established to safeguard."). "Restricting Hearst from disclosing to third parties the precise videos that plaintiffs viewed alongside plaintiffs' PII directly and materially advances that interest." *Saunders*, 711 F. Supp. 3d at 33; *see also* Therrien Dep. at 137:21-138:10 [redacted]

Defendant also contends the VPPA is not "narrowly drawn" because the VPPA is both underinclusive and overinclusive. *See* MSJ at 30. As a general matter, the VPPA is narrowly drawn because "[t]he law limits the dissemination of precisely the kind of information with which the state is concerned, and targets those most likely to disseminate it." *Boelter*, 192 F. Supp. 3d at 449. At the same time, the VPPA "is not absolute," as it includes several exceptions (like consent from the consumer). *Id.* "To the extent that [Defendant] believes the statute may impose too many burdens when applied to the realities of modern technologies … the question of whether the statute's scope should be narrowed ultimately rests with the Legislature, not the courts." *Shah v. Fandom, Inc.*, --- F. Supp. 3d ---, 2024 WL 4539577, at *6 (N.D. Cal. Oct. 21, 2024).

Regardless, the VPPA is neither underinclusive nor overinclusive. As to underinclusivity, Defendant contends "there's no basis to protect viewing of the app's 'prerecorded' content but not 'live' content." MSJ at 30. But "the First Amendment imposes no freestanding underinclusiveness limitation. A State need not address all aspects of a problem in one fell swoop." *Williams-Yulee v. Fl. Bar*, 575 U.S. 433, 449 (2015) (cleaned up). Thus, courts have "upheld laws—even under strict scrutiny—that conceivably could have restricted even greater amounts of speech in service

of their stated interests." *Id.* (cleaned up). A law is underinclusive "only to the extent that … a law does not actually advance a sufficiently important interest, or raises doubts about whether the government is in fact pursuing the interest it invokes." *1A Auto, Inc. v. Dir. of Off. of Campaign and Pol. Fin.*, 480 Mass. 423, 438 (2018) (cleaned up). So, the fact the VPPA ostensibly protects only pre-recorded videos but not live videos does not render the VPPA impermissibly underinclusive, as Defendant cannot show that the VPPA was passed based on some ulterior motive. *1A Auto*, 480 Mass. at 438 (statute not underinclusive "unless the failure to include other entities within its scope demonstrates … its true purpose is to … favor[] the political viewpoints of those entities that fall outside its scope.").[4] As to overbreadth, Defendant contends the statute is overly broad because it "punish[es] speech relating to *all* 'prerecorded' 'audio visual materials,' no matter how anodyne," and "it would punish those so-called 'disclosures' even when there was no public disclosure at all." MSJ at 30. There, of course, was a public disclosure here to third parties, and the disclosure to these third parties impaired Plaintiff's privacy. § VI, *supra*. But more to the point, it is ironically *Defendant* whose argument here would turn the VPPA into a content-based restriction that prohibits the disclosure of video-viewing information only if it concerns a certain subject matter. *See Boelter v. Advance Magazine Publishers Inc.*, 210 F. Supp. 3d 579, 601 (S.D.N.Y. 2016) ("[T]here is no suggestion that the PPPA was enacted to target the message of particular speakers."). Naturally, the Court should not adopt such an interpretation of the statute, nor strike the statute down for being content neutral. Further, what is "anodyne" is highly subjective, as even videos about the weather are able to reveal one's likes and interests. Thus, the VPPA is not overly broad because it does not discriminate based on content.

[4] To the extent the constitutionality of the VPPA hinges on whether the statute applies to both pre-recorded and live video content, the Court should hold that it does pursuant to the canon of constitutional avoidance. *Clark v. Martinez*, 543 U.S. 371, 385 (2005).

Dated: February 7, 2025

Respectfully submitted,

By: */s/ Yitzchak Kopel*
Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Pro Hac Vice*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2025, I electronically filed the foregoing document with the Court's CM/ECF system, which will provide e-mail notice to all counsel of record.

By: *_/s/ Yitzchak Kopel_*
Yitzchak Kopel