**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| CHARLES THERRIEN, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HEARST TELEVISION, INC.,<br><br>Defendant. | Case No. 1:23-cv-10998<br><br>Hon. Richard G. Stearns |

# PLAINTIFF'S STATEMENT OF MATERIAL FACTS PURSUANT TO LOCAL CIVIL RULE 56.1 IN SUPPORT OF HIS OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Dated: February 7, 2025

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Pro Hac Vice*)
Max S. Roberts (*Pro Hac Vice*)
Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr. (BBO # 566161)
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

# TABLE OF CONTENTS

**PAGE**


PLAINTIFF'S RESPONSES TO DEFENDANT'S 56.1 STATEMENT .................................... 1

I. THE HTV MOBILE APPS. ........................................................................ 1

II. PLAINTIFF'S USE OF THE WMUR APP. ........................................................ 4

III. HTV MOBILE APP CONTENT. ................................................................. 18

IV. HOW CONTENT IS PUBLISHED ON THE HTV APPS. ........................................... 22

V. USER ACCESS TO THE HTV APPS. ............................................................ 26

VI. HTV'S USE OF BRAZE. ....................................................................... 32

A. App Installation. ............................................................................. 38

B. Geolocation. ................................................................................... 40

C. COID ........................................................................................... 43

D. Video Count. .................................................................................. 45

E. AAID. .......................................................................................... 47

VII. HTV'S USE OF GOOGLE AD MANAGER (GAM). ............................................. 47

VIII. ADVERTISEMENTS IN THE HTV APPS. ..................................................... 50

IX. HEARST TELEVISION. ........................................................................ 52

PLAINTIFF'S SEPARATE 56.1 STATEMENT OF FACTS ............................................ 56

I. DEFENDANT DISCLOSED PII TO BRAZE AND GOOGLE ........................................ 56

II. DEFENDANT DISCLOSED PII TO BRAZE FOR TARGETED MARKETING AND ANALYTICS ........................................................................................ 60

III. DEFENDANT DISCLOSED PII TO GOOGLE FOR TARGETED ADVERTSING ............................................................................................ 64

IV. GEOLOCATION, E-MAIL ADDRESS, AND AAID ARE REASOANBLY AND FORSEEABLY LIKELY TO IDENTIFY CLASS MEMBERS ....................................... 66

V. THE COID/ARTID AND URL OF THE ARTICLES DISCLOSES THE VIDEOS REQUESTED OR OBTAINED BY CLASS MEMBERS, AS WELL AS THEIR SUBJECT MATTER ................................................................................. 83

VI. DEFENDANT KNOWINGLY VIOLATED THE VPPA ............................................... 84

## PLAINTIFF'S RESPONSES TO DEFENDANT'S 56.1 STATEMENT

### I. THE HTV MOBILE APPS.

1. HTV (or affiliated entities) operates 28 local broadcast television stations that produce news and weather content in various geographic media markets in the United States, including WMUR-TV in Manchester, NH and WCVB-TV in Boston, MA. Other stations include WBBH-TV in Fort Myers/Naples, FL, WESH-TV in Orlando, FL, KCRA-TV in Sacramento, CA, WTAE-TV in Pittsburgh, PA, WBAL-TV in Baltimore, MD, KMBC-TV in Kansas City, MO, WLWT-TV in Cincinnati, OH, WISN-TV in Milwaukee, WI, WPBF-TV in West Palm Beach, FL, WYFF-TV in Greenville/Spartanburg, SC, KOCO-TV in Oklahoma City, PA, WVTM-TV in Birmingham, AL, WGAL-TV in Lancaster/Harrisburg, PA, KOAT-TV in Alburquerque, NM, WXII-TV in Greensboro/High Point/Winston-Salem, NC, WLKY-TV in Louisville, KY, WDSU-TV in New Orleans, LA, KCCI-TV in Des Moines, IA, KETV in Omaha, NE, WMTW-TV in Portland/Auburn, ME, WJCL-TV in Savannah, GA, WAPT-TV in Jackson, MS, WPTZ-TV in Burlington, VT/ Plattsburgh, NY, KHBS-TV/KHOG-TV in Fort Smith/Fayetteville, AR and KSBW-TV in Monterey/Salinas, CA. Declaration of Andrea Butler dated January 17, 2025 ("Butler Decl.") at. Ex. A, Rosellini Decl. ¶ 5; Ex. B, Rosellini Dep., 9:15-24.

**Plaintiff's Response: Admit**

2. Each of the listed stations broadcasts live local news and weather programming to viewers on TV. Ex. A, Rosellini Decl. ¶ 6, Ex. B, Rosellini Dep. at 10:10-21.

**Plaintiff's Response: Admit**

3. HTV stations' live local news and weather programming also are available for viewing on mobile applications operation by HTV (the "HTV Apps").[1] Ex. A, Rosellini Decl. ¶ 6;

[1] Collectively HTV's mobile applications are referred to herein as the "HTV Apps", and any

Ex. B, Rosellini Dep. at 10:13-12:11 & errata.

**Plaintiff's Response: Admit**

4. The HTV Apps also publish news and weather articles for access by users at any time. Ex. A, Rosellini Decl. ¶ 6; Ex. B, Rosellini Dep. at 10:13-11:4 & errata.

**Plaintiff's Response: Admit**

5. News and weather articles on HTV Apps may include one or multiple videos, or no videos at all. Ex. A, Rosellini Decl. ¶ 7; Ex. B, Rosellini Dep. at 69:13-21, 198:4-199:9 & errata; *see also* Ex. D, Reardon Dep. at 127:15-131:3.

**Plaintiff's Response: Admit**

6. The majority of those videos, when present, have aired live on a HTV news broadcast. Ex. A, Rosellini Decl. ¶ 7.

**Plaintiff's Response: Admit**

7. Some articles include live video. Ex. A, Rosellini Decl. ¶ 7.

**Plaintiff's Response: Objection. This statement is inadmissible hearsay pursuant to Fed. R. Civ. P. 802. It also violates the "best evidence rule." Fed. R. Evid. 1002. Subject to these objections, Plaintiff denies this statement as there is no admissible basis for this testimony.**

8. The Apps provide users access to live news and weather feeds. Ex. A, Rosellini Decl. ¶ 7; Ex. B, Rosellini Dep. at 10:13-12:11 & errata.

**Plaintiff's Response: Admit**

9. The Apps provide users access to news and weather articles. Ex. A, Rosellini Decl. ¶ 7; Ex. B, Rosellini Dep. at 10:13-12:11 & errata.

---

individual app is an "HTV App" or "App".

**Plaintiff's Response: Admit**

10. A user does not need to pay HTV in order to access the content and HTV has no mechanism to collect payments from mobile application users. Ex. A, Rosellini Decl. ¶ 8; *see also* Ex. B, Rosellini Dep. at 18:24-19:18 & errata.

**Plaintiff's Response: Admit as to monetary payment, but deny because Plaintiff "paid" by downloading the app and providing his PII. Butler Decl. Ex. C ("Therrien Dep.") at 92:10-19 (downloading the app); *id.* 93:10-14 (providing consideration in the form of his PII).**

11. A user is not required to sign up for an account in order to access the content on HTV's mobile applications, or to watch videos. Ex. A, Rosellini Decl. ¶ 9; Ex. B, Rosellini Dep. at 52:2-24, 158:25-159:9, 110:12-20; *see also* Ex. D, Reardon Dep. at 98:17-21.

**Plaintiff's Response: Admit**

12. A user does not need to grant geolocation permission to install or use the HTV Apps or to watch videos. Ex. A, Rosellini Decl. ¶ 9, Ex. B; Rosellini Dep. at 52:2-24, 158:25-159:9, 110:12-20.

**Plaintiff's Response: Admit**

13. A user does not need to provide an email address to install or use the HTV Apps or to watch videos. Ex. A, Rosellini Decl. ¶ 9; Ex. B, Rosellini Dep. at 91:20-92:6, 110:12-20.

**Plaintiff's Response: Admit**

14. A user does not need to grant permission to share a device mobile advertising ID ("AAID" or "MAID") to install or use the HTV Apps or to watch videos. Ex. A, Rosellini Decl.¶¶ 9 & 12; Ex. B, Rosellini Dep. at 73:2-18, 77:22-78:17; *see also* Ex. D, Reardon Dep. at 106:9-16.

**Plaintiff's Response: Admit**

15. An App user does not need to permit push notifications or "push" alerts in order to

install or use the HTV Apps or to watch videos. Ex. B, Rosellini Dep. at 126:14-23; Ex. A, Rosellini Decl. ¶ 10; *see also* Ex. B, Rosellini Dep. at 126:24-127:22.

**Plaintiff's Response: Admit**

16. An App user does not need to subscribe to email newsletters in order to install or use the HTV Apps or to watch videos. Ex. B, Rosellini Dep. at 126:14-127:22; *see also* Ex. A, Rosellini Decl. ¶ 10.

**Plaintiff's Response: Admit**

17. HTV does not request or obtain a user's name, street address or phone number from HTV App users. Ex. A, Rosellini Decl. ¶ 9.

**Plaintiff's Response: Deny. Defendant requests geolocation, e-mails address, AAID, and other information from users—which Defendant then discloses to Braze and Google—that readily permit Defendant and third parties to infer a user's name, street address, and/or phone number. *See, e.g.*, PSOF ¶¶ 4-6, 10-12, 26-29, 62, 70-74, 77-79, 90, 93, 99, 102-103, 107-108, 110, 114, 125, 145, 150-151.**

18. HTV's news and weather content is supported by digital advertising. Ex. B, Rosellini Dep. at 18:24-19:18 & errata; Ex. A, Rosellini Decl. ¶¶ 29, 55; *see also* Ex. B, Rosellini Dep. at 22:8-13 & errata.

**Plaintiff's Response: Admit**

## II. PLAINTIFF'S USE OF THE WMUR APP.

[redacted]

[redacted]

[redacted]

28. Plaintiff is an insurance broker at a business he established in 2007 called Petra Insurance. Ex. C, Therrien Dep. at 21:8-15, 43:4-24.

**Plaintiff's Response: Admit**

[redacted]

**Plaintiff's Response: Admit**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Plaintiff's Response: Objection. The number of times the AAID may have been reset on the phone prior to the date Plaintiff purchased it is irrelevant, and leads to unfair prejudice, confusion of the issues, and is misleading the jury. *See* Fed. R. Evid. 402 & 403.**

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

**Plaintiff's Response: Admit**

[redacted]

**Plaintiff's Response: Admit**

## III. HTV MOBILE APP CONTENT.

90. Articles on the Apps may contain live videos, videos that had previously aired on a news broadcast, other video content, or no videos at all. Ex. A, Rosellini Decl. ¶ 7; Ex. B, Rosellini Dep. at 10:4-11:4, 70:11-23; *see also* Ex. D, Reardon Dep. at 130:24-131:3.

**Plaintiff's Response: Objection. This testimony is inadmissible hearsay pursuant to Fed. R. Civ. P. 802. It also violates the "best evidence rule." Fed. R. Evid. 1002. Subject to these objections, Plaintiff denies this statement, as there is no admissible basis for this testimony.**

91. The subject matter of videos included in articles may directly relate to the content of the article or it may not. Ex. B, Rosellini Dep. at 70:11-71:24; Ex. A, Rosellini Decl. ¶ 52.

**Plaintiff's Response: Objection. This testimony violates the "best evidence rule." Fed. R. Evid. 1002. Plaintiff also objects to the admissibility of Butler Decl. Ex. A ("Rosellini Decl.") ¶ 52 because it contradicts Mr. Rosellini's prior deposition testimony.** [redacted]

[redacted] **Subject to these objections, Plaintiff denies, as there is no admissible basis for this testimony.**

92. HTV articles are published at unique URLs. A URL is the equivalent of an address or location on the Internet. Ex. B, Rosellini Dep. at 90:16-17; Ex. A, Rosellini Decl. ¶ 36.

**Plaintiff's Response: Admit**

93. HTV articles may be updated one or more times after their initial publication. Ex. A, Rosellini Decl. ¶¶ 33, 34.

**Plaintiff's Response: Objection. This testimony violates the "best evidence rule." Fed. R. Evid. 1002. Defendant has not produced documentary evidence reflecting updates to any article on the apps. Subject to these objections, Plaintiff denies, as there is no admissible basis for this testimony.**

94. An article is considered "updated" if the content changes in some way. This can include adding, removing, or replacing video. Ex. A, Rosellini Decl. ¶ 33.

**Plaintiff's Response: Objection. This testimony violates the "best evidence rule." Fed. R. Evid. 1002. Defendant has not produced documentary evidence reflecting updates to any article on the Apps. Subject to these objections, Plaintiff denies, as there is no admissible basis for this testimony.**

95. Articles related to major weather events (storms, power outages) or breaking news (current law enforcement matters) are often updated one or more times. Ex. A, Rosellini Decl. ¶ 33.

**Plaintiff's Response: Objection. This testimony violates the "best evidence rule." Fed. R. Evid. 1002. Defendant has not produced documentary evidence reflecting updates**

**to any article on the Apps. Subject to these objections, Plaintiff denies, as there is no admissible basis for this testimony.**

96. An article could contain live video content at the time it is first published, but later include no video, or a replay of some, or all, of the earlier live video. Ex. A, Rosellini Decl. ¶ 33.

**Plaintiff's Response: Objection. This testimony violates the "best evidence rule." Fed. R. Evid. 1002. Defendant has not produced documentary evidence of any article purporting to portray live video on the Apps. Subject to these objections, Plaintiff denies, as there is no admissible basis for this testimony.**

97. Users accessing an article at one point in time may see a live video (or videos), and users accessing an article at a later point in time may see no video, a different live video, only replayed video, or some combination of live and replayed videos. Ex. A, Rosellini Decl. ¶ 33.

**Plaintiff's Response: Objection. This testimony violates the "best evidence rule." Fed. R. Evid. 1002. Defendant has not produced documentary evidence of any article purporting to portray live video on the Apps. Subject to these objections, Plaintiff denies, as there is no admissible basis for this testimony.**

98. Only the then-current version of an article is available to be viewed in the App at any given time. Ex. A, Rosellini Decl. ¶ 34.

**Plaintiff's Response: Admit**

[redacted]

[redacted]

[redacted]

## IV. HOW CONTENT IS PUBLISHED ON THE HTV APPS.

103. Computer code (aka "source code" or "code base") controls how the HTV Apps function, including how and where editorial content appears. Ex. A, Rosellini Decl. ¶ 36; Ex. B, Rosellini Dep. at 62:12-18.

**Plaintiff's Response: Admit**

[redacted]

[redacted]

**Plaintiff's Response: Admit**

108. Each published article corresponds to a unique URL. Ex. B, Rosellini Dep. at 81:5-7; Ex. A, Rosellini Decl. ¶ 36.

**Plaintiff's Response: Admit**

[redacted]

[redacted]

[redacted]

[redacted]

**Plaintiff's Response: Admit**

## V. USER ACCESS TO THE HTV APPS.

125. To access news and weather content on a station's mobile App, a potential user would need to visit the applicable "app store" on their device and select the HTV App they want to download. Ex. A, Rosellini Decl. ¶ 40; Ex. C, Therrien Dep. at 113:17-19; Ex. E, Saunders Dep. at 82:16-83:16.

**Plaintiff's Response: Admit**

126. In the app stores, HTV provides public facing disclosures concerning data that the Apps collect and share that are available for potential App users to read before they download an HTV App, including summaries of HTV's Privacy Notice and data sharing practices. Ex. B, Rosellini Dep. at 148:9-21; Ex. A, Rosellini Decl. ¶ 40; Ex. K, HTV Privacy Notice at HTV-0000119-128; *see also* Ex. C, Therrien Dep. at 113:24-114:3, 130:9-131:1; Ex. E, Saunders Dep. at 82:16-83:16.

**Plaintiff's Response: Admit**

127. The app stores and the Apps themselves include links to HTV's applicable Privacy Notice. Ex. A, Rosellini Decl. ¶ 40; Ex. B, Rosellini Dep. at 148:9-21; *see also* Ex. C, Therrien Dep. at 113:24-114:3, 130:9-131:1; Ex. E, Saunders Dep. at 82:16-83:16, 122:1-9; Ex. K, HTV Privacy Notice at HTV-0000119-128.

**Plaintiff's Response: Admit**

128. Once the user downloads the HTV App to their device, they are prompted through a series of options to customize their use of the App. Ex. A, Rosellini Decl. ¶ 10.

**Plaintiff's Response: Admit**

129. Users have the option to request an array of "push" news and/or weather alerts and/or notifications. Ex. A, Rosellini Decl. ¶ 10; Ex. B, Rosellini Dep. at 211:25-212:6; Ex. C, Therrien Dep. at 112:2-113:16.

**Plaintiff's Response: Admit**

130. If users request to receive "push" notifications, users have the option to enable location services. Ex. A, Rosellini Decl. ¶¶ 10, 45; Ex. B, Rosellini Dep. at 52:12-20; Ex. C, Therrien Dep. at 112:2-113:16, 114:18-115:17; Ex. D, Reardon Dep. at 94:5-16, 95:1-8.

**Plaintiff's Response: Admit**

131. If a user chooses to share geolocation at all, users can choose how and when they share geolocation: once, always, or only when using the App. Ex. A, Rosellini Decl. ¶ 10; *see also* Ex. C, Therrien Dep. at 112:2-113:16, 114:18-115:17.

**Plaintiff's Response: Admit**

[redacted]

**Plaintiff's Response: Admit**

133. Separate from HTV App installation, certain Android and Apple devices or operating systems have settings that permit users to disable or enable the sharing of geolocation. Ex. A, Rosellini Decl. ¶ 11; Ex. D, Reardon Dep. at 91:12-24, 92:16-93:15; 106:2-8.

**Plaintiff's Response: Admit**

134. Users may disable alerts, notifications, and location sharing at any time. Ex. A, Rosellini Decl. ¶ 10.

**Plaintiff's Response: Admit**

135. At App installation, there also is an option for the user to provide an email address to sign up to receive emails. Ex. A, Rosellini Decl. ¶ 10; *see also* Ex. B, Rosellini Dep. at 110:12-20, 115:23-116:22; Ex. C, Therrien Dep. at 112:2-113:16; Ex. D, Reardon Dep. at 97:2-13.

**Plaintiff's Response: Admit**

136. Users may unsubscribe from emails at any time. Ex. A, Rosellini Decl. ¶ 10.

**Plaintiff's Response: Admit**

137. A "mobile advertising ID" (known as "AAID") is a string of numbers and letters used in connection with displaying advertisements on a mobile device. Ex. A, Rosellini Decl. ¶ 12; Ex. B, Rosellini Dep. at 37:18-38:17, 73:8-74:8 & errata; Ex. H, Vint Decl. ¶¶ 9, 22, 29.

[redacted]

138. In order for HTV to use a device's AAID, users must give HTV permission to do so. Ex. A, Rosellini Decl. ¶ 12; Ex. B, Rosellini Dep. at 73:8-74:8 & errata; Ex. D, Reardon Dep. at 50:4-52:18; *see also* Ex. H, Vint Decl. ¶¶ 9-11.

[redacted]

139. These permissions may be enabled or disabled at any time. Ex. D, Reardon Dep. at 39:10-20, 50:4-52:18; Ex. A, Rosellini Decl. ¶ 12; Ex. B, Rosellini Dep. at 73:8-74:8 & errata; Ex. H, Vint Decl. ¶¶ 9-14, 21-29.

**Plaintiff's Response: Admit**

140. Users may reset or permanently delete an AAID, or "opt out" of having App developers use an AAID altogether. Ex. D, Reardon Dep. at 39:10-20, 50:4-52:18; Ex. F, Vallina-Rodriguez Dep. at 318:18-319:4; Ex. H, Vint Decl. ¶¶ 9-11, 14; Ex. B, Rosellini Dep. at 74:19-76:14.

**Plaintiff's Response: Admit**

[redacted]

142. HTV uses AAIDs consistent with the permission a user sets; HTV does not use an AAID without permission. Ex. A, Rosellini Decl. ¶ 12; *see also* Ex. D, Reardon Dep. at 49:10-50:9, 106:9-16; Ex. H, Vint Decl.¶¶ 9-19.

**Plaintiff's Response: Admit**

143. An AAID is unique to a device. Ex. D, Reardon Dep. at 38:18-40:10; Ex. F, Vallina-Rodriguez Dep. at 316:17-317:6, 317:23-318:17; Ex. A, Rosellini Decl. ¶ 12; Ex. B, Rosellini Dep. at 73:24-74:8; Ex. H, Vint. Decl. ¶ 9.

**Plaintiff's Response: Admit**

144. An AAID is not associated with a person's name or address. Ex. D, Reardon Dep. at 38:18-40:10; Ex. F, Vallina-Rodriguez Dep. at 316:17-317:6, 317:23-318:17; Ex. A, Rosellini Decl. ¶ 12; Ex. B, Rosellini Dep. at 73:24-74:16; Ex. H, Vint Decl. ¶ 9.

**Plaintiff's Response: Deny. Name and address can be readily inferred from AAID. *See* V.R. Rep. ¶ 96 ("The large variety of data brokers and identity management solutions available in the market make the deanonymization of AAIDs and emails trivial, even facilitating the automatic bridging of geolocation information with one's name, home and work addresses, and other sensitive personal data and attributes using very basic data analysis techniques.").**

145. Video autoplay is a setting available to App users. Ex. B, Rosellini Dep. at 51:10-16, 69:13-70:10; *see also* Ex. A, Rosellini Decl. ¶¶ 50, 51, 53.

**Plaintiff's Response: Admit**

146. Users may disable or enable video autoplay at any time. Ex. A, Rosellini Decl. ¶ 53; Ex. B, Rosellini Dep. at 138:14-139:16.

**Plaintiff's Response: Admit**

147. If autoplay is enabled, when a user opens an article with a video or multiple videos,

as those videos are scrolled into view, the videos will start playing automatically if the device is connected to WiFi. Ex. B, Rosellini Dep. at 69:13-70:10.

**Plaintiff's Response: Admit**

148. Even if autoplay is enabled, if the device is using a cellular connection, *i.e.*, not connected to WiFi, videos in an article require the user to tap to play them. Ex. B, Rosellini Dep. at 69:13-70:10.

**Plaintiff's Response: Admit**

149. When autoplay is enabled and the device is connected to WiFi, if an article includes a single video, additional videos continue to play after the initial video plays in an article if the user does not navigate away from the article. Ex. A, Rosellini Decl. ¶ 53; *see also* Ex. B, Rosellini Dep. at 51:10-16, 69:13-70:10.

**Plaintiff's Response: Admit**

150. The subject matter of any additional videos in an autoplay sequence can change depending on when a particular article is accessed, and could be on a different topic than the first video. Ex. A, Rosellini Decl. ¶ 53.

**Plaintiff's Response: Admit**

[redacted]

**Plaintiff's Response: Admit**

## VI. HTV'S USE OF BRAZE.

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## PLAINTIFF'S SEPARATE 56.1 STATEMENT OF FACTS

### I. DEFENDANT DISCLOSED PII TO BRAZE AND GOOGLE

[redacted]

[redacted]

[redacted]

[redacted]

## II. DEFENDANT DISCLOSED PII TO BRAZE FOR TARGETED MARKETING AND ANALYTICS

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

## IV. GEOLOCATION, E-MAIL ADDRESS, AND AAID ARE REASOANBLY AND FORSEEABLY LIKELY TO IDENTIFY CLASS MEMBERS

[redacted]

64. A 2013 study by Yves-Alexandre de Montjoye, et al. found that "four randomly selected spatio-temporal points are enough to uniquely identify 95% of the users in the dataset." Based on this, the authors concluded that "the uniqueness of human mobility traces is high and that mobility datasets are likely to be reidentifiable [*i.e.*, identification by first and last name] using information only on a few outside locations." Kopel Decl. Ex. 89 at 2.

65. Dr. de Montjoye and his colleagues noted that "[f]or re-identification purposes, outside observations could come from any publicly available information, such as an individual's home address, workplace address, or geo-localized tweets or pictures." Kopel Decl. Ex. 89 at 2.

66. Dr. de Montjoye's study [redacted]

[redacted]

68. "Humans follow simple reproducible patterns." Kopel Decl. Ex. 86 at 1.

[redacted]

[redacted]

80. Findings of peer reviewed studies by De Montjoye et al., and Golle and Partridge demonstrated the uniqueness of location trajectories and home-work pairs even when working with significantly more coarse-grained geolocation data than what is available in the HTV dataset. Kopel Decl. Ex. 6 ("Polakis Decl.") ¶ 29.

[redacted]

82. Table III from the Geolocation Study shows the various heuristics used by the data privacy research community in order to identify home and workplaces:

| | | Heuristic Description | Dataset | | Proposed by |
|---|---|---|---|---|---|
| | | | Top | Low | |
| Home | 1 | Cluster with the highest number of tweets | 72.3% | 67.8% | [16], [17], [35], [42] |
| | 2 | Most tweets between 20:00-8:00 | 72.1% | 66.4% | [48] |
| | 3 | Most tweets between 24:00-7:00 | 69.3% | 54.7% | [35] |
| | 4 | Last destination of the day (before 3am) | 73.3% | 64.8% | [35], [42] |
| | 5 | Last destination of the day (w/o days with tweets between 24:00-7:00) | 71.4% | 64.4% | [35] |
| | 6 | Weighted PageRank for destinations | 44.1% | 26.4% | [35] |
| | 7 | Weighted PageRank for origins | 37.5% | 20.9% | [35] |
| | 8 | Most popular cluster in terms of unique days, during the *Rest* (2:00-7:59) and *Leisure* (19:00-01:59) time frames | 73.1% | 64.9% | [22] |
| | 9 | WMFV (best reported time frame: 24:00-5:59) | 65% | 50.9% | [46] |
| | 10 | W-MEAN (best reported time frame: 24:00-5:59) | 0.6% | 14.7% | [46] |
| | 11 | W-MEDIAN (best reported time frame: 23:00-5:59) | 15.6% | 24.5% | [46] |
| | 12 | LPAuditor's Home detection without 2nd level clustering | 73.7% | 69.3% | this paper |
| | 13 | **LPAuditor's Home detection** | **92.2%** | **92.9%** | **this paper** |
| Work | 14 | Most popular cluster in terms of unique days, during the *Active* time frame (e.g., working hours, 08:00-18:59) | 33.2% | 48.9% | [22] |
| | 15 | Cluster with the second highest number of tweets | 18.5% | 22.8% | - |
| | 16 | LPAuditor's Work detection without 2nd level clustering | 32.2% | 30.4% | this paper |
| | 17 | **LPAuditor's Work detection** | **55%** | **57.6%** | **this paper** |

Kopel Decl. Ex. 77, Table III.

83. "After the home, the workplace is arguably the second most easily identifiable location in a trace." Kopel Decl. Ex. 76 at 391.

84. "It is natural to think of the top 2 locations as home and work for a large fraction of the population, but more generally the number … of top preferential locations determines the

power of an adversary and safety of a user's privacy. The more top locations an adversary knows about a target, the easier it is to identify the target." Kopel Decl. Ex. 90 at 2.

[redacted]

86. "Frequented locations (work, other commonly frequented locations like gyms, coffee shops, etc.) can be used as additional signals for identifying the user by differentiating between cohabiting users with the same "home & work pairs," including those that live in multi-residential complexes." Polakis Decl. ¶ 29.

87. The Geolocation Study revealed "cases of users that have relocated (e.g. after graduating), collect students living in dorm rooms during their first year and then moving to a house, and students that regularly visit their family home." Kopel Decl. Ex. 77 at 7.

[redacted]

89. The concept that individuals are likely to be identified and de-anonymized by cross-referencing external data sources against frequented locations is widely accepted within the community. Kopel Decl. Ex. 89 at 2; Kopel Decl. Ex. 90 at 146. Kopel Decl. Ex. 76 at 393; Kopel Decl. Ex. 77 at 2.

[redacted]

[redacted]

93. The New York Times ran a project in 2019 called the "Times Privacy Project" in which they identified people based on geolocation data provided to them. They concluded that: "Yes, the location data contains billions of data points with no identifiable information like names or email addresses. But it's child's play to connect real names to the dots that appear on the maps." Kopel Decl. Ex. 92; [redacted]

94. The Times Privacy Project stated that "In most cases, ascertaining a home location and an office location was enough to identify a person. Consider your daily commute: would any other smartphone travel directly between your house and your office every day?" Kopel Decl. Ex. 92.

[redacted]

97. A report from the Duke Sanford Cyber Policy Program "examines 10 major data brokers and the highly sensitive data they hold on U.S. individuals." This report shows that data brokers purport to provide access to individual's interests, buying activities, in-store purchase data, behavior, political behavior, geolocation data, travel vendors, and much more. Polakis Decl. ¶ 33.

[redacted]

99. A study by Dr. Polakis "empirically demonstrates how web services (e.g., social networking sites like Facebook and Twitter) can be used for automatically mapping users' emails

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

117. Plaintiff uses the WMUR App from his home multiple times per week. *See* Therrien Class Cert. Decl. ¶ 3.

[redacted]

120. Plaintiff regularly used the WMUR App from home between February 20, 2022 and August 27, 2023 to check the weather. HTV-0000633; Therrien Class Cert. Decl. ¶ 3.

[redacted]

[redacted]

126. Plaintiff kept location services enabled at all times on the WMUR app during the class period. Therrien Class Cert. Decl. ¶ 4.

[redacted]

[redacted]

131. The methodology from the Geolocation Study can reasonably be applied to the data in this case based on the established "similarities between the usage patterns of HTV apps and Twitter." Polakis Decl. ¶¶ 23, 30.

132. "There is nothing unique about the data in this case that would exempt it from the universal consensus of the privacy research community that there is no way to anonymize this level of precise geolocation information." Polakis Decl. ¶¶ 23, 30.

133. "Scientists routinely extend the proven principles and methodologies from studies to external datasets where they are expected to be comparable." Polakis Decl. ¶ 27.

134. "The reason privacy researchers conduct these studies is to inform about the real-world implications of dissemination of personally-identifying information in cases such as this." Polakis Decl. ¶ 27.

135. "There is nothing unique about the data in this case that would exempt it from the universal consensus of the privacy research community that there is no way to anonymize this level of precise geolocation information." Polakis Decl. ¶ 30.

[redacted]

[redacted]

140. The senior author of the Geolocation Study agrees with Dr. V.R.:

> Dr. Vallina-Rodriguez's comparison of the data at issue in this case with the data examined in the existing literature on this topic, including my own cited studies, persuasively demonstrates that the findings of those studies apply here with equal force. In this regard, I agree with Dr. Vallina-Rodriguez that the findings of my Geolocation Study demonstrate that users of the Hearst Apps are reasonably and foreseeably likely to be identified by disclosure of 250 spatiotemporal points.

Polakis Decl. ¶ 31.

[redacted]

[redacted]

146. The system from the Geolocation Study "does not take into consideration the content and semantics of the tweets posted, but only the temporal characteristics and distribution of the tweets in each cluster. It should be emphasized that our work focuses on location metadata and not the tweet content." Kopel Decl. Ex. 77 at 3.

147. In the Geolocation Study, the content of tweets was solely used in the Geolocation Study to validate and quantify the accuracy of the findings of application of the methodology to the sets of geolocation points. Kopel Decl. Ex. 77 at 6 ("While our home/work identification algorithms focus on spatio-temporal characteristics, creating the ground truth mandates an analysis of the tweets' content.").

148. The point of the ground truth in the Geolocation Study was to prove the effectiveness of the methodology so it could be used on other datasets. As the study's author explains:

> once a methodology or tool has been empirically tested and evaluated, other researchers can then also employ that tool as part of their research. If researchers had to create new ground truth datasets and re-evaluate every single previously-evaluated (peer-reviewed) technique for every new research study, scientific progress would come to a halt.

Polakis Decl. ¶ 27.

149. The results of the de-anonymization of class members can be validated:

> by seeing if separate pieces of HTV data can be mapped back to the same person. For instance, if analysis of an account's geolocation data leads to a specific name, and that same name is also separately found to be associated with the accompanying email address or mobile advertising ID from the HTV data, we can then confirm that the deanonymization process was correct.

[redacted]

[redacted]

159. "Misuse of location data can lead to damaged reputation, harassment, mugging, as well as attacks on an individual's home, friends or relatives." Kopel Decl. Ex. 76 at 16.

[redacted]

[redacted]

## V. THE COID/ARTID AND URL OF THE ARTICLES DISCLOSES THE VIDEOS REQUESTED OR OBTAINED BY CLASS MEMBERS, AS WELL AS THEIR SUBJECT MATTER

[redacted]

[redacted]

[redacted]

174. Defendant did not instruct Braze to retain Class Member data even after Defendant knew of its relevance following the action's commencement on May 5, 2023, nearly a year before the end (and amounting to approximately 38%) of the Class Period. ECF No. 1.

[redacted]

Dated: February 7, 2025

Respectfully submitted,

By: /s/ *Yitzchak Kopel*
Yitzchak Kopel

**BURSOR & FISHER, P.A.**
Yitzchak Kopel (*Pro Hac Vice*)
Max S. Roberts (*Pro Hac Vice*)

Victoria X. Zhou (*Pro Hac Vice*)
1330 Avenue of the Americas, 32nd Floor
New York, NY 10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
E-Mail: ykopel@bursor.com
mroberts@bursor.com
vzhou@bursor.com

**REARDON SCANLON LLP**
James J. Reardon, Jr.
45 South Main Street, 3rd Floor
West Hartford, CT 06107
Telephone: (860) 955-9455
Facsimile: (860) 920-5242
E-Mail: james.reardon@reardonscanlon.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2025, I electronically filed the foregoing document with the Court's CM/ECF system, which will provide e-mail notice to all counsel of record.

By: */s/ Yitzchak Kopel*
Yitzchak Kopel